# EXHIBIT 3

**SECURITY AGREEMENT FOR THE INSURANCE PROGRAM**

| Program Owners & Insureds[1] | Embraceor, LLC; WorkCentric, LLC; WorkCentric 2, LLC; and WorkCentric 3, LLC |
|---|---|
| Program Owner Address | 1900 Reston Metro Plaza, Suite 600, Reston, VA 20190 |
| Program Effective Date | January 1, 2023 |

This Security Agreement, dated as of the Effective Date, is given by the Program Owners, as identified above and in the Loss Fund Management Agreement, hereinafter referred to as "Pledgor," with its principal place of business address set forth above, and

In favor of **Sunz Insurance Solutions, LLC**, hereinafter referred to as "Secured Party", with an office address of 1301 Sixth Avenue West, Bradenton, Florida 34205. All capitalized terms used herein (including the preamble, recitals, exhibits and schedules hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Loss Fund Management Agreement or, if not defined therein, in the UCC. The following terms used herein (including the preamble) shall have the following meanings:

"**Accounts**" means all "accounts" as defined in Article 9 of the UCC.

"**Assigned Agreements**" means all contracts and other agreements to which any Pledgor is a party as of the date hereof, or to which any Pledgor becomes a party after the date hereof, including each Material Contract, as amended, restated, supplemented or otherwise modified from time to time.

"**Chattel Paper**" means all "chattel paper" as defined in Article 9 of the UCC, including "electronic chattel paper" and "tangible chattel paper", in each case, as defined in Article 9 of the UCC.

"**Collateral**" as defined in Section 1.

"**Collateral Records**" means all books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" means all property (whether real, personal or mixed) assigned, hypothecated, pledged or otherwise securing any Collateral, including any security agreement or other agreement granting a Lien in such real or personal property.

"**Commercial Tort Claims**" means all "commercial tort claims" as defined in Article 9 of the UCC.

"**Commodities Accounts**" means all "commodity accounts" as defined in Article 9 of the UCC.

"**Copyright Licenses**" means any and all agreements providing for the granting of any right in or to any Copyrights (whether any Pledgor is licensee or licensor thereunder).

"**Copyrights**" means all U.S. and foreign copyrights (including community designs), including copyrights in software and databases, and all "mask works" (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing, (i) all registrations and applications therefor, including the registrations and applications listed on Schedule 4.7(A), (ii) all extensions and renewals

---

[1] Included as a "Program Owner" shall be any subsequent entity endorsed as an additional named insured to any insurance policy(ies) where such subsequent entity, under NCCI's experience rating plan or the experience rating plan of the applicable rating bureau, may be deemed combinable with the listed Program Owners set forth herein.

thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

**"Deposit Accounts"** means all "deposit accounts" as defined in Article 9 of the UCC.

**"Documents"** means all "documents" as defined in Article 9 of the UCC.

**"Equipment"** means (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether classified as equipment under the UCC), and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

**"General Intangibles"** means (i) all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" as defined in Article 9 of the UCC, and (ii) all interest rate or currency protection or hedging arrangements and all other Hedge Agreements, all tax refunds, all licenses, permits, concessions and authorizations, all Assigned Agreements and all Intellectual Property (in each case, regardless of whether classified as general intangibles under the UCC).

**"Goods"** means (i) all "goods" as defined in Article 9 of the UCC and (ii) all Inventory and Equipment, in each case, regardless of whether classified as goods under the UCC.

**"Instruments"** means all "instruments" as defined in Article 9 of the UCC.

**"Insurance"** means all insurance policies covering any or all of the Collateral (regardless of whether Secured Party is a loss payee or a lender's loss payee thereof).

**"Intellectual Property"** means, collectively, (i) the Copyrights, (ii) the Copyright Licenses, (iii) the Patents, (iv) the Patent Licenses, (v) the Trademarks, (vi) the Trademark Licenses, (vii) the Trade Secrets, and (viii) the Trade Secret Licenses.

**"Inventory"** means (i) all "inventory" as defined in Article 9 of the UCC, (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Pledgor's business, (iii) all goods in which any Pledgor has an interest in mass or a joint or other interest or right of any kind, and (iv) all goods which are returned to or repossessed by any Pledgor, all computer programs or software embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether classified as inventory under the UCC).

**"Investment Accounts"** means, collectively, (i) the Securities Accounts, (ii) the Commodities Accounts, and (iii) the Deposit Accounts.

**"Investment Related Property"** means (i) all "investment property" as defined in Article 9 of the UCC, (ii) all Pledged Equity Interests, (iii) all Pledged Debt, (iv) all Investment Accounts, and (v) all certificates of deposit (in each case, regardless of whether classified as investment property under the UCC).

**"Letter of Credit Rights"** means all "letter-of-credit rights" as defined in Article 9 of the UCC.

**"Money"** means "money" as defined in Article 1 of the UCC.

**"Patent Licenses"** means any and all agreements providing for the granting of any right in or to any Patents (whether any Pledgor is licensee or licensor thereunder).

**"Patents"** means all U.S. and foreign patents and certificates of invention, or similar industrial property rights, and, with respect to any and all of the foregoing, (i) all patents and applications therefor, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past,

present and future infringements thereof, and (vi) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

**"Pledged Debt"** means all Indebtedness owed to any Pledgor, issued by the obligors named therein, the instruments evidencing such Indebtedness and all interest, Cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

**"Pledged Equity Interests"** means all (i) Pledged Stock, (ii) Pledged LLC Interests, (iii) Pledged Partnership Interests, and (iv) Pledged Trust Interests.

**"Pledged LLC Interests"** means (i) all interests in any limited liability company owned by any Pledgor, (ii) the certificates, if any, representing such limited liability company interests, (iii) any interest of any Pledgor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

**"Pledged Partnership Interests"** means (i) all interests in any general partnership, limited partnership, limited liability partnership or other partnership, in each case, owned by any Pledgor, (ii) the certificates, if any, representing such partnership interests, (iii) any interest of any Pledgor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

**"Pledged Stock"** means (i) all Capital Stock in any corporation owned by any Pledgor, (ii) the certificates, if any, representing such Capital Stock, (iii) any interest of any Pledgor on the books and records of such corporation or on the books and records of any securities intermediary pertaining to such Capital Stock, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Capital Stock.

**"Pledged Trust Interests"** means (i) all interests in any Delaware business trust or other trust owned by any Pledgor, (ii) the certificates, if any, representing such trust interests, (iii) any interest of any Pledgor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

**"Proceeds"** means (i) all "proceeds" as defined in Article 9 of the UCC, (ii) all payments or distributions made with respect to any Investment Related Property, and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

**"Receivables"** means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of the applicable Pledgor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

**"Receivables Records"** means (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing any Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices and other papers relating to any Receivables, including all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to any Receivables, whether in the possession or under the control of any Pledgor or any computer bureau or agent from

time to time acting for any Pledgor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements and other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments and other writings, including lien search reports, from filing or other registration offices, (iv) all credit information, reports and memoranda relating thereto, and (v) all other written or non-written forms of information related in any way to the foregoing or any Receivables.

"**Records**" means all "records" as defined in Article 9 of the UCC.

"**Securities Accounts**" means all "securities accounts" as defined in Article 8 of the UCC.

"**Supporting Obligations**" means all "supporting obligations" as defined in Article 9 of the UCC.

"**Trademark Licenses**" means any and all agreements providing for the granting of any right in or to any Trademarks (whether any Pledgor is licensee or licensor thereunder).

"**Trademarks**" means all U.S., state, territorial, provincial and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, trade styles, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature and, with respect to any and all of the foregoing, (i) all registrations and applications therefor, (ii) all extensions or renewals thereof, (iii) all of the goodwill of the business connected with the use thereof and symbolized thereby, (iv) all rights to sue for past, present and future infringements or dilutions thereof or for any injury to goodwill, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Trade Secret Licenses**" means any and all agreements providing for the granting of any right in or to any Trade Secrets (whether a Pledgor is licensee or licensor thereunder).

"**Trade Secrets**" means all trade secrets and all other confidential or proprietary information and know-how now or hereafter owned or used in, or contemplated at any time for use in, the business of any Pledgor, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating or referring in any way to such Trade Secret, including (i) all rights to sue for past, present and future misappropriations or other violations of such Trade Secret and (ii) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Florida or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"**United States**" or "**U.S.**" means the United States of America.

1. **Grant of Security Interest**. Each Pledgor hereby grants to Secured Party a security interest in and continuing lien on all of such Pledgor's right, title and interest in, to and under all of the following types of personal property of such Pledgor, in each case, whether now owned or existing or hereafter acquired or arising and wherever located (collectively, the **"Collateral"**):

    A. Accounts;
    B. Chattel Paper;
    C. Commercial Tort Claims;
    D. Documents;
    E. General Intangibles;
    F. Goods;
    G. Instruments;
    H. Insurance;

    I. Intellectual Property;

    J. Investment Related Property;

    K. Letter of Credit Rights;

    L. Money;

    M. Receivables and Receivables Records;

    N. to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

    O. to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

2. **Termination of Agreement and Security Interest**.  This Agreement, including the security interest granted herein by Pledgors, may terminate by mutual written agreement of the Parties upon Pledgor's satisfaction of all Obligations arising under or otherwise related to (a) any issued Insurance Policy(ies) and all endorsements thereto, (b) the Quotation, and (c) the Loss Fund Management Agreement(s) plus Pledgors' compliance with the Security Requirements, all of which, in addition to any renewals thereof, is referred to collectively as the Insurance Program.  Upon satisfaction of all obligations, Secured Party may, if requested by Pledgors, confirm in writing the termination of this Agreement and the security interest granted herein.

3. **Description of Obligation**.  The following Obligation is secured by this Agreement:

    A. All debts, obligations, liabilities, and agreements of Pledgors to Secured Party arising out of or related to the Insurance Program and any Insurance Policy(ies) issued thereunder including any renewal; and

    B. All costs and expenses incurred by Secured Party, including attorney's fees (whether or not suit is filed), to obtain, preserve, perfect, enforce, and defend this Security Agreement and maintain, preserve, collect, and realize upon the Collateral.

4. **Pledgor's Warranties**.  Pledgor hereby represents and warrants to Secured Party as follows:

    A. **Financing Statements**.  No financing statement covering the Collateral is or will be on file in any public office, except the financing statements relating to this security interest, and no security interest, other than the one herein created, has attached or been perfected in the Collateral or any part thereof.

    B. **Title to and Transfer of Collateral**.  Pledgor has rights in or the power to transfer the Collateral and its title to the Collateral is free of all adverse claims, liens, security interests and restrictions on transfer or pledge except as created by this Security Agreement.

    C. **Location, State of Incorporation and Name of Pledgor**.  Pledgor's chief executive office is located at the address set forth above, and Pledgor's exact legal name is as set forth on the first page of this Security Agreement.

    D. **Power and Authority**.  Pledgor has full power and authority to make this Agreement, and all necessary consents and approvals have been obtained to effectuate the validity of this Agreement.  Pledgor authorizes Secured Party to file a financing statement describing the Collateral with any appropriate filing office or officer and to take any action Secured Party deems necessary to perfect its interest in the Collateral including, but not limited to, obtaining control agreements with third parties in possession of any Collateral. In addition to Secured Party's rights herein, including but not limited to paragraph 5.M., at Secured Party's request, Pledgor agrees to take such actions as are necessary to properly perfect Secured Party's rights to the Collateral.

5. **Pledgor's Covenants**.  Until full payment and performance of every Obligation and termination or expiration of any obligation or commitment of Secured Party:

A. **Obligation and This Agreement**. Pledgor shall perform all its agreements herein and in any other agreements between it and Secured Party.

B. **Ownership and Maintenance of the Collateral**. Pledgor shall keep all tangible Collateral in good condition. Pledgor shall defend the Collateral against all claims and demands of all persons at any time claiming any interest therein adverse to Secured Party. Pledgor shall keep the Collateral free from all liens and security interests except those for taxes not yet due and the security interest hereby created.

C. **Insurance**. Pledgor shall insure the Collateral with companies acceptable to any lender with an interest in the Collateral ("Lender"). Such insurance shall be in an amount not less than the fair market value of the Collateral and shall be against such casualties, with such deductible amounts as Lender shall approve. All insurance policies shall be written for the benefit of Pledgor and Lender as their interests may appear, payable to Lender as loss payee, or in other form satisfactory to Lender, and such policies or certificates evidencing the same shall be furnished to Lender. All policies of insurance shall provide for written notice to Lender at least thirty (30) days prior to cancellation. Risk of loss or damage is Pledgor's to the extent of any deficiency in any effective insurance coverage.

D. **Risk of Loss**. Pledgor has all risk of loss of the Collateral.

E. **Secured Party's Costs**. Pledgor shall pay all costs, expenses and fees necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement, including attorney's fees (whether or not suit is filed) and other fees or expenses for which Pledgor is obligated to reimburse Secured Party in accordance with the terms of the Obligation Documents.

F. **Information and Inspection**. Pledgor shall (i) promptly furnish Secured Party any information with respect to the Collateral requested by Secured Party; (ii) allow Secured Party or its representatives to inspect the Collateral, at any time and wherever located, and to inspect and copy or furnish Secured Party or its representatives with copies of, all records relating to the Collateral and the Obligation; and (iii) promptly furnish Secured Party or its representatives such information as Secured Party may request to identify the Collateral, at the time and in the form requested by Secured Party.

G. **Additional Documents**. Pledgor shall sign and deliver any papers deemed necessary or desirable in the judgment of Secured Party to obtain, maintain, and perfect the security interest hereunder and to enable Secured Party to comply with any federal or state law in order to obtain or perfect Secured Party's interest in the Collateral or to obtain proceeds of the Collateral.

H. **Records of the Collateral**. Pledgor at all times shall maintain accurate books and records covering the Collateral. Secured Party is hereby given the right to audit the books and records of Pledgor relating to the Collateral at any time and from time to time. The amounts shown as owed to Pledgor on Pledgor's books and on any assignment schedule will be the undisputed amounts owing and unpaid.

I. **Disposition of the Collateral**. No Collateral may be sold, leased, made use of by a third party, or otherwise disposed of by Pledgor in any manner without the prior written consent of Secured Party.

J. **Accounts**. Each account held as Collateral will represent the valid and legally enforceable obligation of third parties and shall not be evidenced by any instrument or Chattel Paper.

K. **Change of Name/Status and Notice of Changes**. Without the written consent of Secured Party, Pledgor shall not change its name, identity, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise), chief executive office, type of organization or jurisdiction of organization or establish any trade names, in each case, without providing Secured Party with thirty (30) days prior written notice, change its corporate status, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise), chief executive office, type of organization or jurisdiction of organization, use any trade name, or engage in any business not reasonably related to its business as presently conducted. Pledgor shall notify Secured Party immediately of (i) any material change in the Collateral or the location of the Collateral, (ii) a change in Pledgor's location, (iii) a change in any matter warranted or represented by

Pledgor in this Agreement, or in any of the Obligation Documents or furnished to Secured Party pursuant to this Agreement, and (iv) the occurrence of an Event of Default (hereinafter defined).

- L. **Possession of the Collateral**. Pledgor waives presentment, notice of acceleration, demand, notice of dishonor, protest, and all other notices with respect thereto. Where Collateral is in the possession of a third party, Pledgor will join with Secured Party in notifying the third party of Secured Party's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of the Secured Party.

- M. **Power of Attorney**. Pledgor appoints Secured Party and any officer thereof as Pledgor's attorney-in-fact with full power in Pledgor's name and behalf to do every act which Pledgor is obligated to do or may be required to do hereunder; however, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall Secured Party be liable to Pledgor for failure to take any action hereunder. This appointment shall be deemed a power coupled with an interest and shall not be terminable as long as the Obligation is outstanding and shall not terminate on the disability or incompetence of Pledgor.

- N. **Other Parties and Other Collateral**. No renewal or extension of or any other indulgence with respect to the Obligation or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligation, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligation or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under the law, hereunder, or under any other agreement pertaining to the Collateral. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Obligation or seek to realize upon any other security for the Obligation, before foreclosing or otherwise realizing upon the Collateral. Pledgor waives any right to the benefit of or to require or control application of any other security or proceeds thereof, and agrees that Secured Party shall have no duty or obligation to Pledgor to apply to the Obligation any such other security or proceeds thereof.

- O. **Compliance with State and Federal Laws**. Pledgor will maintain its existence, good standing and qualification to do business, where required, and comply with all laws, regulations and governmental requirements, including without limitation, environmental laws applicable to it or any of its property, business operations and transactions.

6. **Rights and Powers of Secured Party**. Secured Party, after the occurrence of a Default, without liability to Pledgors may take control of the Collateral including, but not limited to, the customer lists; may take control of funds held as collateral held for paid loss, and may exercise all other rights which an owner of such Collateral may exercise; and at any time thereafter transfer any of the Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or any act or omission on the part of Secured Party, its officers, agents or employees, except for its or their own willful misconduct or gross negligence. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

7. **Default.**

- A. **Event of Default**. An event of default ("Event of Default") shall occur if: (i) Pledgor or any other obligor on all or part of the Obligation shall fail to timely and properly pay or observe, keep or perform any term, covenant, agreement or condition in this Agreement or in any other agreement between Pledgor and Secured Party, including any agreements comprising the Insurance Program or otherwise related to the Obligation (collectively, the "Obligation Documents"); or (ii) Pledgor becoming subject to any proceeding under the Bankruptcy Code or any similar remedy under the state statutory or common law.

- B. **Rights and Remedies**. If any Event of Default shall occur, then, in each and every such case, Secured Party may, without presentment, demand, or protest; notice of default, dishonor, demand, non-payment, or protest; notice of intent to accelerate all or any part of the Obligation; notice of acceleration of all or any

part of the Obligation; or notice of any other kind, all of which Pledgor hereby expressly waives, (except for any notice required under this Agreement, any other Loan Document or applicable law), at any time thereafter exercise and/or enforce any of the following rights and remedies at Secured Party's option:

  i. **Acceleration**.  The Obligation shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under the Obligation shall at Secured Party's option immediately cease and terminate.

  ii. **Possession and Collection of the Collateral**.  At its option: (a) take possession or control of, store, lease, operate, manage, sell or instruct any agent or broker to sell or otherwise dispose of all or any part of the Collateral; (b) notify all parties under any account or contract right forming all or any part of the Collateral to make any payments otherwise due to Pledgor directly to Secured Party; (c) in Secured Party's own name, or in the name of Pledgor, demand, collect, receive, sue for, and give receipts and releases for, any and all amounts due under such accounts and contract rights; (d) endorse as the agent of Pledgor any check, note, Chattel Paper, documents, or instruments forming all or any part of the Collateral; (e) make formal application for transfer to Secured Party (or to any assignee of Secured Party or to any purchaser of any of the Collateral) of all of Pledgor's permits, licenses, approvals, agreements, and the like relating to the Collateral; (f) take any other action which Secured Party deems necessary or desirable to protect and realize upon its security interest in the Collateral; and (g) in addition to the foregoing, and not in substitution therefor, exercise any one or more of the rights and remedies exercisable by Secured Party under any other provision of this Agreement, under any of the other Obligation Documents, or as provided by applicable law (including, without limitation, the Uniform Commercial Code as in effect in Florida (hereinafter referred to as the "UCC")).  Pledgor shall, upon Secured Party's demand, promptly make the Collateral available to Secured Party at a place designated by Secured Party, which place shall be reasonably convenient to both parties.

  iii. **Receiver**.  Obtain the appointment of a receiver for all or any of the Collateral, Pledgor hereby consenting to the appointment of such a receiver and agreeing not to oppose any such appointment.

  iv. **Right of Set Off**.  Without notice or demand to Pledgor, set off and apply against any and all of the Obligation any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to Pledgor.

8. **General.**

   A. **Parties Bound**.  Secured Party's rights hereunder shall inure to the benefit of its successors and assigns.  In the event of any assignment or transfer by Secured Party of any of the Obligation or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Obligation or the Collateral not so assigned or transferred.

   B. **Waiver.**  No delay of Secured Party in exercising any power or right shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.  Each right, power and remedy of Secured Party as provided for herein or in any of the Obligation Documents, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy.  The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

   C. **Agreement Continuing**.  This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Pledgor shall be closed at any time, shall be equally applicable to any new transactions thereafter.  Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.

D. **Definitions**. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 9 definitions apply.

E. **Waiver of Trial by Jury**.  To the extent permitted by law, Pledgor and Secured Party hereby waive trial by jury and any litigation brought by either of the parties hereto against the other on any manner arising out of or in any way connected with this Security Agreement.

F. **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF FLORIDA.**

G. **NOTICE OF FINAL AGREEMENT.  THIS WRITTEN SECURITY AGREEMENT AND THE OTHER OBLIGATION DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

H. **Confirmation of Arbitration and Confirmation of Choice of Law Pursuant to California Insurance Code section 11658.5**

1. The Parties have negotiated and agreed that Your Insurance Program is deemed made in the State of Florida and involves interstate commerce.  The choice of arbitration law negotiated pursuant to California Insurance Code section 11658.5 is the laws of the State of Florida.

2. Any arbitration shall take place in Florida unless the Parties mutually agree in writing to an alternative site.  The choice of arbitration venue negotiated pursuant to California Insurance Code section 11658.5 is Bradenton, Florida.

3. Program Owner acknowledges Sunz provided it with a "NOTICE OF DISPUTE RESOLUTION TERMS TO BE INCLUDED IN CERTAIN AGREEMENTS PURSUANT TO CALIFORNIA INSURANCE CODE SECTION 11658.5" and the terms of this Agreement reflect the final agreement of Program Owner and Sunz relating to the resolution of disputes under this Agreement.

4. For purposes of California, no claim coming within the authority of the Insurance Commissioner shall be subject to arbitration.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be duly executed by their duly authorized representatives as of the Effective Date.

**January 1, 2023**  ("Effective Date")

| | |
|---|---|
| **PLEDGOR – PROGRAM OWNER** | **SECURED PARTY:** |
| **EMBRACEOR, LLC; WORKCENTRIC, LLC; WORKCENTRIC 2, LLC; AND WORKCENTRIC 3, LLC** | **Sunz Insurance Solutions, LLC** |

**Sign**_____ S.a_____  **Sign**_____ Rick Leonard _____
                                                                                                    AF395F242B28447...
By: _____Sheldon Altschuler_____  [Printed Name:_____Rick Leonard_____
Title: _____President_____  [Title:_____President_____

**Attachment Clause on Following Page**

## Attachment Clause

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.
**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement Effective                Policy No.                          Endorsement No.
Insured                              Insurance Company

                    Countersigned by     _____