# EXHIBIT 8



**Author's Direct Info**
tbryant@sunzinsurance.com
941.900.4455

September 19, 2023

**Sent Via Next-Day and Email**
Found@immediate.com
David@workcentric.com
Sheldon@workcentric.com

Docks Sutherland - CEO
Embraceor, LLC / Workcentric 2, LLC/ WorkCentric 3, LLC / WC TopCo, LLC
1900 Reston Metro Plaza, Suite 600
Reston, CA  20190

David Harvey -  COO / Executive Vice-President
Embraceor, LLC / Workcentric 2, LLC/ WorkCentric 3, LLC / WC TopCo, LLC
1900 Reston Metro Plaza, Suite 600
Reston, CA  20190

Sheldon Altschuler - President
Embraceor, LLC / Workcentric 2, LLC/ WorkCentric 3, LLC / WC TopCo, LLC
1900 Reston Metro Plaza, Suite 600
Reston, CA  20190

Re:    **Notice of Default Under Promissory Note**

Gentlemen.

Please accept this letter as Notice of Default under the Commercial Promissory Note, dated July 18, 2023, in the principal amount of $13,993,287. A copy of the note is attached to this letter.

Pursuant to Section 2 of the Note, payment of the full principal amount was due no later than 5:00 pm (est) on Tuesday, September 12, 2023.  Payment was not received thus causing you to be in default under the Note.  Pursuant to Section 10 of the Note, please remedy this default no later than September 29, 2023.

Docks Sutherland / David Harvey / Sheldon Altschuler
September 19, 2023
Page 2 of 2

In the event you do not comply with your payment obligations SUNZ will proceed, as its right, under all agreements between SUNZ and you.  SUNZ reserves all rights in this regard.

Sincerely,

Theodore G. Bryant
Exec. V.P. / Chief Legal Officer

Enclosures

TGB/jw

cc:    Steven F. Herrig
        Rick Leonard

## COMMERCIAL PROMISSORY NOTE

**PRINCIPAL AMOUNT:  $ 13,993,287**                                   **July 18, 2023**
                                                                    **Bradenton, Florida**


FOR VALUE RECEIVED, Embraceor, LLC; WorkCentric 2, LLC; and WorkCentric 3, LLC with a principal place of business located at 1900 Reston Metro Plaza, Suite 600, Reston, VA 20190 and WC TopCo LLC, in its capacity as owner of the heretofore mentioned entities, with a principal place of business located at 174 West 4th Street, Unit 290 in New York, NY 10014 (referred to collectively as the "**Payor**"), jointly and severally hereby promises to pay to the order of SUNZ INSURANCE SOLUTIONS, LLC (the **"Payee"**), at its offices at 1301 6TH Avenue West in Bradenton, FL 34205, or such other place as the Payee shall designate in writing from time to time, the principal sum of thirteen million nine hundred ninety-three thousand two hundred eighty-seven dollars ($13,993,287.00) owed to Payee for all claim expenses, loss fund payment obligations, and other payment requirements arising under or otherwise related to the Insurance Program established by Payee on behalf of Payor ("**Principal Amount**")[1] together with interest thereon as hereinafter provided.

1.  **INTEREST RATE**.  Payee has agreed with Payor that interest shall be charged at twenty-five one hundredth of one percent (00.25 %) per year on the outstanding Principal Amount.

2.  **PAYMENT OF PRINCIPAL AND INTEREST**. Payor may make prepayment but, in any event, the full Principal Amount must be paid in full no later than 5:00 pm (EST) on Tuesday, September 12, 2023.

3.  **APPLICATION OF PAYMENTS**.  Except as otherwise specified herein, each payment or prepayment, if any, made under this Note shall be applied to pay late charges, accrued and unpaid interest, principal, escrows (if any), and any other fees, costs and expenses which Payor is obligated to pay under this Note, in such order as the Payee may elect from time to time in its sole discretion.

4.  **ADUSTMENT OF PRINCIPAL AMOUNT**.  [Omitted].

5.  **TENDER OF PAYMENT**.  All payments on this Note are payable on or before the due date thereof, at the office of the Payee specified above and shall be credited on the date the funds become available in lawful money of the United States. All sums payable to the Payee which are due on a day on which the Payee is not open for business shall be paid on the next succeeding business day and such extended time shall be included in the computation of interest.

6.  **LATE CHARGE**.  In the event any installment of principal or interest required to be made by Payor under this Note is not received by the Payee within five (5) days after its due date, Payee may require Payor to pay, on demand, a late charge of five percent (5%) of such delinquent payment. The foregoing right is in addition to, and not in limitation of, any other rights which the Payee may

---

[1] The terms and conditions of the Insurance Program are set forth in the Program Documents effective as of January 1, 2023.  The Program Documents consist of the Loss Fund Management Agreement, Quotation Agreement, Security Agreement, Guaranty, Claims Agreement, Large Risk Alternative Rating and Insurance Program Agreement, and Claims Value Schedule.

have upon Payor's failure to make timely payment of any amount due hereunder.

7.    **PREPAYMENT**. This Note may be prepaid, in whole or in part, at any time without penalty.

8.    **SECURITY FOR THE NOTE.**

8.1.    This Note is executed and delivered in accordance with a commercial transaction described herein. As security for the payment of the monies owing under this Note, Payor has delivered or has caused to be delivered to the Payee the Security Agreement executed of even date herewith by Payor in favor of the Payee (**"Security Agreement" – attached as Exhibit A**) on certain property of the Payor as more fully described in the Security Agreement.

8.2.    Payor hereby grants to the Payee a continuing security interest in all property of Payor, now or hereafter in the possession of the Payee, as security for the payment of this Note, which security interest shall be enforceable and subject to all the provisions of this Note, as if such property were specifically pledged hereunder.

8.3    The security interest used to secure this promissory note shall be extinguished once this Note is paid back and all obligations (other than any contingent claims that have not been asserted in writing) under this agreement have been satisfied.

9.    **DEFAULT RATE**. From and after the Maturity Date or from and after the occurrence of an Event of Default hereunder that is still continuing, irrespective of any declaration of maturity, all amounts remaining unpaid or thereafter accruing hereunder, shall, at Payee's option, bear interest at a default rate of ten percent (10%) per annum (the **"Default Rate"**), or the highest permissible rate under applicable usury law, whichever is less. Such default rate of interest shall be payable upon demand, but in no event later than when scheduled interest payments are due, and shall also be charged on the amounts owed by Payor to the Payee pursuant to any judgments entered in favor of the Payee with respect to this Note.

10.    **EVENTS OF DEFAULT**. Each of the following shall constitute an event of default hereunder (an **"Event of Default"**): (a) the failure of Payor to pay any amount of principal or interest hereunder within five (5) business days of the date same becomes due and payable; or (b) the occurrence of any other default in any term, covenant or condition hereunder that is not remedied within fifteen (15) days of the occurrence or any Event of Default under the Security Agreement or the Pledge Agreement or any other Program Document, that continues beyond any applicable notice and/or cure period.

11.    **REMEDIES**. If an Event of Default exists, the Payee may exercise any right, power or remedy permitted by law or as set forth herein or in the Program Documents or any other Document including, without limitation, the right to declare the entire unpaid principal amount hereof and all interest accrued hereon, and all other sums secured by the Security Agreement of any other Program Document, to be, and such principal, interest and other sums shall thereupon become, immediately due and payable.

12.    **MISCELLANEOUS**.

12.1.    **Integration**. Except for any obligations under the Program Documents that remain after

its termination, this Note and the Security Agreement constitute the sole agreement of the parties with respect to the transaction contemplated hereby and supersede all oral negotiations and prior writings with respect thereto if not referenced herein specifically.

12.2.   **Attorneys' Fees and Expenses**.  If the Payee retains the services of counsel by reason of an Event of Default hereunder or under the Security Agreement that is continuing, or any of the other Program Document, or on account of any matter involving this Note, or for examination of matters subject to the Payee's approval, all reasonable costs of suit and all reasonable attorneys' fees and such other reasonable expenses so incurred by the Payee, including post-trial and appellate proceedings, shall be paid by Payor, on demand, and shall be deemed part of the obligations evidenced hereby.

12.3.   **No Implied Waiver**.  The Payee shall not be deemed to have modified or waived any of its rights or remedies hereunder unless such modification or waiver is in writing and signed by the Payee, and then only to the extent specifically set forth therein.  A waiver in one event shall not be construed as continuing or as a waiver of or bar to such right or remedy in a subsequent event.  After any acceleration of, or the entry of any judgment on, this Note, the acceptance by the Payee of any payments by or on behalf of Payor on account of the indebtedness evidenced by this Note shall not cure or be deemed to cure any Event of Default or reinstate or be deemed to reinstate the terms of this Note absent an express written agreement duly executed by the Payee and Payor.

12.4.   **Waiver**.  Payor, jointly and severally, waives demand, notice, presentment, protest, demand for payment, notice of dishonor, notice of protest and diligence of collection of this Note.  The liability of Payor shall not be affected by the failure of the Payee to perfect or otherwise obtain or maintain the priority or validity of any security interest in any collateral.  The liability of Payor shall be absolute and unconditional and without regard to the liability of any other party hereto.

12.5   **No Usurious Amounts**.  Anything herein contained to the contrary notwithstanding, it is the intent of the parties that Payor shall not be obligated to pay interest hereunder at a rate which is in excess of the maximum rate permitted by law.  If by the terms of this Note, Payor is at any time required to pay interest at a rate in excess of such maximum rate, the rate of interest under this Note shall be deemed to be immediately reduced to such maximum legal rate and the portion of all prior interest payments in excess of such maximum legal rate shall be applied to and shall be deemed to have been payments in reduction of the outstanding principal balance, unless Payor shall notify the Payee, in writing, that Payor elects to have such excess sum returned to it forthwith.  Payor agrees that in determining whether or not any interest payable under this Note exceeds the highest rate permitted by law, any non-principal payment, including without limitation, late charges, shall be deemed to the extent permitted by law to be an expense, fee or premium rather than interest.  In addition, the Payee may, in determining the maximum rate of interest allowed under applicable law, as amended from time to time, take advantage of: (i) the rate of interest permitted by Section 687.12 Florida Statues ("Interest rates; parity among licensed Payees or creditors") and 12 United States Code, Sections 85 and 86, and (ii) any other law, rule or regulation in effect from time to time, available to the Payee which exempts the Payee from any limit upon the rate of interest it may charge or grants to the Payee the right to charge a higher rate of interest than allowed by Florida

Statutes, Chapter 687.

12.6    **Partial Invalidity**.  The invalidity or unenforceability of any one or more provisions of this Note shall not render any other provision invalid or unenforceable.  In lieu of any invalid or unenforceable provision, there shall be added automatically a valid and enforceable provision as similar in terms to such invalid or unenforceable provision as may be possible.

12.7    **Binding Effect**.  The covenants, conditions, waivers, releases and agreements contained in this Note shall bind, and the benefits thereof shall inure to, the parties hereto and their respective heirs, executors, administrators, successors and assigns; provided, however, that this Note cannot be assigned, sold, or otherwise transferred in any respect by Payor or Payee without the prior written consent of the Payee or Payor, as the case may be, and any such assignment or attempted assignment by Payor or Payee shall be void and of no effect with respect to the Payee or Payor, as the case may be.

12.8    **Modifications**.  This Note may not be supplemented, extended, modified or terminated except by an agreement in writing signed by the party against whom enforcement of any such waiver, change, modification or discharge is sought.

12.9    **Sales or Participations**.  [Omitted.]

12.10.    **Jurisdiction**.  Payor irrevocably appoints each and every owner, director, shareholder, partner and/or officer of Payor as its attorneys upon whom may be served, by regular or certified mail, any notice, process or pleading in any action or proceeding against it arising out of or in connection with this Note, the Security Agreement, or any other Program Document.  Any judicial proceeding brought against any of the parties to this Note on any dispute arising out of this Note or other Program Document may only be brought in any court of competent jurisdiction situated in Manatee County, Florida, and each of the parties to this Note accepts for itself the exclusive jurisdiction of the aforesaid courts.

12.11    **Notices**.  All notices and communications under this Note shall be in writing and shall be given by either (a) hand-delivery, (b) first class mail (postage prepaid), or (c) reliable overnight commercial courier (charges prepaid), to the parties at their addresses as first listed above.  Notice shall be deemed to have been given and received: (i) if by hand delivery, upon delivery; (ii) if by mail, three (3) calendar days after the date first deposited in the United States mail; and (iii) if by overnight courier, on the date scheduled for delivery.  A party may change its address by giving written notice to the other party as specified herein.

12.12.    **Governing Law**.  This Note shall be governed solely by and construed exclusively in accordance with the substantive laws of the State of Florida without reference to conflict of laws principles.

12.13. **WAIVER OF JURY TRIAL. PAYOR KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS PAYOR MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON, ARISING OUT OF, OR IN ANY WAY RELATED TO THIS NOTE OR ANY OTHER AGREEMENT BETWEEN THE PARTIES. NO PAYOR SHALL HAVE ANY LIABILITY TO PAYEE OR ANY OTHER PERSON FOR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, LOST PROFITS OR PUNITIVE DAMAGES.**

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

**I**N **WITNESS WHEREOF**, Payor, intending to be legally bound, has duly executed and delivered this Note as of the day and year first above written.

**Embraceor, LLC; WorkCentric 2, LLC; and WorkCentric 3, LLC PAYOR**

Sign_____

*David Harvey*

Printed Name:_____David Harvey_____

Title:_____Exec. V.P. / COO_____

Date:_____July 20, 2023 | 6:39 AM PDT

**WC TOPCO, LLC PAYOR**

Sign_____

*David Harvey*

Printed Name:_____David Harvey_____

Title:_____Exec. V.P. / COO_____

Date:_____July 20, 2023 | 6:39 AM PDT

Documentary Stamp Tax has been paid by Payor

# Exhibit A

# Security Agreement

## SECURITY AGREEMENT

This Security Agreement (this "Agreement"), dated as of the Effective Date, as identified in the Commercial Promissory Note in the amount of $10,148,487.00 executed by the Pledgor concurrently with this Agreement (the "**Promissory Note**"), is given by Pledgor, as identified below, in favor of **Sunz Insurance Solutions, LLC**, hereinafter referred to as "Secured Party", with an office address of 1301 Sixth Avenue West, Bradenton, Florida 34205.

> **Pledgor**:   Embraceor, LLC; WorkCentric 2, LLC; WorkCentric 3, LLC; and WC TopCo LLC.

> **Address**:   1900 Reston Metro Plaza, Suite 600, Reston, VA 20190 and at 174 West 4th Street, Unit 290 in New York, NY 10014.

Pledgor and Secured Party agree as follows:

Subject to Section 2 hereof, this Agreement and the rights hereby granted by Pledgor to the Secured Party in the Collateral shall terminate automatically, and without any further action, upon the payment in full of all principal and accrued interest covered by the Promissory Note. The Secured Party will issue and file a UCC- 3 Termination Statement with the Secretary of State of any State in which it filed a UCC-1 Financing Statement.

All capitalized terms used herein (including the preamble, recitals, exhibits and schedules hereto) and not otherwise defined herein shall have the meanings ascribed thereto in that certain Loss Fund Management Agreement ("Loss Fund Management Agreement"), among SUNZ Insurance Solutions, LLC and SUNZ Insurance Company ("SUNZ") and Embraceor, LLC; WorkCentric, LLC; WorkCentric 2, LLC; and WorkCentric 3, LLC ("Pledgor"), dated as of January 1, 2023 (the "Effective Date"), or if not defined therein, in the UCC. The following terms used herein (including the preamble) shall have the following meanings:

"**Accounts**" means all "accounts" as defined in Article 9 of the UCC.

"**Assigned Agreements**" means all contracts and other agreements to which any Pledgor is a party as of the date hereof, or to which any Pledgor becomes a party after the date hereof, including each Material Contract, as amended, restated, supplemented or otherwise modified from time to time.

"**Chattel Paper**" means all "chattel paper" as defined in Article 9 of the UCC, including "electronic chattel paper" and "tangible chattel paper", in each case, as defined in Article 9 of the UCC.

"**Collateral**" shall have the meaning set forth in Section 1. For purposes of clarity, it is understood and agreed that Collateral shall not include any Excluded Collateral.

"**Collateral Records**" means all books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" means all property (whether real, personal or mixed) assigned, hypothecated, pledged or otherwise securing any Collateral, including any security agreement or other agreement

granting a Lien in such real or personal property.

**"Commercial Tort Claims"** means all "commercial tort claims" as defined in Article 9 of the UCC.

**"Commodities Accounts"** means all "commodity accounts" as defined in Article 9 of the UCC.

**"Copyright Licenses"** means any and all agreements providing for the granting of any right in or to any Copyrights (whether any Pledgor is licensee or licensor thereunder).

**"Copyrights"** means all U.S. and foreign copyrights (including community designs), including copyrights in software and databases, and all "mask works" (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing, (i) all registrations and applications therefor, including the registrations and applications listed on Schedule 4.7(A), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

**"Deposit Accounts"** means all "deposit accounts" as defined in Article 9 of the UCC.

**"Documents"** means all "documents" as defined in Article 9 of the UCC.

**"Equipment"** means (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, fixtures and tools (in each case, regardless of whether classified as equipment under the UCC), and (iii) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

**"Equity Interests"** means all (i) Stock, (ii) LLC Interests, (iii) Partnership Interests, (iv) Trust Interests; and (v) and any other interest, participation or other ownership, management or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting, in each case including all voting and economic rights (including the right to receive a share of the profits and losses of, or distributions of property) related thereto.

"**Event of Default**" shall have the meaning set forth in Section 7A.

"**Excluded Collateral**" means the Equity Interest and the Intellectual Property now or hereafter property of the Pledgor, and the Proceeds and products of any of the foregoing or any other personal property not specifically designated as Collateral.

**"General Intangibles"** means (i) all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" as defined in Article 9 of the UCC, and (ii) all interest rate or currency protection or hedging arrangements and all other Hedge Agreements, all tax refunds, all licenses, permits, concessions and authorizations, and all Assigned Agreements (in each case, regardless of whether classified as general intangibles under the UCC).

**"Goods"** means (i) all "goods" as defined in Article 9 of the UCC and (ii) all Inventory and Equipment, in each case, regardless of whether classified as goods under the UCC.

"**Instruments**" means all "instruments" as defined in Article 9 of the UCC.

"**Insurance**" means all insurance policies covering any or all of the Collateral (regardless of whether Secured Party is a loss payee or a lender's loss payee thereof).

"**Intellectual Property**" means, collectively, (i) the Copyrights, (ii) the Copyright Licenses, (iii) the Patents, (iv) the Patent Licenses, (v) the Trademarks, (vi) the Trademark Licenses, (vii) the Trade Secrets, and (viii) the Trade Secret Licenses.

"**Inventory**" means (i) all "inventory" as defined in Article 9 of the UCC, (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or furnished, all raw materials, work in process, finished goods and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Pledgor's business, (iii) all goods in which any Pledgor has an interest in mass or a joint or other interest or right of any kind, and (iv) all goods which are returned to or repossessed by any Pledgor, all computer programs or software embedded in any goods and all accessions thereto and products thereof (in each case, regardless of whether classified as inventory under the UCC).

"**Investment Accounts**" means, collectively, (i) the Securities Accounts, (ii) the Commodities Accounts, and (iii) the Deposit Accounts.

"**Investment Related Property**" means (i) all "investment property" as defined in Article 9 of the UCC, (ii) all Pledged Equity Interests, (iii) all Pledged Debt, (iv) all Investment Accounts, and (v) all certificates of deposit (in each case, regardless of whether classified as investment property under the UCC).

"**Letter of Credit Rights**" means all "letter-of-credit rights" as defined in Article 9 of the UCC.

"**Money**" means "money" as defined in Article 1 of the UCC.

"**Patent Licenses**" means any and all agreements providing for the granting of any right in or to any Patents (whether any Pledgor is licensee or licensor thereunder).

"**Patents**" means all U.S. and foreign patents and certificates of invention, or similar industrial property rights, and, with respect to any and all of the foregoing, (i) all patents and applications therefor, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, and (vi) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Person**" means any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**Pledged Debt**" means all Indebtedness owed to any Pledgor, issued by the obligors named therein, the instruments evidencing such Indebtedness and all interest, Cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

**"LLC Interests"** means (i) all interests in any limited liability company owned by any Pledgor, (ii) the certificates, if any, representing such limited liability company interests, (iii) any interest of any Pledgor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

**"Partnership Interests"** means (i) all interests in any general partnership, limited partnership, limited liability partnership or other partnership, in each case, owned by any Pledgor, (ii) the certificates, if any, representing such partnership interests, (iii) any interest of any Pledgor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

**"Proceeds"** means (i) all "proceeds" as defined in Article 9 of the UCC, (ii) all payments or distributions made with respect to any Investment Related Property, and (iii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

**"Receivables"** means all rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Related Property, together with all of the applicable Pledgor's rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records.

**"Receivables Records"** means (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing any Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices and other papers relating to any Receivables, including all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to any Receivables, whether in the possession or under the control of any Pledgor or any computer bureau or agent from time to time acting for any Pledgor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements and other modifications thereto, notices to other creditors or secured parties, and certificates, acknowledgments and other writings, including lien search reports, from filing or other registration offices, (iv) all credit information, reports and memoranda relating thereto, and (v) all other written or non-written forms of information related in any way to the foregoing or any Receivables.

**"Records"** means all "records" as defined in Article 9 of the UCC.

**"Securities Accounts"** means all "securities accounts" as defined in Article 8 of the UCC.

**"Stock"** means (i) all Capital Stock in any corporation owned by any Pledgor, (ii) the certificates, if any, representing such Capital Stock, (iii) any interest of any Pledgor on the books and records of such corporation or on the books and records of any securities intermediary pertaining to such Capital Stock, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in

exchange for any or all of such Capital Stock.

"**Supporting Obligations**" means all "supporting obligations" as defined in Article 9 of the UCC.

"**Trademark Licenses**" means any and all agreements providing for the granting of any right in or to any Trademarks (whether any Pledgor is licensee or licensor thereunder).

"**Trademarks**" means all U.S., state, territorial, provincial and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, trade styles, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature and, with respect to any and all of the foregoing, (i) all registrations and applications therefor, (ii) all extensions or renewals thereof, (iii) all of the goodwill of the business connected with the use thereof and symbolized thereby, (iv) all rights to sue for past, present and future infringements or dilutions thereof or for any injury to goodwill, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Trade Secret Licenses**" means any and all agreements providing for the granting of any right in or to any Trade Secrets (whether a Pledgor is licensee or licensor thereunder).

"**Trade Secrets**" means all trade secrets and all other confidential or proprietary information and know-how now or hereafter owned or used in, or contemplated at any time for use in, the business of any Pledgor, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating or referring in any way to such Trade Secret, including (i) all rights to sue for past, present and future misappropriations or other violations of such Trade Secret and (ii) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Trust Interests**" means (i) all interests in any Delaware business trust or other trust owned by any Pledgor, (ii) the certificates, if any, representing such trust interests, (iii) any interest of any Pledgor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest, and (iv) all dividends, distributions, Cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Florida or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"**United States**" or "**U.S.**" means the United States of America.

1. **Grant of Security Interest**. Each Pledgor hereby grants to Secured Party a security interest in and continuing lien on all of such Pledgor's right, title and interest in, to and under all of the following types of personal property of such Pledgor, in each case, whether now owned or existing or hereafter acquired or arising and wherever located (collectively, the "Collateral"):

   A. Accounts;

   B. Chattel Paper;

C.  Commercial Tort Claims;

D.  Documents;

E.  General Intangibles;

F.  Goods;

G.  Instruments;

H.  Insurance;

I.  Letter of Credit Rights;

J.  Money;

K.  Receivables and Receivables Records;

L.  To the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

M.  To the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

Notwithstanding the provisions of this Section 1, such grant of security interest shall not extend to, and the term "Collateral" shall not include, any Excluded Collateral.

2.  **Termination of Agreement and Security Interest**.

A.  Notwithstanding anything in this Agreement or otherwise to the contrary, this Agreement and the rights hereby granted herein by Pledgor to the Secured Party in the Collateral, including the security interest, shall terminate (i) automatically, and without any further action, upon the payment in full of all principal and accrued interest covered by the Promissory Note; and (ii) by mutual agreement of the Parties upon Pledgor's satisfaction of all Obligations arising under or otherwise related to (a) any issued Policy(ies) and all endorsements thereto, (b) the Quotation, and (c) the Loss Fund Management Agreement(s) plus Pledgors' compliance with the Security Requirements, all of which, in addition to any renewals thereof, is referred to collectively as the Insurance Program.

B.  Upon request of the Borrower, the Secured Party will issue and file (i) a UCC-3 Termination Statement with the Secretary of State of any State in which it filed a UCC-1 Financing Statement and (ii) such other documentation as shall be reasonably requested by the Borrower to evidence the termination of this Agreement and the termination and release of any security interests on the Collateral.

3.  **Description of Obligation**. The following Obligation is secured by this Agreement:

A.  The payment of: all present and future indebtedness of Pledgor to Secured Party pursuant to the financial transaction evidenced by the Promissory Note and the fulfillment by Pledgor of the other terms of this Agreement and the Promissory Note; and

B.  All costs and expenses incurred by Secured Party, including attorney's fees (whether or not suit is filed), to obtain, preserve, perfect, enforce, and defend this Security Agreement and maintain, preserve, collect, and realize upon the Collateral.

4. **Pledgor's Warranties**. Pledgor hereby represents and warrants to Secured Party as follows:

A. **Financing Statements**. No financing statement covering the Collateral is or will be on file in any public office, except the financing statements relating to this security interest, and no security interest, other than the one herein created, has attached or been perfected in the Collateral or any part thereof.

B. **Title to and Transfer of Collateral**. Pledgor has rights in or the power to transfer the Collateral and its title to the Collateral is free of all adverse claims, liens, security interests and restrictions on transfer or pledge except as created by this Security Agreement.

C. **Location, State of Incorporation and Name of Pledgor**. Pledgor's chief executive office is located at the address set forth above, and; Pledgor's exact legal name is as set forth on the first page of this Security Agreement.

D. **Power and Authority**. Pledgor has full power and authority to make this Agreement, and all necessary consents and approvals have been obtained to effectuate the validity of this Agreement. Pledgor authorizes Secured Party to file a financing statement describing the Collateral with any appropriate filing office or officer and to take any action Secured Party deems necessary to perfect its interest in the Collateral including, but not limited to, obtaining control agreements with third parties in possession of any Collateral. In addition to Secured Party's rights herein, including but not limited to paragraph 6.M., at Secured Party's request, Pledgor agrees to take such actions as are necessary to properly perfect Secured Party's rights to the Collateral.

5. **Pledgor's Covenants**. Until full payment and performance of every Obligation and termination of the Promissory Note:

A. **Obligation and This Agreement**. Pledgor shall perform in all material respects all its agreements herein and in any other agreements between it and Secured Party.

B. **Ownership and Maintenance of the Collateral**. Pledgor shall keep all tangible Collateral in good condition. Pledgor shall defend reasonably the Collateral against all material claims and demands of all persons at any time claiming any interest therein adverse to Secured Party. Pledgor shall keep the Collateral free from all liens and security interests except those for taxes not yet due and the security interest hereby created.

C. **Insurance**. Pledgor shall insure the Collateral with companies acceptable to Lender. Such insurance shall be in an amount not less than the fair market value of the Collateral and shall be against such casualties, with such deductible amounts as Lender shall approve. All insurance policies shall be written for the benefit of Pledgor and Lender as their interests may appear, payable to Lender as loss payee, or in other form satisfactory to Lender, and such policies or certificates evidencing the same shall be furnished to Lender. All policies of insurance shall provide for written notice to Lender at least thirty (30) days prior to cancellation. Risk of loss or damage is Pledgor's to the extent of any deficiency in any effective insurance coverage.

D. **Risk of Loss**. Pledgor has all risk of loss of the Collateral.

E. **Secured Party's Costs**. Pledgor shall pay all reasonable costs, expenses and fees necessary to obtain, preserve, perfect, defend and enforce the security interest created by this Agreement,

including attorney's fees (whether or not suit is filed) and other reasonable fees or expenses for which Pledgor is obligated to reimburse Secured Party in accordance with the terms of the Obligation Documents.

F.  **Information and Inspection**. Pledgor shall (i) promptly furnish Secured Party any reasonable, non-privileged information with respect to the Collateral requested by Secured Party, to the extent such information is not privileged, proprietary or the like and so long as such information is available without undue burden; (ii) if an Event of Default has occurred and is continuing for more than 20 business days, allow Secured Party or its representatives to inspect the Collateral, at any time and wherever located, and to inspect and copy or furnish Secured Party or its representatives with copies of, all records relating to the Collateral and the Obligation; and (iii) promptly furnish Secured Party or its representatives such information as Secured Party may request to identify the Collateral, at the time and in the form requested by Secured Party.

G.  **Additional Documents**. Pledgor shall sign and deliver any papers deemed reasonably necessary or desirable in the judgment of Secured Party to obtain, maintain, and perfect the security interest hereunder and to enable Secured Party to comply in all material respects with any material and applicable federal or state law in order to obtain or perfect Secured Party's interest in the Collateral or to obtain proceeds of the Collateral.

H.  **Records of the Collateral**. Pledgor at all times shall maintain reasonably accurate books and records covering the Collateral. Secured Party is hereby given the right to audit the books and records of Pledgor relating to the Collateral at any time and from time to time during the existence of an Event of Default that has occurred and is continuing. The amounts shown as owed to Pledgor on Pledgor's books and on any assignment schedule will be the undisputed amounts owing and unpaid absent manifest error.

I.  **Accounts**. Each material account held as Collateral will represent the valid and legally enforceable obligation of third parties and shall not be evidenced by any instrument or Chattel Paper.

J.  **Change of Name/Status and Notice of Changes**. Without the written consent of Secured Party, Pledgor shall not change its name without providing Secured Party with ten (10) days prior written notice, change its corporate status, change the state where it is located, use any trade name or engage in any business not reasonably related to its business as presently conducted. Pledgor shall notify Secured Party immediately of (i) any material change in the Collateral or the location of the Collateral, (ii) a change in Pledgor's location, (iii) a change in any matter warranted or represented by Pledgor in this Agreement, or in any of the Obligation Documents or furnished to Secured Party pursuant to this Agreement, and (iv) the occurrence of an Event of Default (hereinafter defined).

K.  **Possession of the Collateral**. Pledgor waives presentment, notice of acceleration, demand, notice of dishonor, protest, and all other notices with respect thereto. Where Collateral is in the possession of a third party, if an event of default has occurred and is continuing for more than 20 business days, Pledgor will join with Secured Party in notifying the third party of Secured Party's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of the Secured Party.

L.  **Power of Attorney**. Pledgor appoints Secured Party and any officer thereof as Pledgor's attorney-in-fact with full power in Pledgor's name and behalf to do every act which Pledgor is obligated to

DocuSign Envelope ID: 4B6DE92C-8530-4BB9-A9AC-72CC7824F8BC

do or may be required to do hereunder following the occurrence and solely during the continuance of an Event of Default that has been continuing for more than 20 business days; however, nothing in this paragraph shall be construed to obligate Secured Party to take any action hereunder nor shall Secured Party be liable to Pledgor for failure to take any action hereunder. This appointment shall be deemed a power coupled with an interest and shall not be terminable as long as the Obligation is outstanding and shall not terminate on the disability or incompetence of Pledgor.

M. **Other Parties and Other Collateral**. No renewal or extension of or any other indulgence with respect to the Obligation or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligation, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligation or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Secured Party under the law, hereunder, or under any other agreement pertaining to the Collateral. Secured Party need not file suit or assert a claim for personal judgment against any person for any part of the Obligation or seek to realize upon any other security for the Obligation, before foreclosing or otherwise realizing upon the Collateral. Pledgor waives any right to the benefit of or to require or control application of any other security or proceeds thereof, and agrees that Secured Party shall have no duty or obligation to Pledgor to apply to the Obligation any such other security or proceeds thereof.

N. **Compliance with State and Federal Laws**. Pledgor will maintain its existence, good standing and qualification to do business, where required, and comply in all material respects with all applicable and material laws, regulations and governmental requirements, including without limitation, environmental laws applicable to it or any of its property, business operations and transactions.

6. **Rights and Powers of Secured Party**. Secured Party, during the continuance of an Event of Default, without liability to Pledgors may take control of the Collateral including, but not limited to, the customer lists; may take control of funds held as collateral held for paid loss, and may exercise all other rights which an owner of such Collateral may exercise; and at any time thereafter transfer any of the Collateral or evidence thereof into its own name or that of its nominee. Secured Party shall not be liable for failure to collect any account or instruments, or any act or omission on the part of Secured Party, its officers, agents or employees, except for its or their own willful misconduct or gross negligence. The foregoing rights and powers of Secured Party will be in addition to, and not a limitation upon, any rights and powers of Secured Party given by law, elsewhere in this Agreement, or otherwise.

7. **Default.**

A. **Event of Default**. An Event of Default wherever used herein, shall mean an "Event of Default" as such term is defined in the Promissory Note.

B. **Rights and Remedies**. If any Event of Default has occurred and is continuing, then, in each and every such case, Secured Party may, without presentment, demand, or protest; notice of default, dishonor, demand, non-payment, or protest; notice of intent to accelerate all or any part of the Obligation; notice of acceleration of all or any part of the Obligation; or notice of any other kind, all of which Pledgor hereby expressly waives, (except for any notice required under this

Agreement, any other Loan Document or applicable law); at any time thereafter exercise and/or enforce any of the following rights and remedies at Secured Party's option  (so long as an Event of Default is continuing):

i.   **Acceleration**. The Obligation shall, at Secured Party's option, become immediately due and payable, and the obligation, if any, of Secured Party to permit further borrowings under the Obligation shall at Secured Party's option immediately cease and terminate.

ii.  **Possession and Collection of the Collateral**. At its option: (a) take possession or control of, store, lease, operate, manage, sell or instruct any agent or broker to sell or otherwise dispose of all or any part of the Collateral; (b) upon 10 days prior notice to Pledgor, notify all parties under any account or contract right forming all or any part of the Collateral to make any payments otherwise due to Pledgor directly to Secured Party; (c) in Secured Party's own name, or in the name of Pledgor, demand, collect, receive, sue for, and give receipts and releases for, any and all amounts due under such accounts and contract rights; (d) endorse as the agent of Pledgor any check, note, Chattel Paper, documents, or instruments forming all or any part of the Collateral; (e) make formal application for transfer to Secured Party (or to any assignee of Secured Party or to any purchaser of any of the Collateral) of all of Pledgor's permits, licenses, approvals, agreements, and the like relating to the Collateral; (f) take any other action which Secured Party deems necessary or desirable to protect and realize upon its security interest in the Collateral; and (g) in addition to the foregoing, and not in substitution therefor, exercise any one or more of the rights and remedies exercisable by Secured Party under any other provision of this Agreement, under any of the other Obligation Documents, or as provided by applicable law (including, without limitation, the Uniform Commercial Code as in effect in Florida (hereinafter referred to as the "UCC")). Pledgor shall, upon Secured Party's demand, promptly make the Collateral available to Secured Party at a place designated by Secured Party, which place shall be reasonably convenient to both parties.

iii. **Receiver**. Obtain the appointment of a receiver for all or any of the Collateral, Pledgor hereby consenting to the appointment of such a receiver and agreeing not to oppose any such appointment.

iv.  **Right of Set Off**. Without notice or demand to Pledgor, set off and apply against any and all of the Obligation any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to Pledgor.

8.  **General.**

A.  **Parties Bound**. Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Obligation or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Obligation or the Collateral not so assigned or transferred, provided that Secured Party shall not be permitted to assign this Agreement or any rights hereunder without the prior written consent of Pledgor.

B.  **Waiver.** No delay of Secured Party in exercising any power or right shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude other or further

exercise thereof or the exercise of any other power or right. Each right, power and remedy of Secured Party as provided for herein or in any of the Obligation Documents, or which shall now or hereafter exist at law or in equity or by statute or otherwise, shall be cumulative and concurrent and shall be in addition to every other such right, power or remedy. The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.

C.   **Agreement Continuing**. This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Pledgor shall be closed at any time, shall be equally applicable to any new transactions thereafter. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.

D.   **Definitions**. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, Article 9 definitions apply.

E.   **Waiver of Trial by Jury**. To the extent permitted by law, Pledgor and Secured Party hereby waive trial by jury in any litigation brought by either of the parties hereto against the other on any manner arising out of or in any way connected with this Security Agreement.

F.   **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF FLORIDA WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF FLORIDA.**

G.   **NOTICE OF FINAL AGREEMENT. THIS WRITTEN SECURITY AGREEMENT AND THE OTHER OBLIGATION DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

**I**N **WITNESS WHEREOF**, Payor, intending to be legally bound, has duly executed and delivered this Note as of the day and year first above written.

**Embraceor, LLC; WorkCentric 2, LLC; and WorkCentric 3, LLC PLEDGOR**

Sign _David Harvey_____
_DocuSigned by:_
3014B060FCFE468...

Printed Name:_____David Harvey_____

Title:_____Exec. V.P. / COO_____

Date:_____July 20, 2023 | 6:39 AM PDT____

**SUNZ INSURANCE SOLUTIONS, LLC SECURED PARTY**

Sign _Rick Leonard_____
_DocuSigned by:_
AF395F242B28447...

Printed Name:_____Rick Leonard_____

Title:_____President_____

Date:_____July 20, 2023 | 9:43 AM EDT____

**WC TOPCO, LLC PLEDGOR**

Sign _David Harvey_____
_DocuSigned by:_
3014B060FCFE468...

Printed Name:_____David Harvey_____

Title:_____Exec. V.P. / COO_____

Date:_____July 20, 2023 | 6:39 AM PDT____