# EXHIBIT 10



**Author's Direct Info**
tbryant@sunzinsurance.com
941.900.4455

October 18, 2023

**Sent Via U.S. Mail, Next-Day and Email**
David@workcentric.com

David Harvey
COO / Executive Vice-President
Workcentric
1900 Reston Metro Plaza, Suite 600
Reston, VA  20190

Re:    **SUNZ Insurance Company – Forbearance Agreement / Pledge Agreement**
       Pledgors / Obligors:    WC Container, LLC; WC TopCo, LLC; Embraceor, LLC; Workcentric, LLC;
                             Workcentric 2, LLC; Workcentric 3, LLC

Mr. Harvey:

Our efforts working together to complete the Forbearance Agreement and Pledge Agreement, copies of which are attached to this letter for your records, have put us on a good path towards getting Workcentric's workers' compensation insurance program out from under its significant obligations to SUNZ.

Like our groups have talked about over these last eight or nine months, working together is the best strategy to get all payments current, get the book of business situated correctly, and get the loss fund deficit fixed.  One primary concern, as highlighted in the agreements, is Loss Fund.

Focusing on loss fund, the Loss Fund is currently in a deficit position of $ 29,074,717.   This is more than the $23,000,000 ceiling we agreed to in the Forbearance Agreement and related Pledge Agreement.  But, as part of our partnership, you and your group have ten days to get this deficit reduced by making payment to SUNZ of $ 6,074,717 by October 30th.

As you can tell from the attached stewardship report, workcentric's loss fund continues to trend into a significant deficit so we need you and the entire Workcentric management team to work closely with SUNZ and its consultants to get this rectified expeditiously.

Also, during this ten day period, while the Loss Fund deficit is greater than $ 23,000,000, section 6(b) of the pledge agreement addresses things Pledgors/Obligors must suspend temporarily at least until the loss fund deficit matter is cured.  But, we are hopeful Workcentric can meet its obligations, get the loss fund deficit under $ 23,000,000, and have things return to normal.

David Harvey
October 18, 2023
Page 2 of 2

We know Workcentric is working diligently to pay SUNZ all the money SUNZ is owed as related to your workers' compensation insurance program. We appreciate your hard work. But right now, getting the loss fund deficit under $ 23,000,000 is an important event.

It is imperative that Workcentric work closely with SUNZ and its consultants to complete the initiatives discussed in recent correspondence in an urgent and highly prioritized manner. Your cooperation is both appreciated and expected.

Thank you for your continued professionalism and partnership as we work together in getting Workcentric's insurance situation fixed.

Time is of the essence.

Sincerely,

Theodore G. Bryant
Exec. V.P. / Chief Legal Officer

TGB/jw

enclosures

cc:     All copies sent by U.S. Mail, Next-Day Mail, and Email
        Christopher Froelich (christopher.froelich@hklaw.com)
        Docks Sutherland (found@immediate.com)
        Sheldon Altschuler (sheldon@workcentric.com)
        Steven F. Herrig
        Rick Leonard

# STEWARDSHIP REPORT

# LOSS FUND TRENDS



SUNZ INSURANCE

# Collateral

Valuation Date: 10/17/2023

* All claim reserves limited to deductible

| Incurred | Open Reserves | Collateral Held | Minimum Collateral Position | Developed Collateral Position |
|---|---|---|---|---|
| $87,690,296 | $29,462,145 | $28,594,331 | ($29,074,717) | ($45,589,191) |

## Minimum Collateral Standing Trend

| Current Funding Rate |
|---|
| 80% |

| Suggested Funding Rate |
|---|
| 95% |

A collateral payment may be required, in addition to an increase in the loss funding rate, to bring the collateral into a positive position.

Next Renewal Date: 01/01/2024

# FORBEARANCE AGREEMENT

*Execution Copy*

## FORBEARANCE AGREEMENT

This Forbearance Agreement (this "Agreement"), dated as of October 11, 2023 (the "Effective Date"), is made by and among Sunz Insurance Solutions, LLC ("Sunz"); and Embraceor, LLC, Workcentric, LLC, Workcentric 2, LLC, Workcentric 3, LLC and WC TopCo, LLC (collectively, the "Borrowers" or "Obligors"; Sunz and the Obligors, collectively, the "Parties" or, each, a "Party")).

## RECITALS

WHEREAS, Sunz and the Borrowers have entered into a Loss Fund Management Agreement, dated as of January 1, 2023 (the "Loss Fund Management Agreement"), relating to various payment obligations of the Borrowers to Sunz in respect of certain workers' compensation insurance policies (the "Insurance Program");

WHEREAS, to evidence certain delinquent payments under the Loss Fund Management Agreement, the Borrowers have delivered to Sunz a Commercial Promissory Note, dated as of July 18, 2023, in the original principal amount of $13,993,287.00 (the "Note"), which is secured by a Security Agreement, dated as of July 20, 2023 (the "Security Agreement" and, together with the Loss Fund Management Agreement, the Note and the other agreements entered into in connection therewith, the "Transaction Documents");

WHEREAS, to date, the Borrowers have failed to repay various obligations under the Insurance Program, in an aggregate amount equal to not less than $25,800,582.90, comprising (a) unpaid premiums in an aggregate amount equal to $2,344,557.94, (b) loss fund payment obligations (including obligations in respect of the Note) in an aggregate amount equal to $23,000,000, (c) taxes and surcharges in an aggregate amount equal to $456,024.92 and (d) applicable audit premiums (collectively, the "Obligations");

WHEREAS, the failure of the Borrowers to repay when due the Obligations constitute defaults under the terms of the Loss Fund Management Agreement, the Note and the other Transaction Documents (the "Specified Defaults"); and

WHEREAS, the Obligors have requested, and Sunz has agreed, subject to the terms and conditions of this Agreement, to forbear from proceeding with the exercise of Sunz's remedies under the Transaction Documents with respect to the Specified Defaults, for so long as the Obligors comply with the terms of this Agreement and the other Transaction Documents, until the Termination Date (as defined below) (the "Forbearance Period");

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AGREEMENT

1. **Recitals; Acknowledgement and Ratification of Transaction Documents and Obligations**. The foregoing recitals are true and correct and deemed a part of this Agreement. The Obligors acknowledge and agree that all terms, conditions and provisions of the Transaction Documents (as amended from time to time) continue in full force and effect and remain unaffected and unchanged except as expressly and specifically modified by this Agreement. This Agreement is not intended to and shall not be construed to create or constitute a release or relinquishment of, and, except as herein specifically provided to the contrary, shall not affect, the liens, security interests and rights of Sunz, and the liens, security interests and rights of Sunz are hereby ratified, confirmed, renewed and extended in all respects. The Obligors acknowledge and agree that all of the Obligations, in an aggregate amount not less than $25,800,582.90, are due and owing to Sunz and shall arise without offset, defense or counterclaim (it being understood that Obligors do not waive any offset, defense or counterclaim in respect of any amounts in excess of such amount), and further acknowledge and agree that the Loss Fund Management Agreement, the Note, the Security Agreement and the other Transaction Documents are valid and binding and fully enforceable according to their terms. The Transaction Documents are hereby ratified, affirmed and acknowledged as enforceable and operative in all respects by the Obligors.

2. **Conditions of Forbearance**. Sunz's agreement is conditioned upon and subject to the timely satisfaction by the Obligors of each of the following conditions:

(a)    All direct and indirect owners of the Borrowers (collectively, the "Members") shall execute and deliver to Sunz a pledge agreement, substantially in the form attached hereto as Exhibit A (the "Pledge Agreement"), pursuant to which the Members shall pledge to Sunz, as additional collateral securing the Obligations, all direct and indirect membership or other equity interests in the Borrowers;

(b)    Pursuant to the Pledge Agreement, the Members shall within three (3) business days (i) cause any and all direct or indirect membership or other equity interests in the Borrowers to be evidenced by certificates (collectively, the "Certificated Membership Interests") (and, as necessary, amend the governing documents of the Borrowers to permit the issuance of such certificates), and (ii) deliver to Sunz the Certificated Membership Interests, duly indorsed by effective endorsements in accordance with the Uniform Commercial Code as in effect in the State of Florida, in form and substance satisfactory to Sunz in its sole discretion; and

(c)    The Members and the Obligors shall engage in a commercially reasonable process by which the Members and the Obligors shall seek to (i) sell either a minority or majority of the equity interests of the Borrowers, (ii) sell either a minority or majority of the "book" of the Borrowers (i.e., client relationships and revenue), and/or (iii) obtain financing from a third-party lender (the "Process"), in each case as mutually approved by Sunz, the Members and the Obligors, in a manner that will generate sufficient proceeds to satisfy all of the Obligations, it being understood and agreed by the Parties that (A) the Process shall include milestones as mutually agreed to by the Parties for identifying prospective purchasers and/or lenders,

negotiating letters of intent, executing transactional documents and closing such transaction at the conclusion of the Process; and (B) the Parties shall reasonably cooperate with each other in connection with the Process.

3.      **Forbearance**.  Subject to the express provisions of this Agreement, Sunz agrees to forbear from exercising its remedies under the Transaction Documents with respect to the Specified Defaults until the earliest to occur of (the "Termination Date"):

(a)      One hundred twenty (120) days immediately following the Effective Date;

(b)      Reserves under the Loss Fund Management Agreement as calculated by the twice reserved plus incurred methodology at any time being underfunded by an aggregate amount in excess of $23,000,000;

(c)      Any additional defaults occurring under the Loss Fund Management Agreement, subject to any applicable cure periods, as agreed to by the Parties;

(d)      Other than as set forth on Schedule 5(a) attached hereto, any lien being recorded or asserted against any of the Collateral (as defined in the Security Agreement);

(e)      Failure by the Obligors to use reasonable efforts to effectuate the Process or any milestone of the Process, subject to any applicable cure periods, as agreed to by the Parties;

(f)      Any transfer of the Collateral to any third party, outside the ordinary course of the Borrowers' business, without the express written consent of Sunz; and

(g)      The occurrence of any breach of any promise or covenant by the Obligors contained in this Agreement, or of any default by the Obligors under any provision of this Agreement or the Transaction Documents.

Notwithstanding the foregoing, or anything else to the contrary herein or in the Transaction Documents, the Parties hereby acknowledge and agree that (i) upon the repayment in full in cash of all of the Obligations, the Parties shall execute mutually agreeable general releases of all claims in respect of the Insurance Program and the Transaction Documents, and (ii) prior to the Termination Date, the Members shall retain control over the management and operations of the Borrowers.

4.      **Default Under Terms of Agreement**.  Upon the occurrence of any breach of any promise or covenant by the Obligors contained in this Agreement or the Transaction Documents, Sunz shall serve a notice of default upon the Obligors and provide them with ten (10) days opportunity to cure such default.  Said notice shall be served on the Obligors, pursuant to the addresses listed in Section 13, via U.S. mail.  Delivery shall be effective upon mailing the default letter via U.S. mail.

If any default is not cured by the Obligors within ten (10) days, this Agreement shall be terminated.  Upon termination of this Agreement, the entire amount of the Obligations shall be immediately due and payable, and Sunz shall be under no obligation to forbear in any respect and shall be entitled immediately to exercise all of its rights and remedies under the Transaction Documents and Florida law, all without further notice to the Obligors.

Additionally, the occurrence of any of the following events shall be deemed an "Event of Default" under this Agreement (in each case subject to the ten (10) day cure period set forth above): (a) any amount applied in payment of the Obligations is or must be, or is claimed or ordered to be, rescinded, avoided or returned by Sunz to any person or entity for any reason whatsoever (including, without limitation, bankruptcy, insolvency or reorganization of Obligors or any other person); (b) any or if any representation(s) or warrant(ies) of the Obligors in this Agreement are later determined to have been untrue or misleading in any material respect when made; or (iii) the Obligors have breached any provision of the Transaction Documents. Upon the occurrence of any Event of Default, Sunz shall be entitled to retain all amounts paid under this Agreement to reduce the outstanding amount of the Obligations, the Forbearance Period shall immediately terminate, the Obligors shall be liable to Sunz for the remaining Obligations and all other obligations under the Transaction Documents, without notice or demand, and Sunz shall be entitled to immediately file a complaint to obtain judgment against the Obligors and/or seek any other relief that Sunz is entitled to pursuant to the Transaction Documents and/or Florida law, and in connection with such litigation, the Obligors waive personal service of any and all process for any claims arising under or relating to this Agreement or the Transaction Documents, and the Obligors agree that service of process may be made upon them by mailing or delivering a copy of such process to the Obligors at the addresses designated in Section 13.

5.      **Prospective Stay Relief**.  In the event that any Borrower commences a voluntary bankruptcy proceeding or other insolvency case is commenced against any Borrower, Sunz shall be entitled to immediate relief from the automatic stay to exercise all of its rights and remedies under this Agreement and the Transaction Documents and applicable law.  Each of the Borrowers expressly waives any right to contest relief from any stay under any legal theory in effect as a result of an insolvency proceeding.  Each of the Borrowers acknowledges that (a) it has consulted with a restructuring attorney prior to the negotiation and execution of this Agreement, and (b) the prospective stay relief negotiated herein is a material term of this Agreement.

6.      **Rescindment of NOCs**. Prior to the date of this Agreement Sunz issued Notices of Cancellation ("NOCs") to insureds.  Promptly following the execution of this Agreement, and in any event within one (1) business day hereof, Sunz will rescind such NOCs and deliver written confirmation (email being sufficient) of such rescission to Borrowers as promptly as reasonably practicable thereafter.

7.      **No Obligation to Extend Future Forbearances; No Waiver**.  The Obligors acknowledge and agree that Sunz is not obligated and does not agree to any other or future forbearance, except as expressly set forth herein.  This Agreement shall not constitute a waiver by Sunz of any of Sunz's rights under the Transaction Documents.  Except as expressly provided herein, Sunz reserves all of its rights and remedies under this Agreement and the Transaction Documents, at law or in equity, in the event of a default by the Obligors under this Agreement.

No action or course of dealing on the part of Sunz, its officers, employees, consultants or agents, nor any failure or delay by Sunz with respect to exercising any right, power or privilege of Sunz under the Transaction Documents or this Agreement, shall operate as a waiver thereof, except to the extent expressly provided herein.  The rights and remedies provided in this Agreement and the Transaction Documents are cumulative and not exclusive of each other or of any right or remedy provided by law or in equity.  Except as otherwise expressly provided in the Transaction Documents, no notice to or demand upon the Obligors in any instance shall, in itself, entitle the Obligors to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of Sunz to any other or further action in any circumstance without notice or demand.

8.    **Attorneys' Fees, Costs, and Expenses**.  In the event that the Obligors fail to perform any of the obligations under this Agreement or in the event a dispute arises concerning the meaning or interpretation of any provision of this Agreement, the Obligors shall pay any and all costs and expenses incurred by Sunz in enforcing or establishing its rights hereunder, including without limitation reasonable attorney's fees and court costs.

9.    **Novation.** This Agreement shall not constitute a novation of the Obligations or the Transaction Documents.

10.    **Accord and Satisfaction.**  This Agreement shall not constitute an accord and satisfaction of the Obligations or the Transaction Documents.

11.    **Representations and Warranties**. The Obligors hereby make the following representations and warranties:

(a)    The Obligors are not the subject of any proceedings under any law relating to bankruptcy, insolvency, reorganization or other relief of debtors;

(b)    The Obligors have all requisite power and authority to enter into this Agreement and to carry out the provisions hereof.  Each individual executing this Agreement represents and warrants that he or she is duly authorized by the appropriate corporate party or individual(s) to execute this Agreement and has all requisite power, authority and approval required to enter into, execute and deliver this Agreement on behalf of the Obligors, and that no other party's consent is required in connection with the effectiveness of the releases.

(c)    Neither Sunz, nor any officer, agent, servicer, employee, representative or attorney of or for Sunz, has made any statement or representation to the Obligors regarding any fact relied upon in entering into this Agreement (including, without limitation, with respect to any tax ramifications), and the Obligors acknowledge and agree that they have not relied upon any statement, representation or promise of any other party or of any officer, agent, employee, representative or attorney for Sunz in executing this Agreement, or in making the agreements, amendments and releases provided for herein.

(d)     The Obligors represent that they have had adequate opportunity to consult with counsel or other advisor of their own choosing in connection with this Agreement;

(e)     The Obligors acknowledge that, as of the Effective Date, Sunz possesses a lien on the Collateral pursuant to the Security Agreement and on the Pledged Collateral pursuant to the Pledge Agreement; and

(f)     No representation, warranty or statement of the Obligors in this Agreement contains or will contain any untrue statement.

12.     **Confidentiality**. Unless necessary to enforce this Agreement, each Party, for and on behalf of itself, its agents, heirs, insurers, successors and assigns, covenants that it will keep this Agreement and all negotiations with the other Party concerning any of the Transaction Documents and this Agreement strictly confidential and, except as may otherwise be required by law, will not disclose the terms of this Agreement or the content of any of the negotiations hereunder to any person or entity, except to their respective legal, tax and other advisors, financing partners, its counsel, and agents, if required, but only after advising them of this obligation of confidentiality. Each Party shall be responsible for any breach of this provision by any person to whom such Party shall provide information or documents required to be kept confidential under this provision.

13.     **Notice**. Any notice required or permitted under this Agreement shall be deemed effectively given when mailed by certified mail, return receipt requested, or nationally recognized overnight delivery or messenger service and addressed to the Party for whom intended, and when sent by e-mail, to the addresses provided below for that Party or to such other address as any Party may designate for itself or himself by notice given to the other parties in the manner herein provided or when actually received by the Party for whom intended if sent by other than the methods provided herein:

(a) As to the Obligors:

Embraceor, LLC/Workcentric, LLC/Workcentric 2, LLC/Workcentric 3, LLC/ WC TopCo, LLC
1900 Reston Metro Plaza, Suite 600
Reston, VA  20190
Attention: David Harvey, President

With copy to:

Christopher Froelich
Holland & Knight LLP
31 West 52nd Street
New York, NY  10019

(b) As to Sunz:

Sunz Insurance Solutions, LLC
1301 6th Avenue W
Bradenton, FL  34205
Attention: Theodore G. Bryant, Executive Vice President and Chief Legal Officer

With copy to:

Jason Oletsky
Akerman LLP
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL  33301

14.    **Jurisdiction and Venue**.  All Parties agree that they hereby submit themselves to the County or Circuit Court of Manatee County, Florida, for the purposes of the resolution of any disputes or the conduct of any litigation arising out of or seeking to enforce any of the provisions of this Agreement or the Transaction Documents.  The Parties expressly waive any challenge to the jurisdiction, authority, or venue of the County or Circuit Court of Manatee County, Florida, to enforce the terms of this Agreement or the Transaction Documents.

15.    **Time is of Essence**.  Time is of the essence for all time periods set forth herein.

16.    **Consent to Agreement**. The Obligors acknowledge that they have entered into this Agreement, knowingly, voluntarily, and under no duress, and acknowledge that they received substantial consideration for the entering into of this Agreement.

17.    **Tax Consequences**. Any tax consequences resulting from this Agreement, whether federal, state, or local, to any Party, will be the sole responsibility of that Party.

18.    **Governing Law**.  This Agreement shall be construed solely and interpreted exclusively in accordance with the laws of the State of Florida.

19.    **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of, as applicable, each of the Parties' respective successors, assigns, heirs, estates, representatives, transferees, executors, and administrators.

20.    **Amendments**.  This Agreement cannot be amended, rescinded, supplemented or modified except in writings signed by the parties hereto.  The Agreement cannot be modified except by virtue of a further written document signed by the party sought to be charged with that modification.  No amendment, supplement, or termination of this Agreement shall affect or impair any rights or obligations which heretofore have matured under this Agreement unless specifically provided for in that amendment.

21.    **Construction**.  The Parties agree that any rule of construction to the effect that ambiguities are resolved against the drafting party shall not apply to the interpretation of this Agreement.

22.      **Paragraph Headings**. The headings and titles of the several paragraphs of this Agreement are inserted solely for convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction of any term or provision of this Agreement.

23.      **Waiver**.  Any waiver by any party of any of the provisions of this Agreement at any time shall constitute a waiver only for that particular instance and for that particular purpose at that particular time and shall not be construed as constituting a waiver for any other breach of any sort, type, or nature for any occurrence, similar or otherwise, at any time in the future.

24.      **Severability**.  This Agreement and each of its parts shall be severable and, if any provision is determined to be void, invalid or unenforceable, the remainder of this Agreement shall be fully enforced without such term(s).

25.      **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.  A facsimile or e-mail copy of this Agreement and any signature hereon shall be considered for all purposes as originals.

26.      **Further Assurances**.  The Parties agree to execute any documents necessary, and to take any other actions necessary, to implement the terms of this Agreement.

27.      **Complete Agreement**.  This Agreement constitutes the entire agreement between the Parties and supersedes any other discussions or agreements relating to the subject of this Agreement.

28.      **WAIVER OF JURY TRIAL. ALL OF THE PARTIES TO THIS AGREEMENT WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY OF THEM AGAINST ANY OTHER PARTY OR PARTIES IN ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT AND/OR ANY CLAIM OF INJURY OR DAMAGE.**

29.      **Effective Date**.  For all purposes, the Effective Date of this Agreement shall be the date on which the last party hereto executes the Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the undersigned Parties, have executed this Forbearance Agreement as of the date first written above.

**SUNZ:**

SUNZ INSURANCE SOLUTIONS, LLC

Sign: _____

Print Name: _____ Steven F. Herrig _____

Title: _____ CEO _____

**OBLIGORS:**

EBRACEOR, LLC

Sign: _____

Print Name: _____

Title: _____

WORKCENTRIC, LLC

Sign: _____

Print Name: _____

Title: _____

WORKCENTRIC 2, LLC

Sign: _____

Print Name: _____

Title: _____

WORKCENTRIC 3, LLC

Sign: _____

Print Name: _____

Title: _____

**IN WITNESS WHEREOF**, the undersigned Parties, have executed this Forbearance Agreement as of the date first written above.

**SUNZ:**

SUNZ INSURANCE SOLUTIONS, LLC

Sign: _____

Print Name: _____

Title: _____

**OBLIGORS:**

EBRACEOR, LLC

Sign: _____

Print Name: David Harvey

Title: President

WORKCENTRIC, LLC

Sign: _____

Print Name: David Harvey

Title: President

WORKCENTRIC 2, LLC

Sign: _____

Print Name: David Harvey

Title: President

WORKCENTRIC 3, LLC

Sign: _____

Print Name: David Harvey

Title: President

WC TOPCO, LLC

Sign: _____

Print Name: David Harvey

Title: President

# PLEDGE AGREEMENT

EXHIBIT A

Form of Pledge Agreement

**PLEDGE AGREEMENT**

This Pledge Agreement (this "<u>Agreement</u>") is dated as of October 11, 2023, by and among WC Container LLC, Embraceor, LLC, Workcentric, LLC, Workcentric 2, LLC, Workcentric 3, LLC and WC TopCo, LLC (collectively, the "<u>Pledgors</u>" and, each individually, a "<u>Pledgor</u>"); solely for purposes of Section 1 and Section 5, Docks Sutherland (and shall be deemed to be a "Pledgor" for purposes thereof); and Sunz Insurance Solutions, LLC (the "<u>Secured Party</u>").

<u>**RECITALS**</u>

Concurrently with the execution hereof, Embraceor, LLC, Workcentric, LLC, Workcentric 2, LLC, Workcentric 3, LLC and WC TopCo, LLC (collectively, the "<u>Borrowers</u>"), [and Docks Sutherland (together with the Borrowers, the "<u>Obligors</u>")] have entered into a Forbearance Agreement with the Secured Party (the "<u>Forbearance Agreement</u>"). Capitalized terms used and not otherwise defined herein shall have the meanings given such terms in the Forbearance Agreement.

This Agreement is given by the Pledgors in favor of the Secured Party to secure the payment and performance of all of the Obligations (as defined in the Forbearance Agreement).

The Pledgors are the legal and beneficial owners of the membership interests of the Borrowers as set forth on <u>Schedule A</u> attached hereto (collectively, the "<u>Pledged Interests</u>").

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Pledge**.  The Pledgors hereby pledge and grant to the Secured Party, for the benefit of the Secured Party, a continuing first priority security interest in all of the Pledgors' now existing or hereafter arising right, title and interest in and to the following property (collectively, the "<u>Pledged Collateral</u>") to secure all of the Obligations:

(a)     the Pledged Interests;

(b)     all distributions, refunds or returns of capital, repayments of loans or advances, fees, income, profits and other property, interests or proceeds from time to time receivable, received or otherwise distributed or owing to the Pledgors in respect of, or in exchange for, any or all of the Pledged Interests (collectively, "<u>Distributions</u>"); and

(c)     all Proceeds (as such term is defined in Section 9-102 of the Uniform Commercial Code as in effect from time to time in the State of Florida ("<u>UCC</u>")) of any of the foregoing.

2.    **Secured Obligations**.  This Agreement secures, and the Pledged Collateral is collateral security for, the prompt payment and performance in full when due of (a) the Obligations and any other amounts that become due and payable to the Secured Party in respect of payment of the Obligations pursuant to the Forbearance Agreement and the Transaction Documents (as defined therein), and (b) all obligations of the Pledgors now or hereafter existing under or in respect of this Agreement (the obligations described in clauses (a) and (b) are, collectively referred to as the "Secured Obligations"); provided that in the case of clause (b) only, the Pledged Collateral pledged by each Pledgor shall constitute security for the performance only of the obligations of such Pledgor now or hereafter existing under or in respect of this Agreement and not for any other Pledgor's obligations hereunder.

3.    **No Release**.  Nothing set forth in this Agreement shall (a) relieve the Pledgors from the performance of any term, covenant, condition or agreement on the Pledgors' part to be performed or observed under or in respect of any of the Pledged Collateral or from any liability to any person or entity under or in respect of any of the Pledged Collateral; (b) impose any obligation on the Secured Party to perform or observe any such term, covenant, condition or agreement on the Pledgor's part to be so performed or observed; or (c) impose any liability on the Secured Party for any act or omission on the part of the Pledgors relating thereto or for any breach of any representation or warranty on the part of the Pledgors contained in this Agreement. The obligations of the Pledgors contained in this Section 3 shall survive the termination of this Agreement and the discharge of the Pledgors' other obligations hereunder.

4.    **Perfection of Pledge; Further Assurances**.

(a)    The Pledgors shall, from time to time, as may be required by the Secured Party with respect to all Pledged Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Pledged Collateral.

(b)    The Pledgors shall within three (3) business days (i) cause any and all direct or indirect membership or other equity interests in the Borrowers to be evidenced by certificates (collectively, the "Certificated Membership Interests") (and, as necessary, amend the governing documents of the Borrowers to permit the issuance of such certificates), and (ii) deliver to Sunz the Certificated Membership Interests, duly indorsed by effective endorsements in accordance with the Uniform Commercial Code as in effect in the State of Florida, in form and substance satisfactory to Sunz in its sole discretion;

(c)    The Pledgors hereby irrevocably authorize the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Pledged Collateral, without the signature of the Pledgors where permitted by law. The Pledgors agree to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request.

(d)    At any time and from time to time, at the expense of the Secured Party, the Pledgors shall promptly execute and deliver all further instruments and documents and take all further action that may be necessary or that the Secured Party may reasonably request in order to

protect any pledge or security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral.

5.     **Representations and Warranties**.    Each of the Pledgors hereby represents and warrants and covenants (as applicable), as follows:

(a)     Each Pledgor is, and at the time of any delivery of any Pledged Collateral to the Secured Party will be, the legal and beneficial owner of their respective Pledged Collateral. Except as set forth on Schedule 5(a) attached hereto, there are no liens, security interests, encumbrances, claims, options or rights of others (collectively, "Liens") on the Pledged Collateral and the applicable Pledged Collateral is and will be owned by the applicable Pledgor free and clear of any Lien except, in each case, for (i) the security interest created by this Agreement, (ii) any restrictions on transfer in the Borrowers' governing documents, (iii) those imposed under applicable securities laws and (iv) created by the Secured Party during its period of ownership of the Pledged Collateral.

(b)     Each Pledgor has full power, authority and legal right to pledge its Pledged Collateral pursuant to this Agreement.

(c)     No consent of any Party, and no consent, authorization, approval, or other action by, and no notice to or filing with, any governmental authority or other person or entity is required (i) for the pledge by the applicable Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by such Pledgor, (ii) for the exercise by the Secured Party of the voting or other rights provided for in this Agreement, or (iii) for the exercise by the Secured Party of the remedies in respect of the Pledged Collateral pursuant to this Agreement.

(d)     Each Pledgor's address is as set forth on Schedule A.

(e)     As of the date hereof, (i) the Pledged Interests identified on Schedule A constitute all of the equity interests of the Borrowers owned by the applicable Pledgor and (ii) Schedule A constitutes a true and complete description of the Pledged Interests.

(f)     The Pledgors have consented to the Secured Party, upon the occurrence of a Default (as defined below), exercising any rights of membership in the Borrowers and have consented to the Secured Party electing to become a successor member in the Borrowers, as set forth in this Agreement. As used herein, the term "Default" shall mean (i) a breach under the Forbearance Agreement or (ii) the failure of any Pledgor to fulfill any obligation hereunder, in each case, if such breach or failure continues unremedied (if curable) for thirty (30) days after written notice from the Secured Party.

6.     **Voting Rights; Distributions**.

(a)     So long as no Default shall have occurred and be continuing:

(i)     the Pledgors shall be entitled to exercise any and all voting and other consent rights pertaining to the Pledged Interests or any part thereof for any purpose not

inconsistent with the terms or purpose of this Agreement, and the Secured Party shall not be entitled to exercise such rights; and

        (ii)     except as otherwise provided in this Agreement, the Pledgors shall be entitled to receive and retain, and to utilize free and clear of the Lien of this Agreement, any and all Distributions, and the Secured Party shall not be entitled to receive, retain or utilize such Distributions.

     (b)     Upon the occurrence and during the continuance of a Default:

        (i)     all rights of each of the Pledgors to exercise the voting and other consent rights it would otherwise be entitled to exercise pursuant to Section 6(a)(i) shall immediately cease, and all such rights shall thereupon become vested in the Secured Party, which shall thereupon have the sole right to exercise such voting and other consent rights; and

        (ii)     all rights of each of the Pledgors to receive Distributions which it would otherwise be authorized to receive and retain pursuant to Section 6(a)(ii) shall cease, and all such rights shall thereupon become vested in the Secured Party, which shall thereupon have the sole right to receive and hold as Pledged Collateral such Distributions until the Secured Obligations have been paid in full.

**7.**     **Additional Covenants of the Pledgors.**

     (a)     Each Pledgor shall not (i) sell, convey, assign, transfer or otherwise dispose of, or grant any option, right or warrant with respect to, any of the Pledged Collateral pledged by such Pledgor, (ii) create or a permit to exist any Lien upon or with respect to any Pledged Collateral pledged by such Pledgor other than the Lien and security interest granted to the Secured Party under this Agreement and any Lien set forth on Schedule 5(a) attached hereto, (iii) amend, modify or terminate the governing documents of any borrower, or (iv) permit the Borrowers to merge, dissociate, liquidate, consolidate or change its legal form.

     (b)     Each Pledgor shall (i) use its best efforts to cause the Borrowers not to issue any membership interests in addition to or in substitution for the Pledged Interests and (ii) pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional membership interests of the Borrowers acquired by such Pledgor after the date hereof.

**8.**     **Remedies upon Default; Decisions Relating to Exercise of Remedies**.

     (a)     If any Default shall have occurred and be continuing, the Secured Party shall have the right, in addition to other rights and remedies provided for herein or otherwise available to it to be exercised from time to time (including under the Forbearance Agreement, at law or in equity), (i) to retain and apply the Distributions to the Secured Obligations, (ii) to exercise all the rights and remedies of a secured party on default under the UCC in effect in any applicable jurisdiction at that time, (iii) to exercise all rights of the Pledgors as members of the Borrowers and/or become a successor member to the Borrowers, and (iv) to exercise any other rights or remedies pursuant to the Forbearance Agreement.

(b)    In addition to any of the other rights and remedies hereunder, the Secured Party shall have the right to institute any claim, action, suit or proceeding seeking specific performance in connection with any of the agreements or obligations hereunder.

9.    **Power of Attorney**.  Upon the occurrence and during the continuance of a Default,

(a)    each Pledgor does hereby irrevocably make, constitute and appoint the Secured Party, or any of its officers or designees, its true and lawful attorney-in-fact with full power in the name of the Secured Party, its subsidiaries or such Pledgor to endorse any notes, checks, drafts, money orders or other evidences of payment relating to the Pledged Interests that may come into the possession of the Secured Party, with full power and right to do any and all other acts necessary or proper to carry out the intent of this Agreement and the grant of the Liens and security interests hereunder, and such Pledgor, on its own behalf and on behalf of its subsidiaries, hereby ratifies and confirms all that the Secured Party or its substitutes shall properly do by virtue thereof; and

(b)    each Pledgor does hereby further irrevocably make, constitute and appoint the Secured Party, or any of its officers or designees, its true and lawful attorney-in-fact in the name of the Secured Party, its subsidiaries or such Pledgor (i) to enforce all of such Pledgor's rights under and pursuant to all agreements with respect to the Pledged Interests, all for the sole benefit of the Secured Party, (ii) to enter into and perform such agreements as may be necessary in order to carry out the terms, covenants and conditions of this Agreement that are required to be observed or performed by such Pledgor, (iii) to execute such other and further mortgages, pledges and assignments of the Pledged Interests, and related instruments or agreements, as the Secured Party may reasonably require for the purpose of perfecting, protecting, maintaining or enforcing the Liens and security interests granted to the Secured Party hereunder, and (iv) to do any and all other things necessary or proper to carry out the intention of this Agreement and the grant of the Liens and security interests hereunder and such Pledgor hereby ratifies and confirms in advance all that the Secured Party as such attorney-in-fact or its substitutes shall properly do by virtue of this power of attorney.

10.    **Obligations Absolute**.  All obligations of the Pledgors hereunder shall be absolute and unconditional irrespective of (a) any bankruptcy, reorganization or the like of the Borrowers, (b) any lack of validity or enforceability of the Forbearance Agreement, (c) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of, or any consent to any departure from, the Forbearance Agreement, (d) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to any departure from any guaranty, for all or any of the Secured Obligations, or (e) any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Pledgors.

11.    **Expenses**.  Upon demand, the Pledgors will pay to the Secured Party the amount of any and all reasonable and documented out of pocket expenses, including the reasonable and documented out of pocket fees and expenses of its outside counsel and the reasonable and documented out of pocket fees and expenses of any experts and agents, which the Secured Party may incur in connection with (a) the collection of the Secured Obligations, (b) the custody or preservation of, collection from, or other realization upon, any of the Pledged Collateral, (c) the exercise or enforcement of any of the rights of the Secured Party hereunder, or (d) the failure by

the Pledgors to perform or observe any of the provisions hereof; <u>provided</u> that in the case of <u>clauses (b)</u> and <u>(d)</u>, only the Pledgor or Pledgors which has or have failed to perform or observe a provision hereof shall be liable for such expenses in connection with that Pledgor's failure. All amounts payable by the Pledgors under this <u>Section 11</u> shall be due upon demand and shall be part of the Secured Obligations. The Pledgors' obligations under this <u>Section 11</u> shall survive the termination of this Agreement and the discharge of the Pledgors' other obligations hereunder.

12. **Termination**. When all the Secured Obligations (other than Secured Obligations in the nature of continuing indemnities and expense reimbursement obligations not yet due and payable) have been indefeasibly paid in full in cash in accordance with the Forbearance Agreement and have been terminated, this Agreement shall terminate. Upon termination of this Agreement, the Secured Party shall, upon the written request and at the expense of the Pledgor receiving such Pledged Collateral, forthwith assign, transfer and deliver to each Pledgor, against receipt and without recourse to or warranty by the Secured Party, such of the Pledged Collateral of such applicable Pledgor as may be in the possession of the Secured Party (including the Certificated Membership Interests) and as shall not have been applied pursuant to the terms hereof, and shall execute UCC termination statements on Form UCC-3 with respect to any financing statements and amendments filed in connection with this Agreement ("<u>UCC Terminations</u>"). Without limiting the foregoing, the Pledgors are hereby expressly authorized to file UCC Terminations upon the termination of this Agreement without the signature of the Secured Party where permitted by law. The Secured Party shall have no responsibility under this Agreement to undertake any other actions upon termination of this Agreement, except as provided in this <u>Section 12</u>.

13. **Notice**. Any notice or other communication required or permitted under this Agreement shall be deemed to have been duly given and made if given in accordance with Section 13 of the Forbearance Agreement.

14. **Successors and Assigns.**

(a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; <u>provided</u> that the Pledgors may not assign this Agreement, or any of their rights or obligations hereunder, without the prior written consent of the Secured Party and all covenants, promises and agreements by or on behalf of the Pledgors which are contained in this Agreement shall inure to the benefit of the successors and assigns of the Secured Party.

(b) The Secured Party may assign all or a portion of its interests, rights and obligations under this Agreement to any of its affiliates or any successor in interest.

15. **Governing Law**. This Agreement shall in all respects be construed solely in accordance with, and governed exclusively by, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof, which are applicable to contracts made and to be performed wholly within such state.

16. **No Waiver**. No failure on the part of the Secured Party to exercise, and no delay in exercising, any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other

or further exercise thereof or the exercise of any other right, power, privilege or remedy and no course of dealing shall operate as a waiver of any right, power, privilege or remedy of the Secured Party. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

17.    **Amendments, etc**.  No modification, amendment or waiver of any provision of this Agreement, and no consent to any departure by the Pledgors from the provisions hereof, shall in any event be effective unless in the case of a modification or amendment, the same shall be in writing and signed by the Secured Party and the Pledgors and in the case of a waiver, the same shall be in writing and signed by the party against whom such waiver is sought, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Pledgors shall entitle the Pledgors to any other or further notice or demand in the same, similar or other circumstances.

18.    **Severability**.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

19.    **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of, or be taken into consideration in interpreting, this Agreement.

20.    **Execution in Counterparts**.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement. This Agreement may be executed via facsimile or other electronic means (including in .pdf or similar format) and shall be deemed to have the same legal effect as delivery of an original signed copy of the Agreement. No party shall raise the fact that any signature or instrument was transmitted or executed by means of facsimile or other electronic means as a defense to the formation or enforceability of a contract and each party irrevocably waives any such defense. Minor variations in the form of the signature pages to this Agreement, including variations in the footers thereto, shall be disregarded in determining the effectiveness of the signatures thereon.

21.    **Entire Agreement**.  This Agreement, including the Schedule hereto, represents the entire agreement of the parties with regard to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties or their representatives or affiliates, oral or written, respecting such subject matter.

IN WITNESS WHEREOF, the parties hereto have caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

**PLEDGORS:**

WC CONTAINER LLC

Sign: _____

Print Name: David Harvey

Title: President


EBRACEOR, LLC

Sign: _____

Print Name: David Harvey

Title: President


WORKCENTRIC, LLC

Sign: _____

Print Name: David Harvey

Title: President


WORKCENTRIC 2, LLC

Sign: _____

Print Name: David Harvey

Title: President

WORKCENTRIC 3, LLC

Sign: _____

Print Name: David Harvey

Title: President


WC TOPCO, LLC

Sign: _____

Print Name: David Harvey

Title: President


**Solely for purposes of Section 1 and Section 5 hereunder:**

Sign: _____

Print Name: Docks Sutherland


**SUNZ:**


SUNZ INSURANCE SOLUTIONS, LLC


By: _____

Name: _____

Title: _____

WORKCENTRIC 3, LLC

Sign: _____

Print Name: _____

Title: _____


WC TOPCO, LLC

Sign: _____

Print Name: _____

Title: _____


**Solely for purposes of Section 1 and Section 5 hereunder:**

Sign: _____

Print Name: Docks Sutherland


**SUNZ:**

SUNZ INSURANCE SOLUTIONS, LLC

By: _____

Name: _____ Steven F. Herrig _____

Title: _____ CEO _____

**SCHEDULE A**

Pledged Interests

| Borrower | Owner | Owner Address |
|---|---|---|
| WC Container LLC | Docks Sutherland (100%) | 174 West 4th Street, Suite 290<br>New York, NY 10014 |
| WC TopCo LLC | WC Container LLC (100%) | 174 West 4th Street, Suite 290<br>New York, NY 10014 |
| Embraceor LLC | WC TopCo, LLC (100%) | 1900 Reston Metro Plaza<br>Suite 600<br>Reston, VA  20190 |
| Workcentric, LLC | WC TopCo, LLC (100%) | 1900 Reston Metro Plaza<br>Suite 600<br>Reston, VA  20190 |
| Workcentric 2, LLC | WC TopCo, LLC (100%) | 1900 Reston Metro Plaza<br>Suite 600<br>Reston, VA  20190 |
| Workcentric 3, LLC | WC TopCo, LLC (100%) | 1900 Reston Metro Plaza<br>Suite 600<br>Reston, VA  20190 |

73120832;2

## SCHEDULE 5A

## Liens

Pipe Technologies Inc. has a lien on certain approved accounts receivable of and a bank account related to such approved accounts receivable (yet to be formed) by Workcentric LLC.