# EXHIBIT 14

```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3   IN RE:                        .  Chapter 7
                                  .  Case No. 24-10040 (MFW)
4   WORKCENTRIC, LLC,             .
                                  .
5                                 .  Courtroom No. 4
                                  .  824 North King Street
6        Alleged Debtor.          .  Wilmington, Delaware 19801
                                  .
7   . . . . . . . . . . . . . . .  .  Tuesday, March 26, 2024
                                     10:00 a.m.
8
                         TRANSCRIPT OF HEARING
9          BEFORE THE HONORABLE MARY F. WALRATH
                  UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For WorkCentric I:        Mark Desgrosseilliers, Esquire
12                            CHIPMAN BROWN CICERO & COLE, LLP
                              Hercules Plaza
13                            1313 North Market Street
                              Suite 5400
14                            Wilmington, Delaware 19801

15  For the U.S. Trustee:     Jane Leamy, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
16                            844 King Street, Suite 2207
                              Lockbox 35
17                            Wilmington, Delaware 19801

18
    (APPEARANCES CONTINUED)
19
    Audio Operator:           Mandy Bartkowski, Esquire
20

21  Transcription Company:    Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For WorkCentric, the
   Alleged Debtor:                William Sullivan, Esquire
3                                 SULLIVAN HAZELTINE ALLINSON LLC
                                  919 North Market Street
4                                 Wilmington, Delaware 19801

5                                 Martin Seidel, Esquire
                                  HOLLAND & KNIGHT LLP
6                                 31 West 52nd Street
                                  12th Floor
7                                 New York, New York 10019

8                                 Lynn Xerras, Esquire
                                  HOLLAND & KNIGHT LLP
9                                 10 St. James Avenue
                                  11th Floor
10                                Boston, Massachusetts 02116

11 For Sunz Insurance
   Solutions:                     Kate Roggio Buck, Esquire
12                                MCCARTER & ENGLISH LLP
                                  Renaissance Centre
13                                405 North King Street, 8th Floor
                                  Wilmington, Delaware 19801

14
                                  Eyal Berger, Esquire
15                                AKERMAN LLP
                                  201 East Las Olas Boulevard
16                                Suite 1800
                                  Fort Lauderdale, Florida 33301

17
                                  Jason Margolin, Esquire
18                                AKERMAN LLP
                                  401 East Jackson Street
19                                Suite 1700
                                  Tampa, Florida 33602

20

21

22

23

24

25

1                                    INDEX

2  MOTIONS:                                                    PAGE

3  Agenda
   Item 1:  Emergency Motion of WorkCentric 1, LLC,            10
4           To Strike Motion To Dismiss Involuntary
            Petition Filed By Purported Alleged
5           Debtor [Docket No. 34; 2/16/24]

6           Court's Ruling:                                    82

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commenced at 10:00 a.m.)

 2              THE COURT:  Good morning.  This is Judge Walrath.

 3  We are here in the WorkCentric case.

 4              Whom shall I turn it over to start us off?

 5              MR. DESGROSSEILLIERS:  Your Honor, Mark

 6  Desgrosseilliers from Chipman Brown Cicero & Cole on behalf

 7  of WorkCentric I, LLC.

 8              I think we filed the motion to strike.  We filed

 9  the agenda.  So, it might as well be me, I guess, to lead us

10  off if that's okay with Your Honor.

11              THE COURT:  That's fine.

12              MR. DESGROSSEILLIERS:  Your Honor, as noted, we

13  filed an agenda in this case on Friday, March 22nd, 2024 that

14  was at Docket No. 100.  We intend to follow the agenda.  Your

15  Honor will note there are two matters on the agenda.  I know

16  Your Honor's schedule certainly the motion to strike.  We can

17  get to the motion to stay.

18              Generally speaking, as indicated in the agenda,

19  and after discussions with Mr. Sullivan, it was certainly

20  acceptable to the parties, subject to the availability and

21  willingness of the Court, to hear the motion to strike as

22  well.  As Your Honor knows, from reading the pleadings, a lot

23  of the facts, certainly the background, overlap. So, it sort

24  of made sense to us, from a practical standpoint, again, to

25  have those heard today if Your Honor is willing to do so.
```

1          THE COURT:  That's fine.  You mean the motion to

2    stay as well as the relief motion.

3          MR. DESGROSSEILLIERS:  Yes, Your Honor.  That is

4    what I was referring to.  Apologies if I misspoke.

5          Your Honor, with respect to the motion to strike,

6    that is a motion that the manager filed.  That is at Docket

7    No. 34.  We filed that on February 16th.  And, obviously,

8    Your Honor will recall we had a status conference with

9    respect to that motion on February 27th.

10          In accordance with Your Honor's direction and the

11    parties agreement at the status conference, Mr. Sullivan is

12    on, what I will call, the former management submitted their

13    response and their objection to the motion to strike.  Then

14    there was a reply brief joined by my client but filed by

15    SUNZ.

16          Your Honor, with respect to argument today the

17    plan, from what I will call, our side, but the manager and

18    SUNZ collectively, I was intending to turn the podium over to

19    Ms. Buck and her co-counsel on behalf of SUNZ.  Mr. Margolin

20    is on.  It was the intent just to try to keep things smooth

21    and give it to the person with the most knowledge that Mr.

22    Margolin would go over the procedural background and some of

23    the business relationship background.

24          So, that lead to it -- that lead to the dispute in

25    front of Your Honor and that are set forth in the various

1   pleadings.  Then he would turn it over to his colleague, Mr.

2   Berger, to address some of the legal arguments primarily

3   raised in the response or reply brief filed by SUNZ.  Then I

4   have a few words to say from the managers perspective.  We

5   thought that would be most efficient and then we would turn

6   it over to Mr. Sullivan and his co-counsel to respond.

7          If that works for Your Honor, I would turn the

8   podium over to either Ms. Buck or Mr. Margolin.

9          THE COURT:  Well, let me hear from Mr. Sullivan if

10  that is what you anticipate happening today.

11         MR. SULLIVAN:  Your Honor, thank you.  Bill

12  Sullivan on behalf of WorkCentric, the alleged debtor.  Your

13  Honor, I am joined by co-counsel from Holland & Knight and

14  with respect to the first matter Martin Seidel will be

15  handling the matter from our side.

16         Your Honor, in general, we discussed the issues

17  about the motion to stay, discovery, you know, about that

18  going forward which you are already -- which Your Honor has

19  already heard.  With respect to this motion we didn't have

20  any further discussion about procedure other then that their

21  side would go first, but we agree that everyone speaking on

22  their side should go first before we address their cumulative

23  comments.

24

25

1          THE COURT:  All right.  Does the fact that the

2    alleged debtor has withdrawn its motion to dismiss effect --

3    motion to dismiss the involuntary effect today?

4          MR. DESGROSSEILLIERS:  Your Honor, we saw that

5    filing last night as well.  Obviously, it was not included in

6    the agenda. I would defer to Mr. Sullivan on his views. I am

7    happy to respond. From the manager's perspective, I will call

8    them former management, the withdraw of the motion to

9    dismiss, unless Mr. Sullivan is going to tell me that he is

10   also withdrawing his cross-motion to strike, I guess our

11   motion to dismiss does not resolve the matters for today.  I

12   was rather hopeful it would, but the more I thought about it

13   I don't think it does.

14          I would defer to Mr. Sullivan and get his thoughts

15   and his clients thoughts on that, and perhaps SUNZ.  Sorry,

16   Your Honor.

17          MR. SULLIVAN:  Your Honor, Bill Sullivan on behalf

18   of the alleged debtor.

19          It does not resolve the issues that are set for

20   today. I think Mr. Seidel will address that in connection

21   with his comments.  But we certainly believe it provides

22   clarity as to a future course of proceedings that depend on

23   the Court's decision today.

24          MR. DESGROSSEILLIERS:  And, Your Honor, before I

25   cede the podium to SUNZ I forget to mention one thing.  Your

1  Honor is, obviously, in receipt of what we call the joint

2  exhibit binder.  I wanted to mention, and I mentioned it in

3  the email forwarding it to Ms. Capp, and I appreciate Ms.

4  Capp's assistance with this, but the intent in submitting

5  this was so that Your Honor had a kind of ready reference to

6  the various exhibits that were cited in the various briefs.

7          I wanted to be clear that no party, including Mr.

8  Pacitti's client, the petitioning creditor, have agreed to

9  the document to be as for any purposes other than an argument

10 today.  So, there is not agreement on these documents other

11 than ease of reference for the Court, really, and for the

12 parties arguing.

13         I hope that helps Your Honor and I didn't know if

14 Your Honor had any questions about that submission.  I hope

15 Your Honor received that, but again the intent from Mr.

16 Sullivan and myself was to try to be helpful primarily to the

17 Court, but also to parties making arguments to ease the

18 reference to documents going forward.

19         THE COURT:  So, there is no agreement as to

20 admission of any of those or…

21         MR. DESGROSSEILLIERS:  Your Honor, there is not

22 generally agreement as to admissibility. Again, as Your Honor

23 will recall at our status conference this was intended to

24 just be legal arguments and arguments from the documents.

25 Some of the documents I don't think people are going to agree

1  to because they are declarations but they necessarily

2  reference facts that we think collectively are important for

3  Your Honor to consider at least.

4         I guess Your Honor can do with that what you will.

5  I don't know that there is a ready solution.  There may be

6  some disputes here. I don't know that here is a ready

7  solution, but we thought that the argument, at least, made

8  sense today.  Again, Mr. Sullivan may have different thoughts

9  about that or SUNZ may have different thoughts.

10         MR. SULLIVAN:  Your Honor, I am echoing Mr.

11  Desgrosseilliers comments.  The idea was to take all of the

12  exhibits that had been attached to the various pleadings and

13  put them in, sort of, a numerical order so we can find them,

14  but there was not a discussion about admissibility of any of

15  the documents prior to today.

16         THE COURT:  Okay.  We will see --

17         MR. DESGROSSEILLIERS:  And, Your Honor -- oh, I'm

18  sorry.

19         THE COURT:  -- how we deal with that going

20  forward.

21         MR. DESGROSSEILLIERS:  I appreciate that, Your

22  Honor.  Again, Mark Desgrosseilliers for the record.

23         We didn't have a ready way to deal with it.  We

24  had kind of staged this, as Your Honor will recall at

25  argument, and so if we need to address that we figured we

1  could work on that with the Court and amongst ourselves as it

2  came up.

3          THE COURT:  Thank you.

4          MR. DESGROSSEILLIERS:  Thank you, Your Honor.  I'd

5  turn it over to Ms. Buck.

6          THE COURT:  Ms. Buck.

7          MS. BUCK:  Good morning, Your Honor.  Kate Buck

8  from McCarter & English on behalf of SUNZ.

9          Your Honor, I do have, as you see on Zoom, as Mr.

10 Desgrosseilliers mentioned, counsel, Mr. Margolin and Mr.

11 Berger, who will -- they have both been admitted *pro hac* and

12 they will be addressing the various as Mr. Desgrosseilliers

13 noted.

14         THE COURT:  Okay.  Who wants to start then?

15         MR. MARGOLIN:  Good morning, Your Honor.  This is

16 Jason Margolin on behalf of SUNZ.

17         First, may I ask, Your Honor, may I share the

18 screen during the hearing this morning?

19         THE COURT:  You may.

20         MR. MARGOLIN:  Thank you.  So, the managers --

21         THE COURT:  You have it.

22         MR. MARGOLIN:  Thank you.  The manager,

23 WorkCentric I, emergency motion to strike and related issue

24 of who controls the alleged debtor all turn on whether the

25 alleged debtor breached the contract with SUNZ.  The

1    contracts that we are going to be focused on are the October

2    11th, 2023 forbearance agreement and the pledge agreement

3    which the alleged debtor and its affiliated executed with

4    SUNZ.  Now that forbearance agreement affirms the validity of

5    what it called the underlying transaction document.  Those

6    are the various contracts associated with the alleged debtors

7    Worker's Comp insurance program.

8           These contracts are explicit.  Any breach of the

9    underlying transaction documents is a breach of the

10   forbearance agreement and any breach of the forbearance

11   agreement is a breach of the pledge agreement. Now the former

12   managers don't address every default under the contracts that

13   we have raised, but where they do raise an opposition its

14   refuted by the contracts in the documents before the Court.

15          Now for context I think it's important to note the

16   alleged debtor executed the forbearance agreement and pledge

17   agreement at a time when it was in default for non-payment

18   after a long history of financial accommodations provided by

19   SUNZ.  The final accommodation here, in the forbearance

20   period, was to permit the former managers one last

21   opportunity to try and secure new financing or sell the

22   alleged the debtor as a going concern.

23          This is a large operation. The insurance program

24   in the last year WorkCentric, the alleged debtor, was

25   submitting over $2.5 billion in annual payroll.  So,

1    logically the forbearance and the extension of additional

2    insurance coverage that had to cover that payroll was going

3    to require significant remedies and a quick cure. So, these

4    were going to be remedied beyond those that SUNZ already had

5    under the security agreements, the (indiscernible) management

6    agreement, and the other transaction documents that we will

7    touch on today.

8            So, SUNZ has agreed to this forbearance, but it

9    was only in exchange for significant additional powers in the

10   event of a further default. Those powers included voting

11   power, consent power, and management power over the alleged

12   debtor.  SUNZ even received certificated membership interest

13   in the alleged debtor and the affiliates as a whole as

14   pledged interest in case of a further default. Now despite

15   that forbearance, the alleged debtor did default again and

16   did not address the growing loss fund deficient, it failed to

17   pay premiums, it failed to provide documents and financial

18   information that it was required to provide under the

19   transaction documents and forbearance agreement.  And despite

20   demand, there was no cure.

21           There were also some representations by the debtor

22   that were false when made and just could not be cured.  The

23   former manager and the alleged debtor told SUNZ that they

24   were going to facilitate turnover.  Essentially, they said

25   they couldn't cure, so they were going to provide quick claim

1    assignments, but instead what we have learned is that they

2    transferred money away from the alleged debtor.  So, there

3    are multiple breaches which we think are very clear.  Again,

4    each breach is an independent violation and default under the

5    transaction documents and, therefore, a breach of the

6    forbearance agreement and the pledge agreement.

7              Now, I should also point out when the forbearance

8    agreement was executed the alleged debtor agreed it owed SUNZ

9    not less than $25.8 million. So, that is as of October 11th,

10   2023. The liability was higher, but that is the minimum

11   amount they agreed was due and owing to SUNZ.  Unbeknownst to

12   SUNZ at that same time the former managers and alleged debtor

13   have also admitted they owed an additional $25 million to

14   Pipe Technologies and the failure to provide due diligence

15   information on the Pipe debt is an independent branch of the

16   documents the debtor executed with SUNZ.  Again, all of these

17   are independent breaches that require determination that SUNZ

18   is the only power and to exercise voting power, consent

19   power, and management power over the alleged debtor.

20             Now, I think this important that the Court have a

21   little context on the underlying insurance program that lead

22   up to the forbearance agreement and the pledge agreement.

23   So, I want to point out this program begins in December 2019

24   and what I am going to share on the screen is the quotation.

25   This is one of the transaction documents.  It is from

1    December 2019 with WorkCentric. This is Document 97 in the

2    record.  And you can see this program is going to have a

3    $500,000 per accident deductible. So, that means for every

4    claim that each WorkCentric, the alleged debtors, worker

5    would file.  It would be on the hook for the first $500,000

6    of each claim.

7            There is also documents associated with this that

8    required to sign not only this quotation, but a loss fund

9    management agreement, security agreement, and provide funds

10   that are binding.  And you will see those down here at

11   binding they were providing a deposit of over $637,000 and

12   they are agreeing that they are going to pay on a weekly

13   basis amount towards premium and loss funds.  These are

14   amounts that are going to secure the ultimate premium and

15   loss fund obligation that will determine when the program is

16   finished and all the claims have come in and been addressed.

17           At the end of this document, you see a sign for

18   the alleged debtor, WorkCentric I, by its then owner, Sheldon

19   Altschuler as CEO.  This insurance program was repeatedly

20   renewed. There are four policy years.  But we learned that

21   after -- that in August of 2021, and this is from the former

22   manager's own filing, that Docks Sutherland purchased

23   WorkCentric.  So, he takes over in late 2021.  And at that

24   time the financial situation begins to deteriorate.

25

1    In April of 2022 the alleged debtor asked for an

2  accommodation.  Rather then continue to pay cash for the

3  amounts they need to pay for loss funds they ask SUNZ to

4  accept a $4 million letter of credit.  So, SUNZ agrees to

5  that accommodation and tries to work with the alleged debtor.

6  Then after that and the program is again renewed for the

7  final year, this brings us to January 2023, and what you will

8  see on your screen again at Document 94, page 19, is the

9  quotation agreement dated January 1st, 2023 for the alleged

10  debtor and its affiliates.

11    Again, this quotation agreement is also signed by

12  Sheldon Altschuler. He is still officer; he is then president

13  of the debtor and its affiliates.  Also, in this quotation

14  you will see again program summary terms, similar $500,000

15  deductible.  This program has grown at this time.  The

16  payroll for the alleged debtor is they've got $300 million

17  that are going to be under Sunz Insurance Company, that is an

18  affiliate of Sunz Insurance Solutions. I am representing Sunz

19  Insurance Solutions here today.

20    The (indiscernible) two insurance companies and

21  you see one of these companies is Sunz Insurance Company,

22  there is $300 million under that program, and there is also a

23  policy through (indiscernible), again another insurance

24  company, but same deductible and there's another $1.7 billion

25  in payroll.  So that is where you get the estimated payroll

1    for this was going to be over $2 billion. It ended up being

2    even higher.  Again, each year we are seeing similar

3    transaction documents being required, loss on management

4    agreement, security agreements and other documents.

5              Again, with the payroll you see this was a large

6    program.  During the four program years over 11,00 workers

7    filed claims under the insurance program.  SUNZ continues to

8    pay and resolve those claims.  All the while, the alleged

9    debtor is collecting money from its clients that $2 billion

10   in payroll and those monies are supposed to go to the

11   Worker's Comp insurance but the problem arose because the

12   alleged debtor stopped paying those monies to SUNZ.

13             Now I am going to turn to one of the underlying

14   transaction documents which is the loss fund management

15   agreement.  This is the one for 2023.  Again, it includes the

16   alleged debtor along with its affiliates.  It clearly states,

17   and this is at Document 40-2 page 100. This is the document

18   that governs the loss fund obligations for the insurance

19   programs, finding between the alleged debtor and SUNZ.

20             If we go to the end, this is under the loss fund

21   administration section, we see in Paragraph (c) the

22   calculation for how the loss fund is going to be -- there is

23   a minimum that the alleged debtor has to provide SUNZ and

24   that minimum is determined at 200 percent of the open case

25   reserve plus 100 percent of the per accident deductible.

1    Recall, the deductible is $500,000.  So, the way you

2    calculate this is you take the reserves on those claims,

3    multiply them by two and you add $500,000.  That is the

4    minimum that WorkCentric is agreeing to provide to SUNZ as

5    loss funds.

6         The former managers have argued that this metric

7    was changed. It was not, they are incorrect, but the contract

8    does provide SUNZ with the right to increase it and require

9    more then the minimum in the very next paragraph.  So, its

10   immaterial because SUNZ has that power to increase the loss

11   fund required.  I just want to clarify for the Court it did

12   not do that. It simply required WorkCentric to provide the

13   minimum which it failed to do and that is why the loss fund

14   deficient, the amount of loss funds, below what was required

15   continued to worsen.

16        You also see here the loss funds was required to

17   be paid in cash.  Again, allowing WorkCentric to provide a

18   letter of credit in lieu of cash. It was one of the first

19   financial accommodation, but it was one of many and despite

20   that the alleged debtor failed to pay what it owed.

21        Another important transaction document is the

22   security agreements that were executed each year. I am

23   showing on the screen the one from January 1st, 2023.  This

24   is at Document 40-2, page 134. Its important to note within

25   here WorkCentric, the alleged debtor, is representing

1   (indiscernible) that there are not security interests other

2   then what its providing to SUNZ on the collateral.  Its

3   saying it's going to keep its collateral free of all claims,

4   liens, security interests, and restrictions, and transfers

5   and so forth. It also specified that the alleged debtor will

6   provide SUNZ with any information on the collateral when

7   requested.  These provisions are important because with the

8   discovery of the Pipe lien and interest we now know that

9   WorkCentric violated these provisions.

10          So, let's talk about what happened during the last

11  program year. Again, you saw these were signed January 1st,

12  2023.  A few months later WorkCentric asked to let the letter

13  of credit dissolve. I am showing on the screen what we filed

14  at Document 97, page 39, an email from one of the former

15  managers, Mr. David Harvey to Rick Leonard, dated March 6th,

16  2023 and he is asking to let the letter of credit dissolve;

17  that is the $4 million letter of credit.  They are telling

18  SUNZ around this time that they are going to replace it

19  either with another letter of credit or with cash or maybe

20  with a promissory note.

21          SUNZ does permit this to happen because its

22  promised that its going to get replacement but that never

23  happened.  So, the letter of credit expires in April of 2024

24  and that it's a $4 million hit to the loss funds. We see it

25  in the trend.  What I am showing on the screen now, which is

1    at Document 97, page 60, is a standing trend for the loss

2    funds and this was dated as of October 17th, 2017 -- excuse

3    me, October 17th, 2023 and it was affixed to the demand

4    letter that we will talk about in a minute.

5            What this shows is that between March 23rd and

6    April 23rd the deficit worsened by over $6 million.  Again,

7    $4 million of that is the loss -- is the letter of credit,

8    that $4 million letter of credit, expiring and not being

9    replaced.  But you can see from this document how the

10   collateral required (indiscernible) was increasing as those

11   11,000 claims, 11,000 plus claims, continued to come in and

12   accrue amounts that need to be paid while the amount of loss

13   funds on hand is not keeping up with that increase.  So, you

14   see a downward trend in the deficit.

15           Again, this is the valuation, the trend report

16   that was provided to WorkCentric, the alleged debtor, with

17   the demand letter.  You can see at that time the incurred

18   amount of those claims is over $87 million.  That is

19   different than the reserves. The reserves are $29 million and

20   the collateral held is not enough to cover it.  That is

21   before we double the reserve and add $500,000 as the parties

22   agreed.  So, the minimum loss funds that the alleged debtor

23   was required to provide at this time was over $29 million.

24           For context we have also taken the same trend and

25   we have added some annotations to it so that the Court can

1  see, again, exactly where the letter of credit was expiring,

2  where the promissory note was offered by WorkCentric, and I

3  will talk about that in a moment, and how these events

4  changed.  We have also added, in the yellow boxes, we have

5  learned from the Pipe contracts that were filed at Docket 56,

6  again we did not have those until they were filed in this

7  Court, but they show what the alleged debtor was negotiating

8  and agreeing to with Pipe while their obligation to Sunz was

9  getting worse.

10        So, that brings us to July 18th, 2023.  Again, the

11  alleged debtor has said it will replace that $4 million

12  letter of credit with a note or cash.  It took until July for

13  them to provide that replacement and by that time the amounts

14  had increased and so you see that is why they signed the

15  $13.9 million note because that was the amount of the

16  deficient in June of 2023.  They signed the note in July

17  after delay, and they unilaterally extend the maturity date

18  saying that they are not going to pay that till September.

19  Even when that happened, they failed to pay.

20        In August 28th, 2023 SUNZ had served a notice of

21  default under the insurance program.  There was $1.8 million

22  in premium that was not paid, there was $19 million in loss

23  funds that was not paid. They were provided 10 days to cure.

24  Then, you know, the note is not paid.  They send a separate

25  demand under that.  All the while SUNZ doesn't know that the

1 | alleged debtor is executing a fourth forbearance agreement

2 | with Pipe and that is August 29th, 2023. Those documents have

3 | now been filed with the Court.

4 |      You can see on your screen this is the Pipe fourth

5 | conditional forbearance agreement sent to Docks Sutherland

6 | who executes it on the third page on behalf of the alleged

7 | debtor.  He admits that they owe $25.3 million to Pipe.

8 | Again, SUNZ doesn't know independently whether this is what

9 | the petitioning creditor filed to the Court and represented

10 | that it's a valid document.

11 |      What we do know from this is that the alleged

12 | debtor appears to have been unable to pay Pipe and it was

13 | agreeing that a payment that was due in August -- excuse me,

14 | that was due in May was going to be pushed to August.  So,

15 | they attached an updated repayment schedule and we see from

16 | these payments are apparently going to resume October 13th,

17 | 2023.

18 |      Less then two weeks after this fourth forbearance

19 | agreement is executed by the alleged debtor with Pipe that is

20 | when the promissory note with SUNZ matures and is not paid.

21 | SUNZ served demands under the promissory note dated September

22 | 19th, 2023.  Again, that is in the record at Document 30-10,

23 | page 211.  And during this time the alleged debtor reaches

24 | out and seeks to cure to try and find a way to get some

25 | additional time.

1                The culmination of the conditional forbearance

2       term sheet was executed October 7th, 2023.  You see Mr.

3       Sutherland signs it on behalf of the alleged debtor ands the

4       other entities.  And this sets the stage for the forbearance

5       agreement that we are going to talk about in a moment.

6                First, I want to note, he sends Mr. Sutherland,

7       the former manager, sends to SUNZ on October 7th, 2023, a

8       (indiscernible) email.  He attaches the executed version that

9       I just showed the Court and he also attaches the redline.

10      And he tells SUNZ, There's been one change and he says it's

11      been made by counsel, because there's some receivable

12      financing from 2021, meaning they couldn't sign with the

13      line, and so they've removed that line, and he tells SUNZ,

14      he's asked a couple times for the receivables lender to give

15      him a schedule, but they're disorganized and he's still

16      waiting on it.  So, he's saying, I can't tell you what this

17      debt is, but something's out there.

18               So when we look at the redline, we see the only

19      deletion was to remove a provision where the alleged debtor

20      would then say, There were no other liens encumbering the

21      borrower's assets.  So at this point, October 7th, 2023,

22      they're disclosing that there's something out there, but

23      they're not telling us what it is.  And he's telling us he

24      doesn't know anything about it, which is difficult to

25      reconcile with the fact that he had just signed the

1  forbearance agreement that has an explicit payment schedule

2  where payments are going to resume on October 13th, you know,

3  six days after this is sent.  But yet, again, that's what he

4  represents to SUNZ.

5          So that brings us to the operative forbearance

6  agreement and pledge agreement.  The forbearance agreement

7  can be found at Document 97, page 62, and you can see it's

8  dated October 11, 2023.  As I mentioned, it includes the

9  (indiscernible) management agreement, the note, the security

10  agreement, and the other insurance underlying program

11  documents, as transaction documents and WorkCentric, the

12  alleged debtor, its affiliates, they admit they owe not less

13  than $25,800,582.90, and that includes the amounts for the

14  promissory note that they failed to pay.

15          Again, they say it on the next page, as well,

16  agreeing that that amount is due, without offsets, defense,

17  or counterclaim.  And they agree that all the transaction

18  documents are valid and binding.  They agree to execute the

19  pledge agreement that we'll talk about in a minute.  They

20  provide certified membership interests to SUNZ and, again,

21  this is a final attempt for them to buy some time to commit

22  through a process.  And, again, that process that they're

23  talking about is selling the equity interests in the debtor

24  or selling its (indiscernible) or hopefully getting financing

25  to try and get them enough to pay the amounts that they owe.

1            In paragraph 3, we see that forbearance was
2    limited in time and it could terminate under the earlier of
3    multiple conditions, at the latest, 120 days, but
4    importantly, if the reserves, that lost-fund deficit exceeded
5    $23 million, if there was any default under the loss fund
6    management, if they failed to effectuate that process, if
7    they made transfers to -- of collateral to a third party, and
8    if there was any breach of any other transaction document.
9            In paragraph 4, it talks about a default under the
10   forbearance agreement, that they would get 10 days'
11   opportunity to cure.  Very clear.  It goes on, and on the
12   next page, continuing with paragraph 4, saying that they,
13   again, would have 10 days to cure and if they didn't, the
14   forbearance would be terminated and that SUNZ would then,
15   with no obligation to forbear, it could proceed immediately,
16   exercising all the rights under the transaction documents,
17   without further notice.
18           Importantly, I want to point out an event of
19   default under the forbearance agreement included that the
20   obligors had breached any provision of the transaction
21   documents.  This is what I mentioned earlier.  Any breach of
22   the transaction document is an event of default under the
23   forbearance agreement and if it's not cured, that's
24   sufficient to trigger everything that we're talking about
25   today.

1    There are several clear breaches of transaction

2 documents, which constitute breaches of this forbearance

3 agreement that we've walked through and detailed in our

4 papers.  One of the first ones that we continue to mention is

5 the loss fund deficit.  Again, the debtor was required to

6 maintain a minimum amount of loss funds, at 200 percent of

7 open reserves, plus (indiscernible).

8    Under the forbearance agreement, they get a huge

9 accommodation in that.  Rather than provide this amount,

10 provide it in cash and provide it in 10 days, they're allowed

11 to have a negative balance of $23 million.  But even with

12 that huge accommodation and forbearance, they don't keep up

13 with the loss fund and SUNZ served the demand on October

14 18th, 2023, and this is found at Document 97, page 54, and it

15 identifies to the former managers that the loss fund was in a

16 deficit position of over $29 million.  So they were given 10

17 days to cure -- actually, they were given a little more than

18 10 days -- and they were given until October 30th to cure, by

19 paying a little more than $6 million.  Again, that would have

20 just brought the loss fund to negative $23 million, still a

21 huge deficit, but that's what they needed to do to avoid a

22 default under the forbearance agreement, really under the

23 loss fund management agreement, as supplemented by the

24 forbearance agreement.

25    And SUNZ provided this notice on October 18th.

1   They had until October 30th to cure.  The former managers of

2   the alleged debtor, they failed to cure.  And there's no

3   dispute about that.  There's no allegation that they made any

4   payment or did anything more, and this is a clear default

5   under paragraph 4 of the forbearance agreement.

6           And as a default, under the forbearance agreement,

7   it is then also a trigger under the pledge agreement.  I'm

8   showing on the screen paragraph 5(f) of the pledge agreement.

9   It can be found at Document 97, page 75, and it says herein:

10          The term "default" shall mean a breach under the

11  forbearance agreement.

12          And so that's why we've explained, if you've

13  breached the forbearance agreement, you default and breach

14  the pledge agreement, triggering SUNZ's rights under that.

15  And, again, you can breach the forbearance agreement, as the

16  alleged debtor did, by breaching the transaction documents.

17          And this makes sense, because at its core, the

18  pledge agreement, as we see in paragraph 2, was designed to

19  secure the prompt payment and performance in full when due.

20  It was designed to get WorkCentric to pay the amount that

21  they needed to pay and secure against any further default.

22          Now in response, the former managers have raised

23  some counter arguments that are illogical.  For example, they

24  contend they should get credit for the promissory note, even

25  though they failed to pay it at maturity.  So an unpaid note

1    that's in default is valueless.  It was breached before the

2    forbearance agreement was executed and there's really just no

3    credible basis for them to contend it should be considered to

4    offset the amount that was due.

5            And if even if you look at the forbearance

6    agreement itself on the first page, when it talks about the

7    loss funds, it says that includes obligations in respect of

8    the note.  So the note didn't do the trick because they

9    didn't pay it.  It's in default.  And for them to try and ask

10   for credit for that note, it just makes no sense.

11           Now, the loss fund deficit was a large number, so,

12   obviously, it's been the focus.  Its independent reason

13   (indiscernible) enough for this Court to find the debtor is

14   in breach under all these documents and that their rights

15   under the pledge agreement have been triggered.

16           But before I turn it over to Mr. Berger to talk

17   about this those rights, I want to point out, there are

18   several other independent breaches that justify the exact

19   same ruling.  First, I'm going to touch on premium.   In

20   Mr. Leonard's declaration, which I'm showing on the screen as

21   Document 97, page 7, in paragraph 6, he explains that the

22   alleged debtor failed to pay on its weekly invoices,

23   beginning with those that were just prior to the forbearance

24   agreement, the September 19th, 2023, invoices and going

25   forward.

1          Now, those invoices sought amounts for both,

2    premium and loss funds, and he included a table, which I'll

3    show on the screen.  And you can see on this table, which is

4    Document 97, page 56, that you see the weekly invoices.  And

5    under the parties' contract, these are due to be paid within

6    10 days.  And you see the total premium and taxes that were

7    being charged, a little over $4 million, and this was not

8    paid.

9          And that's in addition to the loss fund, which you

10   see here as collateral, that was also being assessed on a

11   weekly basis.  Again, the failure to pay this is an

12   independent breach of the alleged debtor's contract, those

13   transaction documents, and each breach of those transaction

14   documents is a default under the forbearance agreement, which

15   is a default under the program agreement.  Again, that's

16   separate from loss funds and it justifies SUNZ's exercise of

17   its right under the pledge agreement.

18         Separate and apart from that, you know, it just

19   explains the alleged debtor didn't cure the loss offer

20   deficit.  It stopped paying premium and loss funds, and

21   instead of complying or curing, we learned that they

22   transferred collateral away, which is an independent

23   violation.

24         And here, we think it's important to look back at

25   the timeline.  Again, October 18th, 2023, is the date that

 1   SUNZ served its notice under the forbearance agreement of the

 2   breach and pledge agreement, telling the debtor and the

 3   former managers, they need no cure.

 4          They've given until October 30th, and around that

 5   time, they start discussing turning things over voluntarily.

 6   Now, we see on your screen at Document 95, page 6, part of an

 7   email chain, October 26th, 2023, where counsel for the former

 8   managers (indiscernible) by saying, you know, I understand

 9   from Docks that SUNZ will be exercising its pledge.  There's

10   no objection or a contest or challenge, just a request to

11   discuss.

12          When we go further up in the chain, we see

13   counsel, Mr. Berger requesting that they provide information

14   on financials and the Pipe documents; again, those still

15   haven't been produced.  And when they do talk, counsel for

16   SUNZ summarizes the communications that says:

17          You have advised me the Docks will provide an

18   executed quitclaim of all pledged membership interests

19   tomorrow.

20          Counsel for the former managers, and at that time,

21   the alleged debtor, respond and says:

22          As we discussed, I am endeavoring to send to you

23   an initial draft of the quitclaim assignment as soon as I

24   can.

25          This is October 31, 2023.  So, counsel for the

1  alleged debtor at that time and former managers is

2  essentially saying, We're going to turn it all over.  You

3  know, quitclaim assignments were not necessary, but they're

4  representing that they're being prepared and that they're

5  going to comply and turn everything over.

6           In our papers, we focus on, because we think this

7  evidence is waiver of any cure period or technical default if

8  there is any issue, again, I don't think there is, but this

9  certainly looks like (indiscernible) waived it if such a

10  technical issue existed.

11          But what I want to focus on right now is that this

12  is what they're telling on October 31, 2023.  But it turns

13  out that on the eve of that, the former managers, on

14  October 27th, 2023, just a couple of days before, are

15  transferring assets away without SUNZ's consent.

16          So what we have on your screen now is Document 97,

17  pages 100 and 101, is an email from Docks Sutherland, dated

18  October 27, 2023, where he's directing some outgoing wires:

19  directing the payment of commissions; payments to counsel,

20  Quinn Emanuel and Holland & Knight; he's directing over a

21  million-dollar payment to an entity called Two Baboons, which

22  he notes is different than the invoice amount; and a $200,000

23  payment to Mr. David Harvey, again, one of the former

24  managers.

25          The accountants communicate internally and they

1    say, This is going to bring the bank balance to less than

2    $300,000; is that okay?  And they, just to confirm, should --

3    you know, nothing should be paid to SUNZ?

4              Again, this is when they're supposed to be curing.

5    This is during that 10-day cure period.  They're sending a

6    bunch of money out, over $2 million, and they're not doing

7    anything to address the $6 million cure that's required.  The

8    chain goes on where you see the accountants questioning.  You

9    know, they say monies are being sent to many of Docks' legal

10   invoices and other new vendors and some commissions.  They

11   don't have enough money to pay key risk, you know, the

12   replacement insurer they were trying to get and, you know,

13   they question what kind of service was provided by Two

14   Baboons, again, that million-dollar-plus payment.

15             The accountants respond saying that David,

16   presumably David Harvey, called and said Two Baboons invoices

17   were for website and software development.  The invoices are

18   from 2021 to 2023, but he wants to get it all paid in 2023.

19             And so, again, this is all being done during that

20   10-day cure period.  We know these payments did go out

21   because we received the bank statements from Wells Fargo,

22   which, again, show on October 27th, all these payments.  They

23   showed the payments to the lawyers.  They show the $200,000

24   to Mr. David Harvey.  And they show the over a million

25   dollars to Two Baboons.  And we think each one of these is a

 1  transfer of collateral outside the ordinary course, without

 2  consent from SUNZ, which is a breach of the forbearance

 3  agreement.

 4          You know, we saw the Two Baboons, in particular,

 5  and they're suggesting that it's for website or software

 6  development, but that's not how they described Two Baboons to

 7  SUNZ, back in December of 2021.  And what I'm showing is

 8  Document 97, at page 212 is WorkCentric tells SUNZ at that

 9  time it's a holding company and the chain goes on to where

10  the alleged debtor represents that Two Baboons and its

11  employees worked to build or purchase other companies.

12  They're investors or operators.  They say when the target

13  company is located, Baboons will hold some portions of the

14  shares in the acquired company until that company is fully

15  stood up.

16          Now, we believe that the Two Baboons are the

17  former managers, the two former managers, Mr. Sutherland and

18  Mr. Harvey, and that this one million dollars was sent to

19  them without the consent that's required for the transfer and

20  certainly not within the ordinary course of business.  So,

21  again, that triggers 3(f) of the forbearance agreement

22  because it's a transfer of collateral to any third party

23  outside the ordinary course of the borrower's business, the

24  staffing business, without the express written consent of

25  SUNZ.  That's an independent breach of the forbearance

1   agreement and, thus the pledge agreement.

2           I think the $200,000 to former manager David

3   Harvey is its own breach.  We also think that the payment to

4   the attorney's fees, that's $400,000, you saw it go out on

5   October 27th, is suspicious in terms of timing and some of

6   the emails saying it didn't match the invoices, and we think

7   that is also questionable, given the timeline of what's going

8   on here, and that that is independent breaches.  And that's

9   before you get to November and December and those bank

10  statements, which show the former managers continued to send

11  money out without consent from SUNZ.

12          There's another category that we've identified,

13  which was the failure and refusal to provide requested

14  documents and information.  In Mr. Leonard's declaration, and

15  this is at paragraph 25, he informs the Court that if former

16  manager Sutherland or the alleged debtor had disclosed the

17  amount of the Pipe debt, SUNZ would never have entered into

18  that forbearance agreement.  They wouldn't have rescinded the

19  notices of cancellation for insurance and, thereby, provide

20  additional insurance to try and give WorkCentric time to work

21  a sale or get financing, because it just would not have been

22  workable.

23          And to that point, I want to turn back to

24  Mr. Freulich (phonetic), again, then-counsel for the former

25  managers and alleged debtor's email of October 31, 2023.  In

1  that email, he throws out right at the end, you know, when

2  the cure period has elapsed, this is the day after.  There's

3  been no cure.  He asks if Docks Sutherland should spend time

4  on Upsilon's offer to acquire 100 percent of the business.

5  He says the term sheet with the $30 million purchase price.

6          Again, now there's no evidence that this was a

7  real buyer, or that the term sheet existed or that there was

8  any substance to this, but just the concept that you would

9  sell a business, 100 percent of it for $30 million when you

10  owe $25 million to SUNZ and $25 million to Pipe, it's just

11  ridiculous.  It just doesn't make any sense and it looks like

12  it was just a delay tactic, because no one is going to pay

13  $30 million for $50 million in liability.

14          Now, you see below in this chain, as I mentioned

15  before, my colleague Mr. Berger had been asking repeatedly

16  for information on Pipe Technologies, as well as the other

17  banking and financial information.  We saw this requested

18  earlier on October 12th, 2023, and there's an email from Mr.

19  Herrig, the CEO of SUNZ to Mr. Sutherland, Mr. Altschuler,

20  and Mr. Harvey, he's asking for information on the factoring

21  debt, with how Pipe had been characterized and none of this

22  had been provided.  And, again, it is required to be provided

23  under the transaction documents.

24          Showing on the screen, paragraph 5 of the

25  quotation agreement, which requires the debtor to provide

1    financial materials without limitation or restriction, when

2    requested, that include balance sheets, income statements,

3    cash flows, et cetera; a whole host of items that are

4    required to be provided.

5              Separately, as I mentioned before, the security

6    agreement, paragraph (f), this is 5(f), requires information

7    and inspection.  It requires the alleged debtor to promptly

8    furnish them with any information with respect to the

9    collateral when requested.

10             The documents about Pipe were clearly requested

11   and they were never provided.  And, again, you saw from the

12   timeline that the former manager, Mr. Sutherland executing

13   multiple forbearance agreements with Pipe, including that

14   fourth forbearance agreement just a couple of weeks before

15   these requests from SUNZ about Pipe, and yet he's saying, I

16   don't have it.  I can't provide anything.  He's clearly

17   breached their obligation to furnish information and that,

18   again, is an independent breach of the underlying transaction

19   documents, the forbearance agreement, and the pledge

20   agreement.

21             And there's been no response from the former

22   managers and the alleged debtor as to why they failed to

23   comply with those requirements or to challenge that that is a

24   default under the provision.

25             Your Honor, in our written response, we've also

1   outlined, you know, to these breaches, everything that I

2   walked through, are breaches of the implied covenant of good

3   faith and fair dealings that are inherent in every contract,

4   and it really shows the former manager and alleged debtor

5   were negotiating these documents, the forbearance agreement

6   and pledge agreement in bad faith.

7          You know, if they had told us about this

8   additional $25 million in liability, these documents wouldn't

9   have been entered into and this would have ended a while ago.

10          And then, you know, while they're in the process

11   of negotiating and executing these documents, they stop

12   paying the weekly amounts that are due and then they then

13   transfer money away to their attorneys, to themselves, again,

14   without consent, despite promising that they're going to turn

15   things over.

16          So there are so many breaches, but if nothing

17   else, the former managers certainly should not be permitted

18   to profit (indiscernible) the liabilities that have accrued

19   from their massive program.  Again, this program was over

20   11,000 total injured employees.  A thousand of those have

21   open claims that SUNZ continues to handle and that's why

22   these amounts continue to increase.

23          And so, you know, the amounts that we're talking

24   about were necessary to pay premiums and to pay for these

25   claims for the alleged debtor's own employees, and that's the

1  liability the former managers are trying to circumvent.  But,

2  then, it's beyond dispute that they -- the alleged debtor

3  breached the program agreement and forbearance agreement

4  through their own terms, but also through these independent

5  breaches of the underlying contract, those transaction

6  documents.

7          So with that, unless the Court has any questions,

8  I will turn it over to my partner, Mr. Berger, to discuss the

9  effect and the exercise of the pledge agreement.

10          THE COURT:  No, I have no questions.

11          Mr. Berger?

12          MR. BERGER:  Good morning, Eyal Berger on behalf

13  of SUNZ.

14          Your Honor, I want to address why the pledge

15  agreement and applicable Delaware law basically allowed SUNZ

16  to do what it did based on the myriad of defaults that were

17  uncured that Mr. Margolin just walked the Court through.  In

18  the former manager's objections, they raise a myriad of

19  technicalities to try to basically cause some type of

20  confusion as to how SUNZ could use its rights under the

21  pledge agreements, and I am going to try to walk the Court

22  and bring some clarity to that.

23          The first thing I want to do, Judge, is I was one

24  of the lawyers that actually sat there and negotiated the

25  pledge agreement, and I think that the context -- pledge

1    agreements provide different rights and different powers

2    depending on what the parties are trying to solve for, and I

3    think the context here is going to sort of educate and make

4    self-evident why SUNZ would have bargained for and received

5    the broadest powers possible.

6            Mr. Margolin walked the Court through some of the

7    forbearance obligations, and the key obligation there is that

8    what was being promised to SUNZ and why SUNZ was forbearing

9    from exercising all of its rights under the transaction

10   documents is that the alleged debtor and its affiliates were

11   basically saying to SUNZ, look, we are going to do a

12   consensual sale or financing process, we're going to do it

13   over a period of approximately 120 days, we're going to do it

14   transparently and with the cooperation of SUNZ, and it's

15   through this process that we are going to achieve the cure

16   that you are forbearing your rights.  And I think that's

17   instructive and it's key because what are we forbearing?

18   We're forbearing for basically taking all our collateral

19   right then and there.  We are reinstituting our insurance,

20   which is going to create significant exposure to SUNZ, and we

21   are doing it because we are creating a process by which they

22   could potentially cure us.

23           So, in order to achieve those goals, it was both

24   the intent of the parties and ultimately what they documented

25   in the pledge agreement for SUNZ to have the broadest rights

1    possible.  And why is that?  It's because there are four

2    things that would absolutely have been necessary given the

3    history of defaults that Mr. Margolin just walked the Court

4    through.

5          First of all, because we are engaging in some type

6    of sale process or financing process, SUNZ needed to achieve

7    pledge powers and rights that would allow that process to be

8    uninterrupted, not knowing what that process could be.  It

9    could have been an equity deal; it could have been asset

10   deal.  Not knowing the ultimate offer presented, we would

11   have needed the broadest rights possible so that former

12   management could not interrupt that process.  That's first

13   and foremost.

14         Secondarily, Judge, we would have needed absolute

15   ability to take over management so that the assets and equity

16   could not be further unencumbered because we didn't get

17   answers on the Pipe indebtedness, and to fulfill due

18   diligence requests, and we would have needed control rights

19   to stop any type of further misappropriation at the alleged

20   debtor level or at any affiliate level.

21         So all of these things that we had negotiated as

22   something that the forbearance contemplates, the pledge

23   agreement can only implement if you have the broadest rights

24   possible throughout the chain.  And what I'd like to do,

25   Judge, is I'd like to just quickly show on the screen how the

1    chain looks based on what was represented and warranted in

2    the pledge agreement.  And, Judge, may I share my screen as

3    well?

4              THE COURT:  Yes.

5              MR. BERGER:  So, Judge, what you should be looking

6    at is this is the corporate org chart as represented and

7    warranted by all of these parties in the pledge agreement,

8    reflecting at the very top Mr. Sutherland is the 100-percent

9    owner of WC Container, which is the 100-percent owner of WC

10   TopCo, which is the 100-percent owner of the various entities

11   down below, including the alleged debtor, WorkCentric, LLC.

12             Knowing that these interrelationships existed was

13   also key to the plain language of what we negotiated in the

14   pledge agreement.  And what we did, Your Honor, is in

15   paragraph 66 of our response -- and I'm going to put a chart

16   that just summarizes that on the screen -- is we basically

17   went through all the various powers and rights that we

18   negotiated across all of these entities to allow us to

19   implement the default rights that we knew we would have to

20   achieve if there was an uncured default in this process.

21             So, first and foremost is, it is true that many

22   pledge agreements limit a pledge right to a distribution or

23   voting right, that is true.  This pledge agreement never,

24   ever intended that for all the reasons that I just argued,

25   Your Honor.  It had a voting rights and consent rights, but

1    it had a very expansive and probably the most expansive

2    possible right to basically enjoy all of the remedies

3    available to any member.  And I cite to Section 883 in the

4    pledge agreement that explicitly says that the secured party,

5    being SUNZ, shall have a right, in addition to every other

6    right and remedy in the pledge agreement, so in addition to

7    voting rights, in addition to consent rights, to exercise all

8    rights of the pledgors as members of the borrowers, and we've

9    defined those as member rights.

10            That was key, Judge.  We wanted to be able to take

11   control because we did not know how we would find the alleged

12   debtor or any of the other pledgor in the event of an uncured

13   default.  We negotiated heavily and received that right and

14   we did so, Your Honor, not by just getting the power to

15   achieve it, but also by getting warranties, representations,

16   and covenants from all involved to be able to freely exercise

17   that right, and that is also key, Your Honor.

18            If you look at the summary on the screen, you're

19   going to see that Section 5 of the pledge agreement basically

20   has every single party to the pledge, including the former

21   manager's consent and warrant that -- the first consent is

22   found in -- applicable to what we're arguing here is found in

23   5(c) that nobody needs any consent authorization, approval,

24   or other action by, and no notice to or filing with

25   governmental authority, or other person or entity, is

 1   required for the execution, delivery, or performance of this

 2   agreement by such pledgor, for the exercise by SUNZ of the

 3   voting and other rights provided in this agreement, or for

 4   the exercise by SUNZ of the remedies in respect to the

 5   pledged collateral.

 6          So we specifically had everybody covenant,

 7   represent, and warrant that we would need nobody's consent or

 8   authority and no approvals before we did anything regarding

 9   our remedies, and one of those remedies specifically involved

10   the remedies that a membership could assert.

11          We followed that up, Your Honor, in 5(f) by

12   expressly stating that if there was an occurrence of default

13   the pledgors have expressly consented that SUNZ could

14   exercise any rights of membership in the borrowers.  And the

15   key word there is any.  It's not limited to voting, it's not

16   limited to distribution, it's not limited to consent; it is

17   any right.  This was hotly negotiated.

18          We also ask for two things that you don't

19   typically see in a pledge agreement, Your Honor, but in the

20   context of this case it was important for us to receive those

21   things because, again, we're trying to implement what we

22   believe is going to be a consensual sale process that could

23   be interrupted if there's a default.  And so we asked for two

24   things:  One, we actually asked for each pledgor to

25   certificate the membership interest and to actually send an

1  original to our possession.  And, Your Honor, I can represent

2  to the Court that to this day each and every one of those

3  certificates is currently in my possession in Fort

4  Lauderdale, Florida.

5            Secondarily, we specifically asked for an

6  expansive power of attorney that's found in Section 9.  We

7  did this, Your Honor, because the contemplation was that if

8  there was a continuing default, and we're in the midst of

9  either some type of sale process or financing process, SUNZ

10  wanted, negotiated, and received the power to be able to

11  complete that process.  And both of those rights, the

12  certificated membership interests and expansive power of

13  attorney, attorney in fact rights were meant to be used to

14  any type of third party that we might be facing in the event

15  that former management basically absconded, didn't cooperate,

16  or the defaults made it impossible to receive their

17  consensual process to complete the process.

18            Finally, and maybe most importantly, Section 10

19  had a very expansive express waiver that basically all of the

20  obligations that they were committing under the pledge

21  agreement were basically unconditional and absolute, and it

22  didn't matter if there was a bankruptcy filed against the

23  entity and it didn't matter if there was any circumstance

24  that they could come up with that they could allege a

25  defense, they were basically waiving that outright so that we

1    would not be arguing exactly what I'm sitting here arguing

2    today.  This was designed so that they couldn't come up with

3    some bizarre technicality under an operating agreement, they

4    waived that.

5            So that is the pledge rights summary.  And I will

6    take that off my screen, Your Honor.

7            So, basically, the pledge agreement, Your Honor,

8    is governed by Florida law, and Florida law says that the

9    simplest way to view and implement the intent of the parties

10   is to look to the express language of the pledge agreement.

11   I have just shown you, Your Honor, in a summary of the key

12   sections of the pledge agreement that it is not limited to a

13   voting right, it is not limited to a distribution right, it

14   has expansive, expansive rights; we can exercise any rights

15   of a member.  That's the -- Florida law also provides, and we

16   cited in our brief, that the Court should give intent to

17   every provision in the agreement.  Reading it as former

18   managers would want the Court to interpret the pledge

19   agreement would basically eliminate six or seven pivotal

20   sections in the pledge agreement and make them completely

21   superfluous.

22           What's also instructive is there's nothing in the

23   pledge agreement that requires any type of order of remedies,

24   that requires any additions before you exercise a remedy, it

25   simply requires a default, and Mr. Margolin walked the Court

1  through all of the defaults that have not been cured and have

2  still not been cured, they haven't been cured to date.

3         I next want to turn to, Your Honor, actually

4  Delaware law because here is where the former managers try to

5  cause the most confusion, I believe, in their citation to the

6  Court.  They cite the Court to 18-702 for some proposition

7  that it would be impossible to assign a governance right, but

8  if you actually read the plain language of 18-702 that's not

9  what it's trying to preclude.  It's trying to preclude a

10  partial assignment of some type of distribution right.  Here,

11  that's just not applicable for a couple reasons.  One, we're

12  exercising governance rights and not distribution rights;

13  and, two, these are all single-member LLCs by their own

14  representations and warranties.  Simply put, we have the

15  right to everything; we're not trying to partially split

16  anything.

17         So, from that perspective, their citation to 18-

18  702 is misplaced and 18-702 actually expressly permits an

19  assignee of an LLC interest to participate in the management

20  and the business affairs of the LLC, which is exactly what

21  SUNZ is doing under the rights that it received in the pledge

22  agreement.  So their citation to 18-702 actually supports the

23  proposition that SUNZ had the ability to remove former

24  managers and replace them with WorkCentric 1 and the

25  authorized representative of Chris O'Connor.

1          Separately, Your Honor, our brief cites to several

2    Delaware provisions that make this clear.  We cite to 18-407,

3    that expressly cites that you can authorize the delegation of

4    management by a member, which SUNZ did that using WC TopCo's

5    member rights.  18-402 says that you can -- a member can

6    expressly bind an LLC to any agreement that's approved by its

7    member.  Again, we would argue that our consent resolutions

8    do that here.

9          18-101(8) contemplates that an operating agreement

10   could be amended by implication.  We argue that that's

11   exactly what happened here, that the consent resolution

12   either explicitly or implicitly amended the operating

13   agreements to allow SUNZ to take the actions that it did

14   under the pledge agreement.

15          Further, Judge, we cite to Delaware law that

16   basically says that you can validate in equity any

17   permissible act if it does not formally adhere to the

18   operating agreement.  So here, even if some bizarre

19   technicality existed -- for example, they raise this whole

20   natural person, or they raise whether it's manager-managed or

21   member-managed, any of these technicalities, so long as

22   Delaware law would have allowed us to do it, you can --

23   Delaware law contemplates validating the action that we took

24   in equity because we are possessing all of the powers of the

25   members that could have taken the action, and we either

 1 │ implicitly amended the operating agreement or the Court can

 2 │ view it as amended by our actions.

 3 │          Finally, the operating agreements themselves

 4 │ contemplate this action because both the alleged debtor's

 5 │ operating agreement and WC TopCo's operating agreement

 6 │ expressly provide that they can be unilaterally amended by

 7 │ its member.  And who controls all rights of the members at

 8 │ the time of default?  SUNZ does.  So we argued in our brief

 9 │ in multiple places that we either explicitly did this through

10 │ the corporate resolution, because the corporate resolution

11 │ specifically says -- and I can put that on the screen, Your

12 │ Honor, real quick -- if you'll look, Your Honor, the

13 │ corporate resolution explicitly waives all formal

14 │ requirements and we would argue any formal amendment of the

15 │ operating agreement would fall within that.  So that we would

16 │ not have had to formally file an amended operating agreement

17 │ to take this action, both under the waivers that we went

18 │ through in the pledge agreement and under the waivers that

19 │ are specifically in the resolution, and under Delaware law

20 │ that specifically allows the action of the sole member to act

21 │ as an implicit amendment of the operating agreement.  All of

22 │ those reasons would support our ability to have removed the

23 │ former managers and place WorkCentric I and Chris O'Connor in

24 │ its place.

25 │          Finally, Judge, we would argue that the former

1    managers have basically by estoppel and waiver waived their

2    ability to raise any of these arguments.  The pledge

3    agreement expressly provides an express waiver and it

4    expressly provides two separate consents for SUNZ to take all

5    of the actions that we took post-default.  So those

6    provisions would basically act as a contractual waiver and an

7    estoppel that would prevent the former managers from seeking

8    in any way to stop their removal and replacement by SUNZ.

9         And finally, Judge, we argue that we ratified all

10   of these actions by two separate resolutions.  The resolution

11   that removed and replaced them had a broad ratification

12   provision that ratified all prior actions, that would include

13   the execution of the pledge agreement, to the extent that

14   there was any authority lacking for that, and then subsequent

15   resolutions ratify the existing resolution.

16        For all of these reasons, Judge, the plain

17   language of the pledge agreement, operative Delaware law

18   explicitly provides for this, the specific waivers of the

19   former managers, all of these reasons, the Court should

20   absolutely deny the cross-motion to strike and hold that SUNZ

21   properly remove the former managers and replace them with

22   WorkCentric I, the current manager, for the bases alleged in

23   our brief and argued here today.

24        And, Judge, I'll be happy to answer any questions

25   that the Court might have.

1          THE COURT:  I have no questions.

2          MR. BERGER:  Then I think I'll turn the podium

3    over to Mr. Desgrosseilliers.

4          MR. DESGROSSEILLIERS:  Good morning again, Your

5    Honor.  For the record, Mark Desgrosseilliers on behalf of

6    WorkCentric I, LLC, the manager.

7          I'm going to be brief, but the manager adopts the

8    arguments that were made earlier.  Obviously, we made that

9    clear in our filings.  There's no question that there was a

10   breach here of multiple -- multiple breaches, multiple

11   agreements.  There's also no question that SUNZ properly

12   appointed the manager as -- exercised their voting rights to

13   properly appoint the manager, and the manager has the sole

14   rights in this case to act for the alleged debtor.  And,

15   again, adopting the arguments that were already made.

16         In addition to the defaults mentioned by Counsel

17   for SUNZ, and I think it's raised in the filings by the

18   manager, there are continuing defaults.  The defaults

19   continued post even the filing of the involuntary petition,

20   right?  They are still in default, they have not cured, made

21   the monetary cure necessary, they being former management,

22   nor has former management nor the alleged debtor cured the

23   informational and documentary defaults at any point to today,

24   as set forth by Counsel for SUNZ.

25         I think it's critical, Your Honor, to point out

1    that the manager since its appointment has acted in the very

2    way you would expect a manager of this company to act,

3    attempted to act that way until its efforts to do so were

4    thwarted by former management.  Among other things, upon its

5    appointment, the alleged manager did not, as alleged, seize

6    the assets and destroy the business of the alleged debtor.

7    Instead, what the manager did is attempt to mitigate the harm

8    brought about by former management on the, as mentioned,

9    11,000 people receiving workers' compensation benefits.

10           We also attempted -- or the manager also attempted

11   to mitigate the harm inflicted on creditors, including SUNZ;

12   stop the persistent efforts that are detailed in the

13   declarations of Mr. O'Connor that were filed in this case;

14   the efforts of former management to deplete the assets of the

15   alleged debtor for their own benefit; and also find and

16   obtain the return of funds, primarily premiums that were not

17   paid as they should have been in accordance with Florida law.

18           In contrast, I think the actions of former

19   management, certainly as detailed in the declarations of Mr.

20   O'Connor filed in this case -- and one moment, Your Honor --

21   with respect to those declarations here, they are all on the

22   docket, filed in support of the various pleadings.  The

23   declarations of Mr. Connor -- Mr. O'Connor, sorry, are at

24   Exhibits 35, 36, and 37 of the binder submitted to Your

25   Honor; and Mr. Leonard, those are Exhibits 38 and 39 of such

1   electronic binder.  But, again, the actions of the manager

2   since its appointment stand in stark contrast to the actions

3   of former management.

4           After the defaults under the forbearance

5   agreement, indeed after the time for curing the defaults had

6   expired, former management continued to transfer substantial

7   funds from the alleged debtor's accounts, as detailed by Mr.

8   Berger and I think by Mr. Margolin, but also as set forth in

9   Mr. O'Connor's declaration.  That was filed in support of the

10  manager's reply to the objections and it's Exhibit 37.  There

11  were hundreds of thousands of dollars transferred to counsel

12  for former management, over a million dollars transferred to

13  Two Baboons, as Your Honor has heard -- and, again, this is

14  detailed in paragraph 8 of the O'Connor declaration -- and

15  it's information that the manager has obtained from the

16  discovery from Wells to date.

17          Moreover, while the manager (indiscernible)

18  coverage for certain of the employers of those 11,000 people

19  who might otherwise not be able to have insurance coverage,

20  the alleged debtor, based on the manager's review of records,

21  limited review of records to date, has used -- has continued

22  to use delay and litigation to siphon off customers to

23  related entities.  And so rather than attempt to restore the

24  inappropriately transferred premiums, recover losses in

25  excess of the (indiscernible) former management has used a

1  strategy of delay and litigation, which they continue today,

2  to serve their own ends.

3          Moreover, there were allegations I think on some

4  of the filings by former management that the manager

5  exercised control over Wells, I think as evidenced by the

6  Wells records.  It's certain that the manager did not, at

7  least with respect to the Wells account, exercise control

8  over that Wells account.

9          And, finally, I would note, as Your Honor raised

10  at the beginning, the withdrawal of the former manager's

11  motion to dismiss late last night.  I think it's further

12  evidence and, again, it's reflective of prior actions by

13  former management, including, as Your Honor will know from

14  reading the pleadings, the withdrawal of the TRO that was

15  initially filed with the arbitration demand and the demand

16  that the manager be enjoined from exercising its management

17  rights, that was withdrawn in the arbitration.  So when Your

18  Honor asked whether that issue, i.e. the control issue, was

19  raised in the arbitration or was being addressed in the

20  arbitration, it is not because that TRO was withdrawn, and

21  the automatic stay prevented SUNZ from filing a response and

22  an answer to that and raising those very issues.  So that is

23  not being addressed in the arbitration, but that is why.

24          And, again, the withdrawal of that motion to

25  dismiss last night is further evidence of abdication of

1    former management of any management duties.

2            So for the reasons set forth in the motion to

3    strike, Your Honor, and the response filed by SUNZ and by the

4    former management, you know, the manager's position is that

5    the -- sorry, the former management is certainly not the

6    party to act on behalf of the debtors, it's not the party

7    that has the right to either object to or, as it tried to do

8    last night, consent to involuntary petitions.

9            Your Honor, it's a brief argument, I wanted to be

10   not repetitive.  And so I'm happy to answer any questions

11   Your Honor may have and, if not, I'd cede the podium over to

12   Mr. Sullivan.

13           THE COURT:  I have no questions.

14           I'll hear from --

15           MR. DESGROSSEILLIERS:  Thank you.

16           THE COURT:  -- Mr. Sullivan.

17           MR. SULLIVAN:  Good morning, Your Honor, Bill

18   Sullivan on behalf of WorkCentric and the alleged debtor.

19           On the screen is Martin Seidel from Holland &

20   Knight, and he is going to handle the presentation on behalf

21   of WorkCentric.

22           MR. SEIDEL:  Good morning, Your Honor.

23           THE COURT:  Good morning.

24           MR. SEIDEL:  I will endeavor to be slightly

25   briefer than the hour and 15 minutes we've just been through.

1    I was not aware that today was going to be converted into a

2    341 meeting where we were going to be presenting evidence of

3    who knew what about the debtor and the creditors, and all

4    such things.  I thought this was a legal argument.

5            And I will note, before I get into my

6    presentation, that we have had to endure lengthy

7    presentations of documents that are not in the record as if

8    they were evidence, an attorney testifying as to a

9    negotiation in October as a percipient fact witness, and I

10   would add that much of what was discussed there, including in

11   particular, I just want to point out to the Court, the offer

12   of a quit claim in October, which was part of a Rule 408

13   settlement negotiation between the parties and should be

14   disregarded by the Court, if not stricken from the record.  I

15   think since this is just a legal argument before Your Honor,

16   you know what to do with the evidence, I'm not going to waste

17   time responding to it, I'm not going to waste time moving to

18   strike it, you can treat it for what it's worth.

19           THE COURT:  Thank you, but can we -- since you're

20   raising that and I sought some clarity here at the beginning,

21   can we agree that the documents that are central to this,

22   according to SUNZ's argument, namely the pledge agreement,

23   the transaction documents, and the forbearance agreement, can

24   all be considered by the Court?  You have no dispute with the

25   authenticity or bona fides of those documents?

```
 1              MR. SEIDEL:  I would add to that the operating

 2    agreements of the various LLCs.

 3              THE COURT:  Okay.

 4              MR. SEIDEL:  And, yes, also I would say there is

 5    an October 18th letter --

 6              THE COURT:  Okay.

 7              MR. SEIDEL:  -- that was discussed, which I'm

 8    going to discuss, I think that can also be considered.  And I

 9    read from what you're saying, Your Honor, you mean to say

10    that these -- the interpretation of those documents, the

11    understanding of their interplay for purposes of the dispute

12    over control, you can consider that.

13              THE COURT:  Well, I want to be sure that the

14    documents can be admitted into evidence, and then I'm hearing

15    argument as to exactly what those documents mean or their

16    significance.

17              MR. SEIDEL:  Yes, I think that's appropriate, Your

18    Honor.  I think --

19              THE COURT:  Okay.

20              MR. SEIDEL:  -- the fact witness affidavits, the

21    letters, these various other extraneous documents beyond

22    those very core documents that Mr. Berger and Mr. Margolin

23    went on at length about are simply not appropriate or,

24    frankly, necessary to what we're doing here today.  And --

25              THE COURT:  All right.
```

1            MR. SEIDEL:  -- you know, I mean, I'll summarize

2    what I heard for the last hour and a half, which is

3    WorkCentric and its managers bad, SUNZ good.  And lots of bad

4    things have allegedly happened either before October 18th or

5    since October 18th, what's missing from that -- and I think,

6    Your Honor, we put this in at one point -- is the whole gist

7    of the arbitration they keep referring to was that

8    WorkCentric alleged that SUNZ effectively took self-help

9    measures in October and early November of 2023 that included

10   an illegal cyber intrusion, a divergence of assets -- this is

11   my point of view, just as their point of view was what you

12   heard for the last hour and a half.

13           None of that matters.  All of that stuff is

14   perfect grist someday in the bankruptcy for Your Honor or a

15   trustee to sort out for the purposes of determining who's

16   owed what and which creditors stand in which position.

17           THE COURT:  I agree.

18           MR. SEIDEL:  What we've also heard a lot of today

19   is SUNZ is a creditor arguing for why it should control the

20   debtor here for the express purpose of shutting down the

21   bankruptcy so that it can finish the job it started last fall

22   of destroying WorkCentric by seizing whatever is left,

23   getting rid of one of the biggest assets of the estate, which

24   is the lawsuit -- the litigation claim for destruction of

25   business and goodwill by WorkCentric against SUNZ, and

1   leaving -- I was going to use boxing out since we're in the

2   middle of basketball season right now, but leaving out in the

3   cold or boxing out Pipe and any other creditors, and that's

4   been their game from the start.  Even some of the documents

5   they've submitted here where they show the first act after

6   they seized control, in their view, of WorkCentric was to try

7   and fire litigation counsel and shut down the arbitration.

8              THE COURT:  All right.  Well, let's talk --

9              MR. SEIDEL:  The same --

10             THE COURT:  -- let's talk about whether they had

11  the right to do any of this under documents.

12             MR. SEIDEL:  That's where I want to go, Your

13  Honor.  You're reading my mind.

14             THE COURT:  Go ahead.

15             MR. SEIDEL:  I want to focus on this because

16  here's the problem, this is Delaware -- and I will apologize

17  if I misstate things about the bankruptcy process.  As my

18  colleagues will tell you, I'm not a regular in Bankruptcy

19  Court; I'm usually down the street in Chancery Court.

20             THE COURT:  Okay.

21             MR. SEIDEL:  And I think we need to step back and

22  think about this from two perspectives and it will cut

23  through a lot of the stuff here.  You've got to be precise in

24  Delaware.  Delaware is a contractarian state.  I can give you

25  the cites, but they're all over the place.  The Supreme

1    Court, the Chancery Court over and over talk about that, and

2    they talk about LLCs -- and I'm going to summarize it -- as

3    big boy contracts.  These are contracts between sophisticated

4    individuals represented by counsel and where there's wiggle

5    room in the Delaware -- in the DGCL, there's a little bit of

6    wiggle room to present shareholders with the opportunities to

7    read between the lines, if you will, to color outside the

8    lines.  LLC law is about the LLC agreement, which is a

9    contract, and you read the words of the contract overlaid by

10   the LLC Act, and that tells you what you can and you can't do

11   and the steps you need to follow to do it.  And that's

12   another critical issue here.

13           Delaware corporate governance law is built on

14   process and following process.  And the problem here comes

15   from a number of locations and the first one is there was

16   "Default," capital D, as defined under the forbearance

17   agreement.  I'll come to that in a moment.

18           Second, SUNZ, in negotiating its rights under the

19   forbearance and pledge agreement, didn't obtain the rights to

20   simply vote and appoint WC as a manager of -- WC I, pardon

21   me, as a manager of WorkCentric or TopCo.  So, even if there

22   was a default, they didn't -- these documents don't give them

23   the power to do what they purport to have done.  And even if

24   they got that power from the pledge, if you can read between

25   the lines and find it, they didn't follow the proper steps

1    here.

2              I can handle that in whatever order you like, Your

3    Honor.  I think the pledge agreement, let's start with that.

4    There was no default under the pledge agreement.

5              If you could -- my colleague Lynne Xerras is

6    controlling our screen -- Lynne, could you put up slide -- I

7    believe it is slide -- sorry -- slide 11.

8              If I may share my screen, Your Honor?

9              THE COURT:  You may -- well --

10             MR. SEIDEL:  Or my colleague --

11             THE COURT:  -- is it you or she?

12             MR. SEIDEL:  -- Ms. Xerras.

13             THE COURT:  Who do you want --

14             MR. SEIDEL:  She will be -- Lynne Xerras will be

15   sharing the screen.

16             THE COURT:  She has rights.

17             MR. SEIDEL:  Okay.

18             MS. XERRAS:  Yes, I'm getting there right now.

19   I'm so sorry.

20             MR. SEIDEL:  So if we could put up 11, which is --

21             MS. XERRAS:  Okay.

22             MR. SEIDEL:  This is excerpting out the definition

23   of default under the forbearance agreement.

24             THE COURT:  What provision are you referencing?

25             MR. SEIDEL:  It's section 4 of the -- it's

1    default, it's the definition of default, section 4.

2            There you go, you just went past it.

3            MS. XERRAS:  There we go.  Okay.

4            MR. SEIDEL:  One back.

5            MS. XERRAS:  Oh, sorry about that.

6            MR. SEIDEL:  There you go.

7            So this speaks as definitions of default.

8            THE COURT:  Wait a minute.  This is in which

9    forbearance --

10           MR. SEIDEL:  This would be -- this would be

11   exhibit --

12           THE COURT:  Not the pledge agreement, all right,

13   this is the forbearance agreement?

14           MR. SEIDEL:  This is the forbearance agreement,

15   Your Honor, yes.

16           THE COURT:  All right.

17           MR. SEIDEL:  And if you look at that it says, upon

18   the occurrence of any breach of any promise or covenant of

19   the obligors contained in this agreement or the transaction

20   agreement documents, SUNZ shall serve a notice of default

21   upon obligors and provide them with ten days opportunity to

22   cure the default, and then it goes on to describe the

23   definitions.

24           Okay.  So that means you need to have a breach --

25   you need two things here to perfect a breach, the first one

1  is a breach of either this agreement or the transaction

2  agreement -- I'm sorry, three things -- a notice of breach,

3  and ten days to cure.  And the forbearance agreement, by

4  definition, the idea was whatever has come in the past we're

5  forbearing on and we're going to move ahead from this point.

6  So, if there's an old breach, that's being forbeared upon

7  unless and until this agreement terminates, and then it would

8  need to be addressed under its core documents.

9            So what are the provisions of this agreement, what

10  are the promises under this agreement?  If you turn to

11  section 2 of the agreement, which can be found -- Ms. Xerras

12  will pull up tab 9 -- or slide 9, sorry.

13            MS. XERRAS:  Okay, so this is the forbearance

14  agreement.

15            MR. SEIDEL:  All right, do the forbearance

16  agreement, section 2.

17            Now, this is described as conditions of

18  forbearance, which is inartful drafting to say the least.

19  These are in effect the covenants, the promises by the

20  obligors, and there are three of them:  They'll execute and

21  deliver a pledge agreement, A.  That was done, we have

22  evidence it was done.  Pursuant to the pledge agreement, they

23  will direct the members to provide certificated membership

24  interests.  You've heard that those were provided, so that

25  was done.  And, C, they'll work in a commercially reasonable

1    way with SUNZ's oversight to try and sell or refinance the

2    business, and you heard that that -- what's called the

3    process was in fact underway.

4            So those are the only three commitments made in

5    this agreement.  There is no commitment to maintain a certain

6    level in the loss fund or the loss fund deficit, there simply

7    isn't.  And if you turn to the next page, which is what they

8    would rely upon, section 3, "Forbearance," forbearance --

9    this section simply says, "SUNZ agrees to forbear from

10   exercising its remedies under the transaction documents with

11   respect to the specified defaults" -- those are the previous

12   defaults that were already in existence -- "until the

13   earliest to occur of," and then it says, capitalized

14   termination date, and you have A through G below.  Those are

15   definitions of what a termination date is, they're triggers,

16   if you will, of a right to terminate.  They are not

17   covenants, they are not representations, and they are not

18   obligations occasioning a default because termination is not

19   a default.  And you need only look at the very first item,

20   romanette (a), to understand that's what this is because the

21   occurrence -- or the passage of 120 days does not constitute

22   a default of a forbearance agreement, it constitutes the

23   expiration of the forbearance, as do each of the remaining

24   items, including reserves under the agreement as calculated

25   being underfunded by an aggregate in excess of 23 million.

1          So this excess aggregate -- the aggregate deficit

2    of 23 million or more isn't a breach, it's a trigger for a

3    termination rate and, not being a breach, it's not a

4    "Default," capital D, as described in item 4.  This is

5    actually reinforced by the language, the actual language of

6    the letter that was sent on October 18th.

7          And if you could put the letter up, Ms. Xerras,

8    that would be helpful.

9          MS. XERRAS:  It's there.

10         MR. SEIDEL:  Okay.  Now, this letter says, "Dear

11   Mr. Harvey:  Our efforts working together to complete the

12   forbearance agreement and pledge agreement, copies of which

13   are attached for your records, have put us on a good path

14   toward getting WorkCentric's workers' comp program out from

15   under its obligations to SUNZ."

16         Then it goes on to say, "Focusing on the loss

17   fund, the loss fund is currently in a deficit of $29.07

18   million.  This is more than the 23 million ceiling we agreed

19   to in the forbearance agreement and related pledge agreement,

20   but as part of our partnership you and your group have ten

21   days to get this deficit reduced by making a payment to SUNZ

22   of $6.074 million."

23         So what do we have here?  What we have could

24   either be described as a waiver of the termination rights or,

25   more likely, an agreement to extend forbearance by an

 1    additional ten days so that the parties could continue to
 2    work together.  What it is not, in words -- and words matter
 3    here -- is a default notice because it's not triggering --
 4    it's not based upon and it doesn't even purport to be based
 5    upon an alleged default of an obligation under the
 6    forbearance agreement, and it's simply not a notice of
 7    default.  You have to have a notice of default before rights
 8    under the pledge trigger and the pledge agreement in that
 9    regard is clear.

10            So any of the defaults, the specified defaults,
11    which is what we've spent an hour -- wasted an hour and a
12    half hearing about, those don't count, and they can't count
13    until this thing expires or is terminated, and this letter
14    extends termination to October 30th.  So SUNZ, whatever it
15    bargained for in the pledge, lacks the power until ten days
16    after a notice of default, none of which has been provided
17    here because there is no default, to exercise, and that's
18    problem number one with what they're doing here.

19            And I'll pause on that, there was no default.

20            Now, if you read this as a ten-day extension of
21    their right to terminate, they never noticed a termination,
22    but let's assume that the termination of article 2 is self-
23    executing, what does that do?  That means the forbearance
24    agreement goes away.  Now they have to rely on the
25    transaction documents and a default under the transaction

1   documents, and those documents make clear that you have to

2   provide a notice and 30 days cure period, and they never did

3   either of those two things with respect to any of the alleged

4   defaults that they went on and on about between 10:00 and

5   11:20, so none of those triggered the rights under the pledge

6   agreement.

7          So, again, they simply never took the steps --

8   they tried to take shortcuts, but they never took the steps

9   necessary to exercise on their pledge or to become eligible

10  to exercise rights under the pledge.  Now, I can argue with

11  what Mr. Berger said about how 18-702 works.  18-702 focuses

12  on assignments, not pledges, so it would -- to even get to

13  18-702 and voting rights, you need to take the step of

14  foreclosing on the shares, which they never did.  They didn't

15  want the quit claim from us when we were talking settlement

16  and they never exercised a foreclosure, they never took

17  possession of the membership interests to SUNZ or a SUNZ

18  affiliate.

19         And, by the way, I'll digress for a moment that

20  the certificated shares point you heard is nice, but it's not

21  a thing in the world of LLCs.  LLCs have membership

22  interests, you don't need certificates for those unless

23  they're publicly traded a la Chrysler or Stellantis, you

24  know, these big public LLCs, or an investment company.

25  Certificated shares, which is what they're really talking

1  about, is a thing that involves equity stock, and it's a way

2  to deal with issues of record versus straight ownership, it's

3  whether or not you hold the -- the person who holds the

4  certificated stock shares is the record owner, 99 percent of

5  the time that's cedent company and there's certain

6  circumstances like this, like a pledge if these were equity,

7  where you won't have certificated shares, but this

8  certificated shares thing, maybe it's part of the way Florida

9  works, but it's not how Delaware works, at least not with

10  respect to LLC.

11        So what did they need to do here?  What they

12  needed to do -- and this comes -- you know, look, Delaware

13  law provides a clear framework for the governance of an LLC.

14  The cases -- and they're legion or myriad, as Mr. Berger

15  would like to say -- have long held that the operating

16  agreement is a contract and it governs the LLC members, how

17  they function, how they interrelate, who manages what.  And

18  the LLC agreement is presumed to be prepared by sophisticated

19  parties and interpreted strictly to affect the words of the

20  agreement, not the intent of the parties as demonstrated by,

21  you know, *ex officio* lawyer testimony, or what we meant to do

22  or what we intended to do, or as SUNZ's brief puts it how

23  they effectively did something, you have to do something or

24  not do something here.  And what is it they needed to do?

25        So from their own -- and this is one of their own

 1  cases, by the way, the KGIM (ph) case, the Il Mulino case.

 2  In that case, the court said that, you know, the structure of

 3  the companies -- okay, hold on -- yeah, anyway, so that's

 4  from there.  So what is the structure of the companies?  I

 5  believe that they showed you something that was helpful, but

 6  not complete.  If you give me a moment, I will find you --

 7  here we go.

 8         Slide 18, please?

 9         MS. XERRAS:  If I may have one second?

10     (Pause)

11         MS. XERRAS:  Okay.

12         THE COURT:  Is that an exhibit in your joint

13  exhibit binder that I have?

14         MR. SEIDEL:  No.  This was -- honestly, this was

15  meant to be a demonstrative, Your Honor.  It's not in

16  evidence.  It's just to aid the Court.

17         So, this is the corporate structure.  I've

18  simplified it a little bit, but these are all Delaware

19  entities who start with Dock Sutherland at the top.  He's the

20  100 percent member of the immediate company LLC, WC

21  Container, which is not a pledged entity or apart of this

22  operation.  The next thing is you have WC TopCo of which

23  Container or the immediate company is the 100 percent member.

24  That entity, the manager managed LLC, the TopCo operating

25  agreement which controls here says that it shall be managed

1  by a board of managers comprised of natural persons, meaning

2  actual human beings.  And those managers are Dock Sutherland

3  and David Harvey.

4        The only way to replace the board of managers is

5  for the member, in this case a media company or Dock

6  Sutherland through a media company, to terminate.  And they

7  have broad rights to it, but they have to then terminate the

8  board of managers and replace them with natural persons.

9  Even assuming that somehow SUNZ gained the right to vote to

10  replace the managers and did it, they can't replace them with

11  WC1.  They need to replace them with human beings.

12        Next, WC TopCo is the 100 percent member of

13  WorkCentric LLC.  WorkCentric LLC is a manager managed LLC --

14  member managed LLC, pardon me.  And under 18402 of the LLC

15  Act, unless otherwise provided, the power vested in members

16  is vested in the members and there's a proviso to that

17  provided that if an LLC company agreement, and those are the

18  words of the statute, provides for management by a manager,

19  the LLC company agreement of TopCo does not provide for --

20  I'm sorry, of WorkCentric does not provide for manager

21  management.  And that agreement has never been amended.  Not

22  by its member TopCo, or by anybody purporting to act on

23  TopCo's behalf.

24        And amendment by implication, which they cite the

25  (indiscernible) case for, the Il Mulino case, doesn't work.

1   And in Il Mulino, what they're pointing to, the sort of

2   amendment by implication, was Il Mulino, the entities in

3   questions there, were manager managed entities already.  And

4   in the bankruptcy, the managers agreed to step aside in favor

5   of a chief restructuring officer.  And effectively, all the

6   inside parties agreed to that.

7           So, you were substituting a manager.  You weren't

8   creating a new manager worthy agreement and did not provide

9   for one.  In contrast -- so, the effort to appoint WC1 as a

10  manager of WorkCentric fails because it wasn't proposed by

11  the member and it wasn't proper under the operating

12  agreements.  So, how could -- WorkCentric can only be managed

13  by its member, TopCo, absent an amendment to the operating

14  agreement and that never happened here.

15          Theres actually a very instructive case.  It's not

16  cited in anyone's papers, Your Honor, because it came down on

17  Friday.  I will provide the cite to you.  It's the Hudson

18  case from the Southern District of New York; very similar

19  case, it involved pledged interest in an LLC.  Now, what

20  happened there was -- if someone could get me the cite, I'll

21  give it to you.

22          In the Hudson case, Your Honor, parties wanted to

23  set up a pledge over LLC interests and they wanted to be able

24  to provide for the pledge E to be able to get control of the

25  entities.  So, what did they do?  They set up a pledge

1   agreement, a forbearance, all the sort of things we have

2   here.  They also put into escrow membership interest executed

3   in the name of the pledge E and amendments to the operating

4   agreement that would provide for changes to its structure to

5   allow for their appointment of somebody to run the business -

6   - of the pledge E to appoint someone to run the business as a

7   manager.

8          Now, interestingly, the Court rejected the effort

9   to seize control there even though they did all right things

10  in advance because the pledge E tried to execute and pull out

11  of escrow some, but not all, of the escrowed documents.  And

12  the Court noted, you got to do all the steps.  So, what were

13  the steps that could've been -- should've been done here?

14  There needed to be a default that was noticed with a cure

15  period.  The cure needed to expire.  We know that didn't

16  happen.  But let's assume for a minute it did.

17         Now, what do they need to do?  WC1 can't do

18  anything.  SUNZ needed to foreclose on the membership

19  interest and become the member.  This is something they

20  didn't want to do and I don't know why they didn't want to do

21  it and they'll probably -- I don't want to invite them to

22  tell us why.  They had their reasons and they chose not to do

23  that.

24         They should foreclose and become the member of

25  TopCo.  As the member of TopCo they could've then issued --

1    used their power as the member to remove the managers.  Those

2    managers who they replace them with, and they could've picked

3    -- they had to pick an individual or they had to amend the

4    agreement.  But let's say they did it the right way which

5    they didn't, and they appoint Mr. O'Connor in his individual

6    capacity.  Mr. O'Connor would then, as TopCo's managers, need

7    to act as the member of WorkCentric because they've also

8    foreclosed on that interest to amend the agreement to appoint

9    a manager.  None of those things happened here.  They didn't

10   choose to follow the appropriate steps.

11          And if they had not done so, they don't get to

12   take the sloppy shortcut to control.  If they wanted control,

13   they needed to become a member.  If they're not going to be a

14   member, they don't get control.  It's as simple as that.

15   They made a choice in October and November and December not

16   to foreclose and not to attempt to become the member.  We can

17   guess why because the member of those fiduciary duties, the

18   member of those fiduciary duties now to the stakeholders

19   including Pipe, and that's not something they wanted a piece

20   of.  So, they thought they'd do a shortcut.  But Delaware law

21   doesn't permit those kinds of shortcuts, Your Honor.  It's

22   pretty straight forward.

23          Hold on.  The citation to the Hudson 888 Owner LLC

24   is SDNY 24-121 (MEW).  And with that, Your Honor, unless any

1  of my colleagues have something to add, I will invite any

2  questions you might have.

3         THE COURT:  Well, what about their argument about

4  ratification?

5         MR. SEIDEL:  It falls apart because they ratified

6  it themselves.  The ratification they're talking about is

7  their own active ratification after illegally ceasing

8  control.

9         THE COURT:  But what about --

10        MR. SEIDEL:  So, if they didn't become a member

11 and exercise the powers as a member, then there's nothing to

12 ratify.  They can't ratify their own acts.  That's, you know,

13 I mean that -- their argument effectively is, yeah, we didn't

14 do it right but now that we proport to be in control, we're

15 going to ratify our own ultra virus act.

16        THE COURT:  What about their argument that having

17 received the pledged member interest, the right to exercise

18 the member interest, they had the right to do exactly what

19 they did.  They exercised the member's interest.

20        MR. SEIDEL:  Well, no, they are holding these

21 certificated shares.  They never received the member

22 interest.  To receive the member interest, they had to

23 foreclose upon them.

24        THE COURT:  Where does it say that in the

25 agreement?  It says they pledged the member interest.

1          MR. SEIDEL:  Right.  But the pledge doesn't give -

2  - first, they need to default.  Then they need to give

3  notice.  The notice needs to go uncured.  Then they need to

4  exercise -- they need to take ownership of the interests.

5  The pledge just says we're holding them.  That's collateral.

6  They have to do something to have the power as the member.

7  And that's the act they failed to do here.

8          It's Section 4 of the pledge agreement which is

9  perfection -- they haven't perfected the pledge.  They have a

10  pledge.  They just haven't perfected it yet to this day.

11  They're taking the shortcut and saying we're not the holder

12  of the member interest.  We're just going to vote the member

13  interest.  So, they can't do that under the law.

14          THE COURT:  All right.  Let me hear -- anything

15  further?  I'm sorry.

16          MR. SEIDEL:  Not at this time, Your Honor.

17          THE COURT:  All right.  Who wants to respond?

18          MR. BERGER:  Your Honor, may I reply to the

19  corporate governance items and have Mr. Margolin reply to the

20  notice and default issues if that's appropriate, Your Honor?

21          THE COURT:  Yes.

22          MR. BERGER:  So, Your Honor, there's no

23  requirement under either Delaware law, the operating

24  agreements of E or WC TopCo, or the alleged debtor, or the

25  expressed language of the pledge agreement for closure of the

1   membership interest to occur.  In fact, that was made

2   explicit in the actual pledge agreement itself.  And I'll put

3   that just briefly on the screen, Your Honor, because again,

4   it was supposed to be as expansive as possible.

5          So, I'm going to just plainly read from the remedy

6   section of Section 8 which states:

7          "If any default shall have occurred and be

8   continuing, the secured parties shall have the right, in

9   addition to other rights and remedies provided for herein and

10  are otherwise available to it, to be exercised from time to

11  time, including under the forbearance agreement at law or in

12  equity, to exercise all rights of the pledgors" - the pledge

13  jurors in this case, Your Honor, would include WC Container

14  and would include WC TopCo as members of the borrowers which

15  would include WC TopCo and would include the alleged debtor -

16  "And to exercise any other rights or remedies pursuant to the

17  forbearance agreement."

18         So, if you read the plain language of Paragraph

19  8(a), nowhere does it require a formal foreclosure of the

20  membership interest.  Nowhere does it require some type of

21  change of title.  That would've caused an undue delay in the

22  context of what the pledge agreement was attempting to

23  implement.  Separately, there is no citation to any Delaware

24  law that would require that.  We do not have to formally

25

1   foreclose on the membership interest to assign a corporate

2   governance right under a pledge agreement.

3          And we did perfect our security interest, Your

4   Honor.  That's uncontested.  We filed UCC-1.  Everybody in

5   the world knows our security interest.  We took possession of

6   the certificated membership interest.  And every single party

7   to this pledge agreement waived any defenses to us exercising

8   a remedy which you did not hear being argued by former

9   managers.  That they basically waived the very defenses that

10  we're trying to argue in front of Your Honor.

11         There is simply no Delaware obligation to have a

12  formal foreclosure.  I cited Your Honor to the Delaware

13  statute that specifically authorized the delegation of

14  management powers.  I cited Your Honor to the Delaware

15  statutes that specifically allow you as the sole member,

16  which we have the power under Section 8, to amend the

17  operating agreement.  We did not need to do that expressly.

18  We could do that implicitly by (indiscernible).  We could do

19  that via the corporate resolutions.  We did not have to jump

20  through seventeen different steps to exercise the remedies

21  that every single party, including Dock Sutherland, including

22  Derek Harvey, signed and executed under that pledge

23  agreement.

24         Simply put, Delaware law does not mandate jumping

25  through all these hoops.  We cited the Court to legal

1    authority that specifically allows you to amend the operating

2    agreements.  And the operating agreements have no

3    prohibition.  They would've had no prohibition that would've

4    prevented SUNZ from utilizing WC TopCo or WC Container's

5    powers to amend the operating agreements to allow us to

6    change the natural person requirement, to change that its

7    manager managed, to change any of the things that the

8    corporate resolution effectuate.  There's no restriction in

9    the operating agreements.  There's no restriction under

10   Delaware law.  There's no requirement in the plain language

11   of the pledge agreement.  And notice was given and multiple

12   opportunities to cure were given.

13          And I'll the podium to Mr. Margolin just to

14   specifically address the specific defaults and the specific

15   notice that was provided to trigger the rights and remedies

16   that we achieved under the pledge agreement.

17          MR. MARGOLIN:  Thank you.  And Your Honor, again

18   for the record, this is Jason Margolin on behalf of SUNZ and

19   I'm going to share my screen again to direct the Court to the

20   forbearance agreement that was discussed by, really, all of

21   us this morning.  I'm going to focus the Court on Paragraph

22   2(c).  Again, Mr. Seidel, when he talked about the

23   forbearance agreement explained to the Court that these were

24   conditions that the alleged debtor was required to comply

25   with.

1        The alleged debtor breached 2(c), this process
2  paragraph, by failing to provide information on the Pipe debt
3  and other financial information on the debtor.  Again, the
4  purpose of this was the parties were they were going to
5  engage in a commercially reasonable process where they were
6  going to try and sell either the entire alleged debtor or get
7  some financing.  And you can't do either one of those things.
8  You can't sell an entire business or get significant
9  financing without knowing about your obligations.  You need
10 the books and records.  You need the financial balance
11 sheets, profit and loss statements.  And obviously, if you
12 have a $25 million debt Pipe Technologies, you need to
13 include that in the analysis.

14        I'll walk the Court through multiple emails and
15 documents that made it clear SUNZ was unaware of the Pipe
16 information until Dock Sutherland noted that Pipe even
17 existed in discussing the forbearance.  And then, the
18 documents were never provided.  We saw the correspondence
19 where they were repeatedly requested but never provided.
20 Counsel for the alleged debtor and the former managers has
21 not yet represented or argued that it would ever provide it.
22 So, then it's a clear breach of Paragraph 2(c).  Also, a
23 breach of the transaction documents that I walked through
24 before including the quotation and the (indiscernible)

25

1   agreement which each provide SUNZ with an independent right

2   to get those documents.

3         Next, Your Honor, I want to point out that counsel

4   prepared Slide 11 and showed the Court at two paragraphs.

5   You had Paragraph 4, the first provision and the second.  He

6   didn't discuss the third or include that on their slide.  I

7   just want to remind the Court that that third paragraph,

8   within Paragraph 4, is where you have the additional series

9   of events that are deemed an event of default under the

10  forbearance agreement which, again, is also a trigger under

11  the pledge documents.  It includes a breach of the

12  transaction documents.  Again, I walked the Court many of

13  those in detail because, again, that's what triggers an event

14  to default under these documents.

15        Also, if there's a later determination that any

16  representation or warranty by the obligors, again that the

17  alleged debtor, is untrue or misleading when made, that is

18  also an independent event of default.  And these are

19  important because, Your Honor, some of these cannot be cured

20  and that was something that was recognized in the pledge

21  agreement.

22        I'm showing on the screen Paragraph 5(f) of the

23  pledge agreement and document 97, page 75.  And again, it

24  talks about, as I pointed out before, a default is a breach

25  under the forbearance agreement.  But it also goes on to say

1   the failure of pledgor to fulfil any obligation hereunder,

2   and in each case if such breach or failure continues

3   unremedied if curable for 30 days from written notice.

4          Again, Mr. Seidel talked about the need for notice

5   for some of these other breaches contending it wasn't done.

6   It only matters if it's curable.  And there are multiple

7   breaches that cannot be cured.  The false representations

8   that we walked through that the alleged debtor made in

9   several of these documents and the misappropriation, those

10  transfers of the collateral without written consent that I

11  walked through before, there's no cure for those.  They

12  cannot be cured.  They are default.  They haven't been

13  rebutted.  And they are sufficient to explain SUNZ had

14  complete justification to exercise its right under the pledge

15  agreement.

16         And, Your Honor, those were the three key points I

17  wanted to reply to.  And so, unless any of my colleagues have

18  anything else to add, I'll stop there unless the Court has

19  any questions.

20         THE COURT:  I have no questions.  Anybody else?

21         MR. SEIDEL:  If I may, Your Honor, briefly.  It's

22  Martin Seidel, again.

23         THE COURT:  Yes.

24         MR. SEIDEL:  A couple of things.  Just looking at

25  the texts in 2(c) process.  2(c), and this is the forbearance

1   agreement, Your Honor, does not provide information rights.

2   They're implying those in.  Words matter.  You know how to

3   write an information rights provision, every good lawyer

4   does.  They did not provide -- 2(c) does not provide that

5   it's a default not to provide information to SUNZ.  It says

6   that the process needs to be done and that they need to work

7   cooperatively with it.  And in any case, there was never a

8   notice of default for a breach of 2(c) of the forbearance

9   agreement.  So, again, no notice, no cure period, no default,

10  no right to exercise under the pledge.

11          Second, this is all, you know, it keeps circling

12  back to the same thing.  They're worried about being in a

13  bankruptcy court where everybody's actions are going to be

14  exposed.  As that great legal philosopher Johnny Cash once

15  said, what's done in the dark will be brought to light.  And

16  that's what they don't want to have happen here.  They would

17  like to waive their hands, talk about defaults that they

18  never noticed, actions they never took, and say, well, we

19  could've done it and implicitly we should have done it, and

20  we kind of did it, so let us go off in the dark and finish

21  the job.  And that's not how Delaware law works.  I don't

22  actually think it's how Florida law works with all due

23  respect to Mr. Berger.

24          If you do it in the dark, if you do it without

25  doing it, you didn't do it.  And they didn't follow the steps

 1   under their own agreements.  So, they never obtained control

 2   over any of these entities and they have no power as a

 3   creditor, by the way, to block the bankruptcy for their own

 4   benefits.  Everybody else, all the creditors, the actual

 5   debtor here, think a bankruptcy is appropriate.  And the only

 6   point to this argument -- and you asked at the beginning,

 7   what impact did our withdrawal have of our motion to dismiss

 8   the bankruptcy.  It crystalized the issue.

 9          If WorkCentric, my clients, control this process

10   and control the debtor, we will put it in an involuntary

11   bankruptcy and the Trustee can sort out all these competing

12   claims about defaults and breaches and bad faith from both

13   sides and figure out who among the creditors get the money.

14   If WorkCentric I is allowed to act in the dark through half

15   measures and sloppy lawyering, then there will be no

16   accountability and none of what they did will be brought to

17   light.  And Pipe and the other creditors and the equity will

18   be screwed.

19          That's all I got, Your Honor.

20          THE COURT:  All right.  Does anybody else wish to

21   be heard?

22          MR. MARGOLIN:  Your Honor, this is Jason Margolin

23   for SUNZ.  I'm sorry, just one brief comment.

24          On the dark versus light, I just want to remind

25   the Court SUNZ filed a federal court complaint with the

1    initiating process and that is in the light.  That is a

2    public process.  It was the former manager alleged debtor

3    that tried to move it to an arbitration.  And so, that

4    metaphor seemed lost and I just wanted to remind the Court we

5    tried to make this very public.  But again, I think all those

6    documents filed there or filed here really sets forth the

7    rights.  And so, again, that's why we're asking the Court to

8    find that WorkCentric I is the entity that should be in

9    control based on some proper exercise of its pledge rights.

10          Thank you.

11          THE COURT:  All right.  Well, let's do this.

12   Let's take a 10-minute break and I'll come back with my

13   ruling.

14       (Recess taken at 12:01 p.m.)

15       (Proceedings resumed at 12:18 p.m.)

16          THE COURT:  All right.  Thank you.  I think the

17   parties are back.

18          This is Judge Walrath.  We're back on the record

19   for WorkCentric.

20          Let me render my ruling, and this as to the issue

21   of whether or not -- I'll use the term WC-1 is properly

22   authorized to act for the debtors or whether WorkCentric, as

23   controlled by the former managers -- I'll use all that in

24   quote, is authorized to act for the debtor in this case.

25          I think based on the argument and the documents;

1  specifically, the pledge agreement and the forbearance

2  agreement and the October 18th letter that the parties have

3  agreed can be admitted, I find that WC-1 has been properly

4  authorized to act for the debtor in this case, and let me

5  explain why.

6            I think that, under the forbearance agreement, if

7  certain conditions occurred, that it would terminate and I

8  find that those conditions did occur -- or let me say the

9  forbearance terminated because certain conditions failed,

10 namely -- and let me find it.  Let me -- you have too many

11 Exhibits L in your -- there we are.

12           The agreement by Sunz to forbear was conditioned

13 on certain provisions and one of them included the pledge of

14 the interests that were pledged, the certificated membership

15 were given, and that they engage in a process to sell or

16 refinance the provisions.

17           However, the forbearance occurred only so long as

18 and was terminated when certain events occurred, one of which

19 was the reserves in the loss fund -- under the loss fund

20 management agreement exceeded $23 million, there was any lien

21 recorded or asserted against any of the collateral, which it

22 appears the pledge to Pipe did breach that, as well as 5(f)

23 -- or excuse me, 3(f) and, additionally, the breach of the

24 representations in the agreement contained in paragraph 11,

25 namely, that no rep or warranty is untrue.  It appears that

1  several were.

2        But I really think that even WC does not contend

3  that the forbearance agreement is still in effect and I think

4  that the termination of the forbearance agreement occurred

5  when those defaults or breaches occurred and, as Sunz argues,

6  some of those breaches, namely, the misrepresentation and the

7  transfer or pledging of collateral, were not curable and,

8  therefore, not subject to the ten-day cure period.

9        But, in addition, the termination of the

10 forbearance agreement, when it did occur, constituted a

11 default, provided that there was no more forbearance of the

12 defaults that had already occurred in the transaction

13 documents.

14       The forbearance agreement was not a waiver of

15 those defaults, was not a waiver of future performance under

16 those documents.  It was simply a forbearance and once the

17 forbearance agreement terminated ten days after the October

18 18 letter, there were continuing defaults of the transaction

19 documents, namely, the failure to fund the loss fund amount,

20 the failure to pay premiums.

21       WC does not argue that none of those defaults had

22 occurred and, in fact, in the forbearance agreement,

23 acknowledged that defaults -- there were defaults of the

24 transaction documents and, therefore, there was a breach of

25 the transaction documents, a termination of the forbearance

1   agreement, and, therefore, a breach of the pledge agreement,

2   which gave certain rights to Sunz, and among those rights is

3   the right, in 8(a), to exercise all rights of the pledgors as

4   members of the borrowers and/or become a successor member to

5   the borrowers.

6           There is nothing in the pledge agreement that

7   required, therefore, Sunz to foreclose on the members'

8   interest in order for it to exercise all rights as members of

9   the borrowers, and that included replacing managers.  TopCo

10  had the right to replace the manager of the debtor here.

11          The requirement in the governing agreements that

12  the manager had to be a person, if applicable -- and I'm not

13  sure it is, but certainly was waivable.

14          Delaware law, as Mr. Seidel noted, with respect to

15  LLC corporations refers to them as big boy contracts and the

16  big boys are allowed to change their terms, to pledge them,

17  to agree that others can modify them, exercising rights as

18  members, and members of LLCs have the right to change their

19  governing agreements, have the rights to ratify any changes,

20  have the rights to ratify any actions taken that are not

21  strictly in compliance with it.

22          So, therefore, once Sunz had the rights -- the

23  right to exercise all rights of the pledgors as members of

24  the borrowers, they had the right to do what they did which

25  is, namely, to replace management of the debtor, and I think

1    that's all I need decide here.

2         So I conclude that WC-1 is the proper authority to

3    act for the debtor in this case.

4         I'll ask counsel to present a form of order under

5    certification of counsel once it has been circulated among

6    the parties.

7         MR. DESGROSSEILLIERS:  Your Honor, Mark

8    Desgrosseilliers, for the record.  We're happy to do that.

9         We filed one with the motion, but we'll take a

10   look, make sure it incorporates Your Honor's findings at the

11   hearing, references them, and circulate it to the parties and

12   then submit it under COC.

13        Thank you, Your Honor.

14        THE COURT:  All right.  Thank you.  Do we want to

15   go to the second motion to stay discovery?

16        MR. SULLIVAN:  Your Honor, Bill Sullivan, on

17   behalf of WorkCentric.

18        Your Honor, if I could address that briefly?  I

19   think it would be appropriate at this time and it's important

20   to point out what the motion to stay was filed for and what

21   it was not filed for.

22        The motion to stay discovery was filed on the

23   basis that WC-1 did not have the authority to issue subpoenas

24   because it was not properly in control of the debtor.

25        As a brief background, Your Honor, the debtor --

1    or WC-1 issued ten subpoenas to various parties two days

2    after WorkCentric filed its motion to dismiss.  That is my

3    client filed its motion to dismiss.  The notice of intent to

4    serve subpoenas indicated that WorkCentric 1 was filing --

5    issuing these subpoenas in its role as the sole manager for

6    WorkCentric, LLC and on behalf of WorkCentric, LLC, the

7    alleged debtor, and that is what we disputed that they had

8    the right to do.

9         The responses raised, filed by both Sunz and by

10   WC-1, made several points, including the fact that WC-1 could

11   still proceed with the discovery in its position as the

12   collateral agent for Sunz but, of course, discovery, as a

13   collateral agent, would be far different than discovery in

14   the name of the debtor.

15        There was also argument by Sunz that they had a

16   contested matter and could issue the same discovery and, in

17   fact, they issued the exact same subpoenas to eight parties,

18   but not to the two counsel and, again, discovery in a

19   contested matter is different in scope than if you were

20   issuing discovery in the capacity as the -- in control of --

21   being in control of the debtor.  For example, the discovery

22   in a contested matter would have to be relevant to the issues

23   addressing the contested matter.

24        So, Your Honor, the -- it was also raised in the

25   responses that there was no objection to the breadth of the

 1  discovery or the scope of discovery and that's true, Your

 2  Honor, that we did not ask Your Honor to review the

 3  individual request and pair them down or determine they were

 4  appropriate because, again, the motion to stay was filed

 5  based on capacity and in our motion, we indicated that, you

 6  know, to the extent there is a decision otherwise, the

 7  parties would request the right under Rule 26 to make the

 8  appropriate responses.

 9        So, Your Honor, to short-circuit it, given the

10  ruling of the Court regarding the capacity of WC-1s, we would

11  simply request that the Court enter an order denying any

12  further stay of discovery and allowing the parties who have

13  been served with the discovery 14 days to respond or

14  otherwise object to that discovery that has been served in

15  connection with the appropriate rules.

16        THE COURT:  Any objection?

17        MR. SULLIVAN:  So that's --

18        THE COURT:  Any objection to the 14 days?

19        MR. DESGROSSEILLIERS:  Your Honor, no objection to

20  denying the motion.  The 14 days -- I have to look at the

21  response times.  We did get some formal responses and I

22  haven't documented all of those, Your Honor.  Sorry.  Mark

23  Desgrosseilliers, on behalf of WorkCentric 1, for the record.

24        We didn't document all those.  There may be

25  consequences to people not filing a motion to stay and then

1  having some unauthorized motion or a motion filed by someone

2  who is -- the Court has ruled was not authorized certainly to

3  file the response to the -- sorry, the response to the

4  involuntary -- had that filing.

5          I don't think they can piggyback on that.  There

6  are some independent parties who may have waived some

7  response rights but, Your Honor, I'd like to take a moment to

8  look at what was responded to.  I know a couple did have

9  formal responses, some people did not respond, and some

10  people said because of the dispute, we're going to need

11  additional time to respond.

12          So, Your Honor, I apologize for that kind of

13  squeamish lawyer answer, but that's kind of where I am.  I

14  just want to take a look at that and see because I don't -- I

15  think some folks may have actually waived some of their

16  defenses and I don't think it's appropriate to resurrect any

17  defenses for this filing.  I don't know if someone else has a

18  comment because -- Your Honor, I would note that it also

19  applied to Sunz discovery and it was a fairly broad request

20  for a stay, but I would defer to Sunz' counsel on their

21  response.

22          MR. BERGER:  Your Honor, Eyal Berger, on behalf of

23  Sunz.  I kind of echo the comments by WorkCentric once

24  counsel as -- we did not, Your Honor, serve subpoenas on

25  counsel for the former managers acting on the alleged

 1  debtors.  So those -- that is different.

 2          But to the extent that parties have basically, you

 3  know, waived objections and are -- you know, would proceed

 4  with discovery, I don't think, you know, putting in a stay

 5  would be appropriate and expediting the discovery would be

 6  helpful to getting us to the second phase of this case, Your

 7  Honor.

 8          Again, we're fine with 14 days for the

 9  certificates of counterparties that basically have already

10  raised an issue because I don't think that would be much of a

11  delay.  We could probably confer and work it out with those

12  counterparties.  But for parties that are basically -- kind

13  of move forward with discovery, I think that would just

14  create a delay that might not be necessary or serve any party

15  in this case.

16          MR. DESGROSSEILLIERS:  Your Honor, I want to be

17  clear.  We don't have a problem, and I'm not trying to force

18  people to produce documents more quickly and I don't have a

19  problem with extending, which I've done for a couple people

20  who requested -- or a couple entities that have requested.  I

21  just want to be careful about waiving my client's rights to

22  compel discovery and the fact that some folks who did not

23  choose to respond may have already waived their -- may have

24  waived their defenses, Your Honor.  That's all I was

25  suggesting.

1            MR. SULLIVAN:  Your Honor, if I can briefly

2    respond.  I do think 14 days is appropriate, given the fact

3    that there's a holiday weekend coming up in between anyway.

4            And to the extent that -- I will say that, with

5    respect to the eight subpoenas that were issued by Sunz, they

6    are identical to the eight subpoenas issued by WC-1.  So

7    there's not really a distinction between those two sets of

8    subpoenas.

9            And, you know, to the extent that there's a waiver

10   argument, I think that can be raised in connection with any

11   response or otherwise that it -- that is raised by the

12   parties.  But, to be clear, there's eight subpoenas issued to

13   principals of the debtors, manager of parent entities, of

14   other affiliated entities, to a customer, to entities with

15   records of the debtor and also to two law firms.

16           So rather than try to say who -- I don't believe

17   that the Court needs to hear from Mr. Desgrosseilliers as to

18   who he thinks waived or didn't waive the response time.  I

19   think, you know, that can be addressed down the road in

20   connection with any response or lack of response.

21           MR. DESGROSSEILLIERS:  And, Your Honor, maybe to

22   simply this, the -- I think I'm in agreement with Sunz

23   counsel that, certainly, people can have an additional amount

24   of time.  Fourteen days seems reasonable to produce

25   documents, as long as it's without prejudice to both the

1   rights of the party serving the discovery and the party

2   responding to the discovery to raise waiver and all other

3   defenses.

4           I can live with that if my -- if the folks at Sunz

5   can.  I think that works because it reserves our rights and

6   then if there's an issue, we'll get it in front of Your Honor

7   and if there's not, we'll get our documents and I think that

8   works and causes little delay.

9           MR. BERGER:  And that would be acceptable to us,

10  Your Honor.

11          THE COURT:  All right.  Mr. Sullivan, that works?

12          MR. SULLIVAN:  Yes, Your Honor, and I think -- and

13  I heard, you know, the reservation of rights, meaning that

14  parties can also -- if they need more time, can ask for it.

15  But the point being is that we can push those issues --

16          MR. DESGROSSEILLIERS:  Yep.

17          MR. SULLIVAN:  -- down the road and only bring

18  them to Your Honor if we need to.

19          MR. DESGROSSEILLIERS:  Your Honor, yes.  The

20  reservation of rights provision was not with respect to the

21  14 days.  It was with respect to the defenses and other

22  answers that folks may have to the discovery that was issued,

23  just document discovery.  But I imagine privilege and other

24  issues that we'll have to address and I just wanted to be

25  clear that WorkCentric 1 is certainly reserving all of its

1  rights in that regard, that those defenses may have been

2  waived if someone didn't properly respond.

3          That's all.  I just don't want to waive any

4  rights.

5          THE COURT:  Well, then I'm going to rule.  I'm

6  just going to say that I'm going to give parties an

7  additional 14 days with respect to all of the discovery, but

8  subject to Sunz and WorkCentric 1's right to say that

9  something was waived because they didn't act.  But my

10 inclination is that there was an issue as to whether

11 WorkCentric 1 had the authority to act for the debtor and

12 that has only been resolved today.

13          Sunz' right to serve discovery as a creditor -- I

14 won't prejudge, whether the discovery served went beyond that

15 or not.  I'll just reserve those issues until later, but I

16 think everybody can raise those as to any of the discovery

17 served.

18          MR. DESGROSSEILLIERS:  And for the record, Mark

19 Desgrosseilliers.  Thank you, Your Honor.  That works from

20 our perspective and we hear you on what Your Honor said.

21          Thank you.

22          MR. SULLIVAN:  Thank you, Your Honor.

23          MS. LEAMY:  Your Honor, Jane Leamy, for the U.S.

24 Trustee.  I just wanted to ask is the order that's going to

25 be submitted going to take care of the entry of the order for

1    relief on the petition?

2            MR. DESGROSSEILLIERS:  Your Honor -- oh, sorry.

3    Go ahead.  Sorry, Your Honor.  My apologies.

4            THE COURT:  What was the question?  Am I entering

5    any order with respect to the order for relief?

6            MS. LEAMY:  Will there be an order for relief

7    entered with respect to the involuntary petition

8            THE COURT:  I think that WorkCentric 1 filed a

9    motion to dismiss the involuntary.

10           MR. DESGROSSEILLIERS:  Your Honor, Mark

11   Desgrosseilliers.  That's correct.  And Sunz has a motion to

12   stay.  But, yes, we filed a motion to dismiss.  That's

13   correct.

14           THE COURT:  So I think that -- I was only deciding

15   this -- who had the standing to seek to dismiss --

16           MR. DESGROSSEILLIERS:  Correct.

17           THE COURT:  -- the involuntary at this point.

18           MS. LEAMY:  All right.

19           THE COURT:  I think we need a hearing on the

20   motion to dismiss.

21           MS. LEAMY:  Okay.

22           MR. DESGROSSEILLIERS:  That's correct, Your Honor.

23   And that's why, obviously, the timing of the discovery was

24   important both for us and for the petition creditor, frankly,

25   who was also at the status conference, at least opposed to

1  staying discovery and interfering with the hearing on the

2  involuntary itself, which we are all in favor of having Your

3  Honor do.

4          THE COURT:  Do we have it listed or -- for

5  hearing?

6          MR. DESGROSSEILLIERS:  We do not, Your Honor.  We

7  were trying to resolve this threshold issue first and now we

8  have, so I think it is an appropriate time to try to

9  determine when it should be heard.  We're happy to do that

10 amongst counsel and propose that to Your Honor or we can do

11 it now, whichever Your Honor prefers.

12         THE COURT:  I think you should speak among

13 counsel, find an acceptable date, and then speak with Ms.

14 Capp (phonetic) to see if it's -- if it works with our

15 calendar.

16         MR. DESGROSSEILLIERS:  Thank you, Your Honor.

17 That makes perfect sense to me and appreciate that.

18         THE COURT:  All right.  Then I'll look for two

19 forms of order under certification of counsel.

20         MR. DESGROSSEILLIERS:  Yes, Your Honor.  Thank

21 you.

22         THE COURT:  All right.  Thank you.  And we'll

23 stand adjourned.

24         MR. SULLIVAN:  Thank you, Your Honor.

25     (Proceedings concluded at 12:40 p.m.)

1                                CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    March 27, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    March 27, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25