UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNZ INSURANCE SOLUTIONS, LLC,

          Plaintiff,

                                 Case No. 8:23-cv-2517-SDM-CPT

v.

DOCKS SUTHERLAND, a/k/a
BENJAMIN PAUL SUTHERLAND, et al.

          Defendants.

_____/


**PLAINTIFF SUNZ INSURANCE SOLUTIONS, LLC'S**
**<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Plaintiff, SUNZ Insurance Solutions ("SUNZ") moves for summary judgment on Counts I-VI, *i.e.*, all claims against WorkCentric, LLC; WorkCentric 2, LLC; WorkCentric 3, LLC; Embraceor, LLC (collectively, "WorkCentric"); WC TopCo, LLC ("WC TopCo"), and WC Container LLC (collectively, with WC TopCo and WorkCentric, the "Entities"), as well as Sheldon Altschuler.

In 2023, WorkCentric and WC TopCo executed a forbearance agreement admitting they breached their contracts with SUNZ and (at that time) owed SUNZ at least $25,800,582.90 for unpaid premium, deductible costs, and program expenses related to their large-deductible workers' compensation insurance program. WorkCentric and WC TopCo never remedied that admitted breach; instead, they stopped paying any money owed under the program, and the Entities committed additional breaches when SUNZ attempted to mitigate its damages by collecting collateral the Entities conferred to SUNZ for precisely that purpose. Today, the unpaid amounts owed under the insurance program exceed $72 million.

Altschuler agreed to a personal, durable, and unconditional guaranty of all amounts owed by WorkCentric under the insurance program, *i.e.*, the $72 million that has not been paid to SUNZ. Accordingly, SUNZ is entitled to summary judgment against the Entities on the contracts they breached and against Altschuler on his personal guaranty.

WorkCentric used its insurance program to enroll employees of client companies in workers' compensation insurance. In 2023, WorkCentric's program insured more than $2.5 billion in annual payroll. And injured workers have filed more

than 11,000 claims for workers' compensation under the insurance provided. In exchange for a substantial discount on premiums (over $6.1 million in 2023 alone), WorkCentric agreed to pay the first $500,000.00 of losses and expenses for each claim and further agreed to maintain a "Loss Fund" to pay deductible expenses.

But WorkCentric decided it did not want to comply with its deductible obligation – so it simply stopped paying any money for Loss Fund or even premium, leaving SUNZ to pay 100% of the costs associated with WorkCentric's injured workers. After repeatedly breaching their contracts, WorkCentric and WC TopCo admitted they owed more than $25 million in their forbearance agreement with SUNZ, which they also promptly breached. After the breach of the forbearance, the Entities committed further breaches by precluding SUNZ from collecting its collateral and accruing additional millions of dollars in amounts due and owing.

The United States Bankruptcy Court for the District of Delaware confirmed the Entities breached several contracts with SUNZ, and the Entities and Altschuler are otherwise incapable of disputing their past and continuing breaches.

SUNZ is still paying covered claims under the insurance program, including expenses within the $500,000 deductible. As of December 31, 2025, WorkCentric owes $72,197,525.00. Altschuler personally guaranteed this entire amount. Because neither the Entities nor Altschuler can dispute SUNZ's claims, the Court should grant this Motion and enter summary judgment for SUNZ on Counts I-VI.

## STATEMENT OF UNDISPUTED FACTS ("SOF")

**I.    WORKCENTRIC'S OBLIGATIONS UNDER THE INSURANCE PROGRAM AND ALTSCHULER'S GUARANTY**

1.     SUNZ is the licensed and appointed managing general agent to the insurance companies under whose authority SUNZ directed the issuance of workers' compensation insurance policies (collectively, the "Policies") to WorkCentric, with coverage beginning in 2019 and continuing until November 17, 2023 (the "Program"). Declaration of Rick Leonard ("Leonard Dec.") ¶¶ 5, 7.

2.     As MGA, SUNZ must bill and collect all money due under the Insurance Program, and SUNZ signed the agreements with Defendants. *Id.* ¶¶ 8-9.

3.     WorkCentric operated as a staffing company and professional employer organization that contracted to procure workers' compensation insurance for the employees of its client-companies (collectively, the "Clients"). *Id.* ¶ 6. Thus, the Policies were in WorkCentric's name but for the benefit of its specific Clients and their employees. *Id.* Ex. 1.

4.     In addition to the Policies, WorkCentric and SUNZ executed several agreements governing the Program (collectively the "Transaction Documents"),[1] including an annual Quotation Agreement ("Quotation"), Amended Complaint (Doc. 60), Ex. 1; Loss Fund Management Agreement ("LFMA"), *id.* Ex. 2; and

---

[1] The "Transaction Documents" also include a Commercial Promissory Note dated July 20, 2023 (defined below as the "Note"), and additional Security Agreement securing the obligations in the Note (defined below as the "NSA"). *See* Leonard Dec., Ex. 9 (Forbearance Agreement) at 1.

Security Agreement for the Insurance Program ("PSA"), *id.* Ex. 3. *See* Leonard Dec. Ex. 2.

5.      The Entities do not dispute the validity of these agreements, which are re-attached in Exhibit 2 to the Leonard Declaration. *See* Entities Answer (Doc. 60) ¶¶ 49-51; Docks Sutherland and David Harvey Answer (Doc. 90) ¶¶ 49-51.

6.      Additionally, as part of the Program, Altschuler personally executed a "Guaranty for the Insurance Program" ("Guaranty"). Amended Complaint, Ex. 4. Altschuler signed and emailed the Guaranty to SUNZ on December 14, 2022. Leonard Dec. ¶ 10, Ex. 2-A, 2-E.

## A.    WorkCentric Agreed to Make Periodic Premium and Deductible Payments

7.      WorkCentric requested and was approved for a large-deductible Program: in exchange for a substantial premium discount on each Policy, it agreed to pay the first $500,000.00 of loss and claim expense for each workers' compensation claim covered under a Policy (the "Deductible Layer"). Quotation at 3.

8.      WorkCentric agreed both to pay its reduced premium obligation and partially pay its deductible obligation through weekly payments to SUNZ. *Id.*; LFMA at 1.

9.      Specifically, WorkCentric's deductible obligation was partially satisfied by weekly payments allocated to "Loss Fund" as detailed in the LFMA, ¶ B(1). The weekly Loss Fund payment was calculated as a percentage of the "manual premium"

under the Program each week. SUNZ reduces the Loss Fund when it pays loss and claim expenses within the Deductible Layer. *Id.* at 1.

10.     If the Loss Fund fell below a contractual "Minimum Balance," one-deductible (*i.e.*, $500,000.00) plus 200% percent of reserved expenses within the deductible layer under normal conditions, WorkCentric agreed to make up the deficit through an additional Loss Fund payment – in cash. LFMA ¶ B(1)(b). WorkCentric also agreed to increase the periodic Loss Fund payments (*i.e.*, pay a higher percentage of weekly manual premium) to resolve worsening Loss Fund trends. *Id.* ¶ B(2)(a).

11.     On a monthly basis, SUNZ provided WorkCentric a "Loss Fund stewardship report" showing the amounts paid for all claims, open, Loss Fund balance, and the difference between the Loss Fund balance and Minimum Balance. Leonard Dec. ¶ 22, Ex. 3. Also on a monthly basis, SUNZ provided WorkCentric with a spreadsheet itemizing each claim with the amounts paid and reserved for each individual claim. *Id.*

12.     Under the Quotation, WorkCentric could dispute any amounts due by written notice within 180 days after the amount became due. Quotation ¶ 7(b). Despite now vaguely complaining about claim expenses and reserved losses under the Program, neither Harvey nor Sutherland could identify a single claim they believe was improperly administered or reserved. Deposition of David Harvey ("Harvey") at 15:4-17:7, 59:9-60:8 (admitting WorkCentric could dispute claims administration, he had no basis to dispute the Loss Fund Minimum Balance, could not provide an alternative minimum balance figure, and had no evidence to dispute any reserve figures);

5

Deposition of Docks Sutherland ("Sutherland") at 40:20-44:21 (complaining about SUNZ's purported "toxicity" and conceding he had no documents to dispute any individual claim); *id.* 185:7-17 (admitting he did not know how many claims were filed under the program in August, September, or October 2023).

13.     WorkCentric agreed to pay all Loss Fund amounts, including amounts to maintain the Minimum Balance, within ten days after receiving an invoice or other request for payment. LFMA ¶¶ A(3), B(2)(b). The Loss Fund payments were "a mandatory part of [the Program]," and the "[f]ailure to pay Loss Fund as required shall be considered a material misrepresentation that may result in the cancellation of [the Policies]." *Id.* at 3.

14.     However, such a cancellation would not "terminate or otherwise limit" WorkCentric's Loss Fund obligations. *Id.* ¶ B(2)(c). To the contrary, upon cancellation WorkCentric must maintain a higher Minimum Balance equal to "fully developed loss." *Id.* ¶ B(2)(d).

**C.     WorkCentric Secured Its Program Obligations with Assets**

15.     WorkCentric also signed the Program Security Agreement (defined above as the "PSA"), in which it granted SUNZ a first-priority security interest in all rights to a broad class of assets, including "Accounts," "Money," "Letter of Credit Rights," "Receivables," and "Collateral Records" such as "customer lists" (the "Secured Collateral"). PSA ¶ 1; *see id.* at 1 (defining "Collateral Records"). The Secured Collateral secures all WorkCentric's "debts, obligations, liabilities, and agreements" related to the Program, including premium and Loss Fund. *Id.* ¶ 3.

16.    The PSA permits SUNZ – in response to a continuing default under the Program – to immediately "take control of the Collateral including, but not limited to, the customer lists; [] take control of funds … held for paid loss, and [] exercise all other rights which an owner of such Collateral may exercise." *Id.* ¶ 6.

17.    WorkCentric was bound to aid SUNZ's collection of collateral by, among other things, "promptly mak[ing] the Collateral available to [SUNZ]" upon demand and, "[w]here Collateral is in the possession of a third party, … join[ing] with [SUNZ] in … obtaining an acknowledgement from the third party that it is holding the Collateral for the benefit of [SUNZ]." *Id.* ¶¶ 7(B)(ii), 5(L).

### D.    Altschuler Guaranteed WorkCentric's Obligations

18.    To further secure WorkCentric's obligations under the Insurance Program, Altschuler – WorkCentric's original owner – executed his Personal Guaranty. *See, e.g.*, Guaranty; Leonard Dec. ¶ 20.

19.    Even after selling WorkCentric in 2021, Altschuler continued representing WorkCentric, including in negotiations with SUNZ. *Id.* ¶ 21. He also continued signing the Transaction Documents for each policy year through the 2023 Policy Year. *Id.* ¶ 10. And he signed the Guaranty in December 2022. *Id.*, Ex. 2-E.

20.    In the Guaranty, Altschuler "guarantees and becomes surety to [SUNZ] for the full, prompt and unconditional payment of all Liabilities," *i.e.*, "all liabilities of obligations arising under the [LFMA]" or the Policies. Guaranty ¶¶ 1(A) & 2(A).

21.    The Guaranty "is a personal and primary obligation of [Altschuler] and shall be a continuing and inexhaustible Guaranty." *Id.* ¶ 1(B). It is a guaranty "of

payment and not of collection," and it "is independent to and separate from the liability of [WorkCentric] … and the availability of any other collateral security or funds." *Id.*

## II.    THE ENTITIES REPEATEDLY BREACH CONTRACTS WITH SUNZ

### A.    WorkCentric's Breaches of the Transaction Documents and All Entities' Entry into the Forbearance and Pledge

22.    In 2023, WorkCentric began defaulting under the Transaction Documents, particularly the LFMA. Leonard Dec. ¶ 23. Specifically, WorkCentric's Loss Fund fell below the Minimum Balance in March 2023. That deficit balance has remained beyond the Program's termination (the "Loss Fund Deficit"). *Id.*, Ex. 3.

23.    As an accommodation for the Loss Fund deficit, in July 2023, WorkCentric and WC TopCo signed a Promissory Note ("Note"), with a principal amount of $13,993,287.00 (the Loss Fund Deficit at the time) and payment due September 12, 2023. Leonard Dec., Ex. 4 (Note) at 1; *accord* Amended Complaint, Ex. 6; *see* Sutherland and Harvey Answer ¶ 117 (admitting Harvey signed the Note).

24.    The Note was secured by a Note Security Agreement (the "NSA"; collectively, with the PSA, the "Security Agreements") substantially similar to the PSA, except that it secured the obligations under the Note and pledged the assets of WorkCentric and WC TopCo. Leonard Dec. Ex. 5 (NSA) ¶ 3; *accord* Amended Complaint Ex. 6; Sutherland and Harvey Answer ¶ 117 (admitting Harvey signed the NSA).

25.    The Loss Fund Deficit continued to worsen, and WorkCentric failed to timely pay additional Loss Fund amounts as required under the LFMA. Leonard Dec. ¶ 25.

26.    As a result, on August 28, 2023, SUNZ delivered a notice of default under the Transaction Documents. *Id.* ¶ 26, Ex. 6.

27.    WorkCentric and WC TopCo did not pay the Note, and SUNZ delivered a separate notice of default under the Note on September 19, 2023. *Id.* ¶ 27, Ex. 7.

28.    The defaults were never cured. *Id.* ¶ 28. On October 5, 2023, SUNZ served Altschuler a notice of default under the Guaranty and issued notices of insurance cancellation effective October 17, 2023. *Id* ¶ 28*.*, Ex. 8.

29.    On October 11, 2023, WorkCentric and WC TopCo signed the Forbearance Agreement ("Forbearance"), in which they agreed they (a) defaulted under the Transaction Documents and (b) owed SUNZ not less than $25,800,582.90 for unpaid premiums, Loss Fund deficit (including the Note), and taxes and surcharges (the "Forbearance Debt"). *Id.* ¶ 29, Ex. 9 (Forbearance) ¶ 1; *accord* Amended Complaint Ex. 10; *see* Entities Answer ¶¶ 136-37 (admitting the Entities signed the Forbearance); Sutherland and Harvey Answer ¶¶ 136-37 (same). WorkCentric and WC TopCo agreed the Forbearance Debt would arise "without defense, offset, or counterclaim" if the Forbearance terminated. Forbearance ¶¶ 1, 4.

30.    The parties negotiated the Forbearance through counsel. *Id.* ¶ 11(c).

31.    In exchange, SUNZ agreed to rescind the notices of cancellation and to forbear its remedies only with respect to the admitted Forbearance Debt. *Id.* ¶ 6.

32.     The Forbearance is predicated on the Entities maintaining the Loss Fund deficit below $23 million, among other express obligations. *Id.* ¶ 3.

33.     The Forbearance defines a breach as a breach of its own terms or further default under the Transaction Documents. *Id.* ¶ 4(iii). If a breach is not cured within ten days after written notice (the "Forbearance Cure Period"), the Forbearance terminates, the Forbearance Debt is "immediately due and payable," and SUNZ "shall be entitled immediately to exercise all of its rights and remedies under the Transaction Documents and Florida law, all without further notice to the Obligors." *Id.* ¶ 4.

34.     Simultaneous with the Forbearance, the Entities also executed a Pledge Agreement (the "Pledge") pledging their 100% ownership interests in each other (the "Pledged Collateral") to secure the Forbearance Debt and "any other amounts that become due and payable" under the Transaction Documents. Leonard Dec., Ex. 10 (Pledge) ¶ 2; *see* Entities Answer ¶¶ 140-42 (admitting the Entities executed the Pledge); Sutherland and Harvey Answer ¶¶ 140-41 (same).

35.     If a default under the Pledge (including a breach of the Forbearance) continued uncured for thirty days (the "Pledge Cure Period"), SUNZ could then collect the Pledged Collateral by exercising all rights of membership in the Entities, including becoming successor members. Pledge ¶¶ 5(f), 6, 8.

**B.    The Entities' Breaches of the Forbearance and Pledge, and WorkCentric's Further Breaches of the Transaction Documents**

36.    SUNZ complied with the Forbearance by rescinding the notices of cancellation and forbearing collection of the Forbearance Debt. Leonard Dec. ¶ 31. But WorkCentric and WC TopCo promptly breached the Forbearance.

37.    First, WorkCentric allowed the Loss Fund deficit to exceed $23 million. *Id.* ¶ 32, Exs. 3-B, 11.

38.    As a result, by October 18, 2023, WorkCentric's Loss Fund deficit exceeded $29 million. *Id.*, Ex. 11 This continued failure to maintain the Loss Fund breached the Forbearance, the Pledge, and the LFMA. *Id.*; Forbearance ¶ 4; Pledge ¶ 5(f).

39.    Second, WorkCentric paid no premium in October 2023. Leonard Dec. ¶ 33. That failure independently breached the Transaction Documents and the Forbearance. Quotation ¶ 1(e); Forbearance ¶ 4; Pledge ¶ 5(f).

40.    Third, WorkCentric (through Sutherland and Harvey) failed to engage in and obstructed the contemplated process to sell WorkCentric. While negotiating the forbearance, Sutherland revealed the existence, but not the extent, of a debt to another purported creditor. Leonard Dec., ¶ 34. SUNZ repeatedly requested information about that debt and WorkCentric's financial position; Sutherland refused to provide the requested documents. *See id.*

41.    This failure is yet another breach of the Forbearance and the Transaction Documents, including the Quotation and the Security Agreements, which entitle

SUNZ to collect and inspect documents demonstrating WorkCentric's financial position. Quotation ¶ 5; Security Agreements ¶ 5(f).

42.    SUNZ delivered written notice of the Forbearance Defaults on October 18, 2023 ("Notice of Forbearance Default"), triggering both the Forbearance Cure and Pledge Cure. Leonard Dec. ¶ 35, Ex. 11. In the Notice of Forbearance Default, SUNZ permitted the entities to cure by paying $6,074,717.00 not later than October 30, 2023, *i.e.* more than ten days after notice. *Id.* But the Entities never cured. *Id.* ¶ 36.

43.    After the Forbearance Cure Period expired, SUNZ was immediately entitled to satisfy the Forbearance Debt and WorkCentric's other obligations by collecting the Secured Collateral. Forbearance ¶ 4. Later, when the Pledge Cure Period expired, SUNZ would be entitled to <u>also</u> collect the Pledged Collateral. Pledge ¶ 5.

44.    SUNZ complied with these dual cure periods. On November 1, 2025 (longer than the cure period), SUNZ appointed the Collateral Agent to collect under the Secured Collateral. Leonard Dec. ¶ 37. The Collateral Agent sought customer lists and other "Collateral Records" to ascertain WorkCentric's full business, accounts holding money held for paid loss, and third-parties who owed payments to WorkCentric. *Id.* ¶ 38.

45.    In response to these collection efforts, the Entities (through Sutherland and Harvey) committed additional breaches under the Security Agreements and Pledge.

46.    On November 2, 2025, after learning SUNZ was collecting the Secured Collateral with Altschuler's assistance, Harvey instructed WorkCentric's third-party

IT vendor to block Altschuler's access to all WorkCentric records, prohibiting him from discharging WorkCentric's duty to promptly assist the collection. Margolin Dec. ¶ 4, Ex. 1.

47.    At the same time, Sutherland spoke with Intuit, which locked <u>all</u> access to WorkCentric's QuickBooks account, prohibiting anyone from accessing it. *Id.* ¶ 5, Ex. 2. Without access to WorkCentric's system or QuickBooks data, the collateral agent could not identify Secured Collateral, could not transition Client payments, and could not maintain WorkCentric's going-concern value.

48.    Further, Sutherland and Harvey contacted Wells Fargo on behalf of WorkCentric to further frustrate SUNZ's collection of any funds held for paid loss. Margolin Dec. ¶ 6, Ex. 3. To this end, Sutherland and Harvey created a brand new amended operating agreement for WorkCentric LLC, breaching the Pledge's obligation not to "amend, modify or terminate the governing documents of any borrower." *Id.*; Pledge ¶ 7(a)(iii).

49.    On November 3 and 6, 2025, Sutherland and Harvey – on behalf of the Entities – circulated to brokers, agents, and clients a public letter and other documents falsely attacking SUNZ's collection of collateral and expressly telling clients <u>not</u> to comply with the Collection Agent's request that it be paid amounts owed to WorkCentric. Margolin Dec. ¶¶ 7-9, Exs. 4-6. These documents breached the Security Agreements. Security Agreements ¶ 5(L).

50.    These impairment efforts continued after the Pledge Cure Period expired. On November 18, 2025, after the expiration of the Pledge Cure Period, SUNZ

exercised its rights under the Pledge by appointing the Collateral Agent as manager of each Entity. Leonard Dec. ¶ 48. The same day, the Entities terminated Holland & Knight's representation. *Id.*

51.    But three days later, David Harvey (still purportedly on behalf of WorkCentric) re-circulated Holland & Knight's November 6 Letter, along with a new letter to all WorkCentric customers and brokers. Margolin Dec. ¶ 10, Ex. 7. Again, rather than informing customers that their debts to WorkCentric were payable to SUNZ or otherwise supporting SUNZ's exercise of its Pledge rights, the new letter reiterated the false claim that SUNZ had interfered with WorkCentric's operations, falsely suggested SUNZ froze WorkCentric's QuickBooks account, and concluded that WorkCentric could not pay brokerage commissions and client deposits "due to Sunz's improper actions." *Id.*

52.    This conduct destroyed the Entities. As a result of WorkCentric's efforts to undermine the collection of collateral, SUNZ could not identify the Clients, seamlessly transition payment under the program, or otherwise collect its Collateral. Leonard Dec. ¶¶ 40-43. As such, SUNZ was forced to issue new notices of cancellation in November 2023. *Id.* ¶ 44, Ex. 12. Sutherland candidly recognized that WorkCentric (*i.e.*, SUNZ's collateral) was destroyed after its systems were locked, forcing SUNZ to issue the October Notices of Cancellation and precluding their rescission. Sutherland at 65:24-69:3 (noting that WorkCentric's enterprise value was "negligible" after the Program was cancelled for non-payment).

53.    Moreover, as a result of the Entities' conduct (at Sutherland and Harvey's behest), SUNZ incurred substantial attorney's fees and other costs in this action and the involuntary bankruptcy action against WorkCentric (the "Involuntary Action"). *In re WorkCentric, LLC*, Case No. 24-bk-10040-MFW (Bankr. D. Del. 2024). Leonard Dec. ¶ 50.

54.    Pursuant to the Pledge, SUNZ sent a written demand for repayment of its attorney's fees incurred in the Involuntary Action on March 24, 2025. *Id.*; *see* Margolin Dec. ¶ 16, Ex. 13. The Entities have not paid the demanded amount.

## III.    THE BANKRUPTCY COURT CONFIRMED THE ENTITIES' BREACHES AND SUNZ'S FORECLOSURE RIGHTS

55.    In the Involuntary Action, Counsel retained by the Collateral Agent appeared on behalf of WorkCentric LLC. Margolin Dec., Ex. 8. When lawyers representing Sutherland and Harvey's interests also appeared purportedly on behalf of WorkCentric LLC, the Bankruptcy Court determined it would need to resolve who controlled WorkCentric LLC before proceeding further. *Id.*, Ex. 9 at 7 (describing the question of control as a "gating issue").[2]

56.    On April 1, 2024, after extensive briefing and a hearing, the Bankruptcy Court concluded that the Entities had breached the Forbearance and Pledge, and failed to cure those breaches in the applicable cure periods. *Id.*, Ex. 10 ("Control Order"); *see id.*, Ex. 11 ("Hearing Tr.") (reflecting the "legal and factual bases" for the Control

---

[2] SUNZ requests the Court take judicial notice of the public docket in the Involuntary Action, specifically the Bankruptcy Court orders and hearing transcripts attached to the Margolin Declaration.

Order). The Bankruptcy Court further concluded these breaches entitled SUNZ to exercise its rights under the Pledge, including the right to appoint the Collateral Agent as sole manager, and accordingly the Collateral Agent "has been properly authorized to act." Control Order ¶ F.

57.    The appeal of the Control Order by the WC TopCo was dismissed. *See In re WorkCentric LLC, WC TopCo LLC v. WorkCentric 1, LLC*, No. 24-485 (CFC), 2024 WL 3552619 (D. Del. July 26, 2024). No further appellate review was sought.

58.    On March 13, 2025, the Bankruptcy Court dismissed the Involuntary Petition in an order that expressly preserved "all findings of fact and conclusions of law relied upon … in entering the Control Order." Margolin Dec., Ex. 12.

## IV.    WORKCENTRIC CONTINUED BREACHING THE TRANSACTION DOCUMENTS AFTER TERMINATION OF THE INSURANCE PROGRAM AND THE AMOUNTS OWED REMAIN UNPAID BY THE ENTITIES AND ALTSCHULER

59.    Although the Insurance Program terminated in November 2023, WorkCentric's obligations under the Transaction Documents remained (and remain) in effect, especially with respect to the LFMA, ¶¶ B(2)(c)-(d).

60.    Moreover, although no new insurance has been issued, claims arising before cancellation have continued to be filed, adjudicated, and paid. Leonard Dec. ¶ 51. And WorkCentric's Loss Fund obligations with respect to these claims continues to accrue. *Id.* ¶ 52; LFMA ¶ B(2)(d).

61.    As of December 31, 2025, the Loss Fund balance, not deficit, is negative $38,512,141. Leonard Dec. ¶ 54, Ex. 13. The Loss Fund deficit is $72,197,525. *Id.*

62.     Thus, WorkCentric owes nearly $40 million to reimburse deductible level expenses already paid; it owes an additional $33 million to return the Loss Fund to its required minimum balance, now that the minimum balance is set to fully developed loss. LFMA ¶ B(2)(d).

63.     None of WorkCentric, the Entities, or Altschuler has paid any of the amounts due and owing. Leonard Dec., ¶ 55.

## LEGAL STANDARD

Summary judgment is appropriate if no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A fact cannot be genuinely disputed where there is insufficient evidence in the record from which a reasonable jury could enter a verdict for the non-movant. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of informing the Court of the basis for its motion and the parts of the record that demonstrate an absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Where the issue is one for which the non-moving party will bear the burden at the trial, the movant may satisfy its burden by demonstrating that the nonmovant has not developed facts from which it could prevail at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Once the movant carries its initial burden of showing an absence of genuine dispute, the burden shifts to the nonmovant to identify the existence of a genuine

dispute that precludes summary judgment. *Krone v. Dick's Sporting Goods, Inc.*, 2022 WL 486334, at * 3 (M.D. Fla. Feb. 17, 2022) (Mizelle, J.) (collecting cases).

## ARGUMENT

### I.    SUNZ IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIMS AGAINST THE ENTITIES

Each claim against the Entities (Counts I-V) sues for breach of a contract. SUNZ is entitled to judgment on each claim because the record demonstrates (1) valid contracts, (2) the Entities' material breaches, and (3) SUNZ's damages as a result. *LSQ Funding Grp., L.C. v. EDS Field Servs.*, 879 F. Supp. 2d 1320, 1327-28 (M.D. Fla. 2012) (citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)).

At the threshold, the Entities are precluded from disputing any of these elements with respect to the breaches giving rise to the Forbearance Debt or to the breach of the Forbearance and Pledge, because the Bankruptcy Court already found them liable. Control Order ¶ D; Hearing Tr. 82:25-85:5. Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to [a] prior judgment.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)).[3] This preclusion applies against all parties that "'have had a full and fair opportunity to litigate'" an issue in a prior

---

[3] Although this action invokes federal diversity jurisdiction, the preclusive effect of the Control Order is governed by federal law. *Stoll v. Gottlieb*, 305 U.S. 165, 171-72 (1938) (applying federal res judicata to "an adjudication under the reorganization provisions of the Bankruptcy Act"); *see Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001) (describing *Stoll* as "a federal-question case" and stating "States cannot give those judgments merely whatever effect they would give their own judgments, but must accord them the effect that this Court prescribes").

action. *Id.* (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)). Even if parties were not named as litigants in the prior action, issue preclusion nonetheless applies if they "were adequately represented by someone with the same interests who [wa]s a party" or if they "assume[d] control over the" prior litigation. *Id.* at 894-95 (internal quotations omitted) (alternation in original).

In the Involuntary Action, Attorney Siedel (former counsel in this action for each Entity, *see* Doc 35) appeared purportedly on behalf of WorkCentric and its "former management," *i.e.* Sutherland and Harvey as the manager and ultimate owner of the Entities during the relevant period. Hearing Tr. 53:17-21. Seidel argued extensively against the conclusion the Entities breached the agreements with SUNZ, as such a breach was a prerequisite to SUNZ's appointing a new manager. *Id.* at 58:13-67:7, 79:24-81:19. The Bankruptcy Court rejected that argument and expressly held the Entities had committed several breaches under the Forbearance, the Pledge, and the Transaction Documents, which allowed SUNZ to appoint a new manager under the Pledge. *Id.* at 82:25-83:5. After an unsuccessful appeal, that conclusion is expressly incorporated and preserved in a final order by the Bankruptcy Court. Margolin Dec., Ex. 10. Having fully litigated breach with respect to the Forbearance Debt, and lost, the Entities are precluded from now re-litigating whether they breached their agreements with SUNZ. *Taylor*, 553 U.S. at 894-95; *see In re Bilzerian*, 1996 WL 885850 (M.D. Fla. Oct. 22, 1996), *aff'd,* 153 F.3d 1278 (11th Cir. 1998).

Putting aside the preclusive effect of the Control Order, no Entity can dispute their liability under any claim.

19

All Entities executed the Pledge (Count II), entitling SUNZ to recover attorney's fees incurred to collect the Pledged Collateral if the Forbearance was breached or terminated. SOF ¶ 34. The Forbearance was breached in October 2023, and terminated no later than November 1, 2023. *Id.* ¶¶ 36-42. No party can dispute that the Entities' "obligations" to SUNZ, including the Forbearance Debt, remain unpaid. *Id.* ¶ 63. SUNZ has paid considerable costs, including costs and attorney's fees in this action and the Involuntary Action, to collect the Collateral. *Id.* ¶ 53-54. The Entities cannot dispute they breached the Pledge by undermining SUNZ's collection of Collateral and failing to pay SUNZ's collection costs despite demand. *Id.* ¶¶ 43-54. Thus, SUNZ is entitled to summary judgment against each Entity in Count II.

Similarly, neither WorkCentric nor WC TopCo can dispute the failure to repay the Forbearance Debt, which breached the Forbearance and/or the Transaction Documents.[4] *Id.* ¶¶ 33, 63. Thus, WorkCentric and WC TopCo are jointly liable for the failure to pay the Forbearance Debt, whether under the Forbearance (Count I) or Transaction Documents (Counts III-V).

Finally, WorkCentric cannot dispute its continued failure to pay additional and accruing amounts due to SUNZ, further breaching the Transaction Documents. *Id.* ¶¶ 59-63. As of December 31, 2025, WorkCentric's Loss Fund deficit is $72,197,525. Leonard Dec. ¶ 53. And importantly, this total already accounts for all mitigation

---

[4] And, as with the Pledge, WorkCentric and WC TopCo cannot dispute that they (at Sutherland and Harvey's direction) breached the Security Agreements by impairing SUNZ's collection of Collateral to satisfy this debt.

efforts by SUNZ – *i.e.*, every dollar collected from WorkCentric has been returned to
the Loss Fund or used for further collection efforts. *Id.* ¶ 49. Because $23,000,000 of
the total constitutes the Forbearance Debt, WorkCentric's excess liability for breach
of the Transaction Documents (Counts III-IV) is $49,197,525, which amount is due
and owing from WorkCentric.

In short, the Entities cannot dispute their liability to SUNZ and raise no
affirmative defenses with which to contend. Thus, the Court should grant summary
judgment for SUNZ and against the Entities as follows: (1) against all Entities, jointly
and severally, on Count II for a total sum of $721,756.88, plus prejudgment interest,
fees, and costs; (2) against WorkCentric and WC TopCo, jointly and severally, on
Count I (or, in the alternative, Counts III-V) for a total sum of $25,800,582.90, plus
prejudgment interest, fees, and costs; and (3) against WorkCentric (*i.e.*, WorkCentric,
LLC; WorkCentric 2, LLC; WorkCentric 3, LLC; and Embraceor LLC), jointly and
several on Counts III-IV for a total sum of $49,197,525.00.

## II. SUNZ IS ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM AGAINST ALTSCHULER UNDER THE GUARANTY

### A. Altschuler Cannot Dispute His Breach of the Guaranty

Like the claims against the Entities, the claim against Altschuler for breach of
the Guaranty (Count VI) sounds in contract. *TemPay, Inc. v. Biltres Staffing of Tampa
Bay, LLC*, 945 F. Supp. 2d 1331, 1342-44 (M.D. Fla. 2013). Thus, SUNZ is entitled to
judgment against Altschuler because the record demonstrates (1) a valid contract – *i.e.*,

the Guaranty, (2) Altschuler materially breached the contract, and (3) SUNZ suffered damages as a result. *LSQ Funding Grp.*, 879 F. Supp. 2d at 1327-28.

Altschuler cannot dispute the Guaranty exists and is binding. SOF ¶ 6. Moreover, the Guaranty is absolute, unconditional, personal, and durable: it expressly guarantees all present and future obligations under the Transaction Documents; guarantees payment, not simply collection; and allows SUNZ to collect from Altschuler without attempting to first collect from any other person. *Id.* ¶¶ 20-21. As such, Altschuler became liable under the Guaranty <u>immediately</u> upon WorkCentric's breach. *Jain v. Buchanan Ingersoll & Rooney PC*, 322 So. 3d 1201, 1204-05 (Fla. 3d DCA 2021) (guaranty of "payment and not … of collection" is an absolute guaranty imposing liability immediately upon an underlying breach).

Altschuler cannot dispute that WorkCentric breached the Transaction Documents. *See supra*, § I. Nor can he dispute his failure to pay SUNZ despite written notice under the Guaranty. SOF ¶ 28; Leonard Dec. ¶ 55. Accordingly, SUNZ is entitled to judgment against Altschuler under the Guaranty for the full amount of WorkCentric's obligation under the Transaction Documents, *i.e.*, the $72,197,525.00 owed under the LFMA.

### B.    Altschuler's Affirmative Defenses are Unavailing

Altschuler raises four affirmative defenses, none of which defeats summary judgment:

*First*, Altschuler "adopts all defenses that the principal may have." Altschuler Answer at 15. But Altschuler does not identify any defense, the Entities do not raise

any defense, and the Entities <u>cannot</u> raise any defense, because they admitted their breaches in the Forbearance and the Bankruptcy Court confirmed them. *Supra*, § I.

*Second*, Altschuler argues the claims against him "should be limited to damages actually suffered by Plaintiff." Altschuler Answer at 16. They are. SUNZ sues for amounts owed to it under the Transaction Documents, amounts Altschuler expressly guaranteed. SOF ¶¶ 20, 61. Because SUNZ does not seek damages beyond what it actually suffered, *i.e.*, amounts it was owed but has not received, this affirmative defense cannot avoid summary judgment.

*Third*, Altschuler argues SUNZ's claims have been satisfied "by the purchase of client accounts by a third party." Altschuler Answer at 16. But no such sale occurred. Altschuler's Answer does not clarify the purported sale, and he has not otherwise developed a record on this issue. That alone prevents this "defense" from thwarting SUNZ's entitlement to summary judgment.

In any event, even were the Court to consider this "defense," it appears to rest on a mischaracterization, by Sutherland and Harvey, of Vensure Employer Service, Inc.'s provision of a new insurance program to Clients after the Program was cancelled. *See* Margolin Dec. Ex. 14 (Altschuler's Initial Disclosures). When it became clear Sutherland and Harvey would prohibit SUNZ from maintaining WorkCentric's value, and the notices of cancellation had to be issued a second time, SUNZ worked with Vensure to offer Clients the opportunity to temporarily obtain new coverage under the same or similar terms as those under the Program, without any gap in

23

coverage. Leonard Dec. ¶ 45, Ex. 12. Notably, this required <u>new</u> insurance to be issued at the Client's election. *Id.* ¶ 46. Nothing was or could have been sold to Vensure.

Moreover, the new insurance was facilitated by SUNZ as the MGA under the program – not in any exercise of Secured or Pledged Collateral. *Id.* ¶ 47, Ex. 12. SUNZ could have offered new insurance after the first notices of cancellation were issued, before it had any Pledge rights. In either event however, SUNZ would have (and did) offer the new insurance as representative of the insurers. *Id.*, Ex. 12. Finally, this new insurance extended only ninety days. *Id.* ¶ 45.

In short, there was no "purchase" of WorkCentric's assets, *i.e.*, continuing customers relationships under the Program. Sutherland and Harvey destroyed those relationships and thus any prospect of an asset to sell. SOF ¶¶ 46-52. Instead, this new insurance reflects SUNZ attempting to provide a runway to Clients SUNZ was prohibited from maintaining WorkCentric as a going concern. The new insurance was in no way an asset of WorkCentric and has no bearing on this action, except as a reflection of SUNZ's continued attempts to mitigate the harm to Clients from Defendants' failings.

The proceeds from all Secured and Pledged Collateral are already accounted for in the outstanding balance of $72,197,525. *See supra*, § I. Thus, Altschuler is responsible for the entire outstanding amount.

*Fourth*, and finally, Altschuler suggests unidentified agreements between SUNZ and WorkCentric after the Guaranty "changed their relationship to each other and terminated any obligation of Altschuler" under the doctrine of novation. Altschuler

Answer at 16. But Altschuler has not identified the subsequent agreement constituting a novation, and the Forbearance expressly states that it "shall not constitute a novation of the Obligations or the Transaction Documents." Forbearance ¶ 9.

Nor do any agreements executed after the Guaranty "demonstrate the parties' intention to extinguish the original obligation of [Altschuler]." *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 328 F. Supp. 2d 1319, 1332 (S.D. Fla. 2004) (rejecting novation defense and granting summary judgment for breach of contract). To the contrary, every agreement after the Guaranty affirms the obligations under the Transaction Documents and simply adds additional obligations. *E.g.*, Note ¶ 12.1; NSA ¶ 2.A; Forbearance ¶ 1; Pledge ¶ 2. Altschuler cannot demonstrate that any agreement extinguished his obligation under the Guaranty.

Because Altschuler cannot demonstrate a question of fact with respect to his affirmative defenses, the Court should grant summary judgment for SUNZ and against Altschuler on Count VI for a total sum of $72,197,525.00, plus prejudgment interest, costs, and attorney's fees.

## CONCLUSION

For the reasons set forth above, the undisputed material facts establish that that SUNZ is entitled to judgment as a matter of law on all its claims against the Entities and Altschuler. As such, the Court should grant this Motion and enter summary judgment for SUNZ on Counts I-VI.

Date: January 15, 2026

Respectfully submitted,

/s/ Jason L. Margolin

**JASON L. MARGOLIN, ESQ.**
Florida Bar No. 69881
Lead Trial Counsel
jason.margolin@akerman.com
**KEENAN MOLASKEY, ESQ.**
Florida Bar No. 1031827
keenan.molaskey@akerman.com
**AKERMAN LLP**
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
Phone: (813) 223-7333

**CHRISTOPHER S. CARVER, ESQ.**
Florida Bar No. 993580
christopher.carver@akerman.com
**JASON S. OLETSKY, ESQ.**
Florida Bar No. 9301
jason.oletsky@akerman.com
**AKERMAN LLP**
201 East Las Olas Boulevard, Suite 1800
Ft. Lauderdale, FL 33301
Phone: (954) 463-2700
Fax: (954) 463-2224

*Counsel for Plaintiff*